# TABLE OF CONTENTS OF EXHIBITS

**EXHIBIT A**

Ithaca City Court documents filed by Cornell on November 2, 2007 . . . . . . . . . . . 3

**EXHIBIT B**

Order unsealing Plaintiff's criminal records in Tompkins County Court; unsealed records filed by Cornell on December 12, 2007 . . . . . . . . . . . . . . . . . . . . . . . .7

**EXHIBIT C**

March 17, 1983 *Cornell Chronicle* edition reporting on Plaintiff's crimes . . . . . 100

**EXHIBIT D**

Cornell's Memorandum of Points and Authorities in support of its anti-SLAPP motion, filed on November 2, 2007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

**EXHIBIT E**

Cornell's Reply in further support of its anti-SLAPP motion . . . . . . . . . . . . . . . 133

**EXHIBIT F**

Declaration of Valerie Cross Dorn, filed on November 2, 2007 . . . . . . . . . . . . . 144

**EXHIBIT G**

Declaration of Nelson E. Roth, filed on December 12, 2007 . . . . . . . . . . . . . . . .147

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

STATE OF NEW YORK : COUNTY OF TOMPKINS
CITY COURT        : CITY OF ITHACA

THE PEOPLE OF THE STATE OF NEW YORK

- vs -

Kevin G. VanGinderen  DOB 10/23/61
                                    _Defendant_

ACCUSATORY
INSTRUMENT

## A C C U S A T I O N

BE IT KNOWN THAT, by this Accusatory Instrument,  Barbara  Bourne

as the Complainant herein, accuses   Kevin G. VanGinderen

the above named Defendant, with having committed the offense of

Burglary in the third Degree

in violation of the Section  140.20  , Subdivision      of the   Penal   Law

of the State of New York,  xxViolationxxxxxxxxxxxxxMisdmeanr xx   a Class   D   Felony.

## F A C T S

On or about the  5th   day of  March 1983   , the said defendant did, in the City of Ithaca, County

of Tompkins, New York,

did knowingly enter or remain unlawfully in a building , to wit: defendant entered at approx.

2:00AM room 312C Fernow Hall, Tower Road, Cornell University, City of Ithaca, N.Y., to committ

the crime of larceny therein by stealing books, with said office space belonging to Richard

J. Baker, with all action by defendant without authorization, are contrary to the provisions

of the Statute in case made and provided.

The above allegations of fact are made by the Complainant herein:

        upon direct knowledge

XXXXX  upon information and belief, with the sources of Complainant's information and the grounds for his

belief being Investigation of case(Cornell) 83-n422 and sworn confession of defendant

WHEREFORE, Complainant prays that a warrant be issued for the arrest of the said defendant.

Barbara Bourne
                                    _Complainant_

## N O T I C E
(Penal Law, Section 210.45)

IT IS A CRIME, PUNISHABLE AS A CLASS A MISDEMEANOR UNDER THE LAWS OF THE STATE
OF NEW YORK, FOR A PERSON, IN AND BY A WRITTEN INSTRUMENT, TO KNOWINGLY MAKE A
FALSE STATEMENT, OR TO MAKE A STATEMENT WHICH SUCH PERSON DOES NOT BELIEVE
TO BE TRUE.

Affirmed under penalty of perjury this   8th

day of  March   , 19 83 .

Barbara Bourne
        _Complainant_

Court

Sworn to before me this        day

of         , 19   .

OR

Judge or Justice, Desk Officer or Superior, or
other authorized person.

5

EXHIBIT A,
Page 3

**ADAMS, THEISEN & NASH**

ATTORNEYS AND COUNSELORS AT LAW
301 THE CLINTON HOUSE
103 WEST SENECA STREET
ITHACA, NY 14850

607-272-3442

HENRY W. THEISEN
RALPH W. NASH

STEPHEN M. BOWMAN

ARMAND L. ADAMS
1911-1983

August 16, 1983

R. James Miller, Esq.
Ithaca City Prosecutor
120 East Clinton Street
Ithaca, New York 14850

Re:  People v. Kevin G. Vanginderen

Dear Jim:

This letter will confirm arrangements to be made in City Court to resolve this matter.  Kevin will plead on Monday, August 22, to petit larceny in full satisfaction of any charges relative to thefts at Cornell University.  Upon his plea the People will agree to a sentence of a one year conditional discharge.

I have made arrangements to have an appropriate accusatory instrument drawn.  As I noted in our telephone conversation, this matter was originally handled by the District Attorney's Office, but as it is being resolved by a misdemeanor in City Court, they would like you to handle the plea and sentence for them.

Thank you for your attention to this matter.

Yours very truly,

ADAMS, THEISEN & NASH

Ralph W. Nash

RWN/dh

cc:  Robert C. Mulvey, Esq.
     Assistant District Attorney

EXHIBIT A,
Page 4

STATE OF NEW YORK : COUNTY OF TOMPKINS
CITY COURT          : CITY OF ITHACA

THE PEOPLE OF THE STATE OF NEW YORK

- vs -

KEVIN G. VANGINDEREN    DOB: 10-23-61

*Defendant*

**ACCUSATORY
INSTRUMENT**

### ACCUSATION

BE IT KNOWN THAT, by this Accusatory Instrument,    R. James Miller
as the Complainant herein, accuses   Kevin G. Vanginderen
the above named Defendant, with having committed the offense of

Petit Larceny

in violation of the Section   155.25      , Subdivision      of the   Penal          Law
of the State of New York,    a Violation    a Class A  Misdemeanor    a Class      Felony.

### FACTS

On or about the    5th    day of   March, 1983     , the said defendant did, in the City of Ithaca, County
of Tompkins, New York,

did commit the crime of petit larceny by stealing books located at room 312C, Fernow Hall,
Tower Road, Cornell University, located within the City of Ithaca, New York

The above allegations of fact are made by the Complainant herein:

upon direct knowledge

XX    upon information and belief, with the sources of Complainant's information and the grounds for his
belief being   investigation of case  (Cornell) 83-422 and sworn confession of defendant.
WHEREFORE, Complainant prays that a warrant be issued for the arrest of the said defendant.

R. James Miller          *Complainant*

### NOTICE
(Penal Law, Section 210.45)

IT IS A CRIME, PUNISHABLE AS A CLASS A MISDEMEANOR UNDER THE LAWS OF THE STATE
OF NEW YORK, FOR A PERSON, IN AND BY A WRITTEN INSTRUMENT, TO KNOWINGLY MAKE A
FALSE STATEMENT, OR TO MAKE A STATEMENT WHICH SUCH PERSON DOES NOT BELIEVE
TO BE TRUE.

Affirmed under penalty of perjury this

day of    August        , 1983

R. James Miller
*Complainant*

Sworn to before me this            day

of                    , 19

OR

Judge or Justice, Desk Officer or Superior, or
other authorized person.

Court

7

# CITY COURT
## OF
## ITHACA

The People of the State of New York

— against —

Karla Thierlinderen

_____  Defendant

Before _____ Judge, City Court

Defendant arraigned August 22, 19 81

Counsel Ralph Nash, Esq.

Bail $ _____ Posted _____ Remitted _____
Set

The defendant heretofore on being brought before the City Court Judge was informed as follows:

1. You are charged with

Petit Larceny

Sec. 152.25 Penal Law

which is a felony ☐
misdemeanor ☒
violation ☐

2. The information was read to the defendant and a copy furnished to him. ☐

3. The defendant was informed that being found guilty or pleading guilty to such a charge could result in a sentence and fine or

4. You have the right to the aid of counsel or to have an attorney represent you in every stage of the proceedings. If you are financially unable to afford counsel and you want an attorney to represent you, the Court will assign counsel to you. You are entitled to an adjournment for a reasonable time in order to obtain counsel or to have one assigned and you are entitled to communicate free of charge by letter or telephone in order to obtain counsel and in order to inform a relative or friend of your arrest. ☐

Ordered Def. supld. with Ralph Nash, Esq. This charge filed with the court in satisfaction of a charge of Burglary Third Degree. Copy of the chg. given to counsel. Waived arraignment. Plea of guilty entered to this charge ad agreed upon by City Pros Miller and ADA Frank Salthaan. Def. sentenced to unCond. Dschg. — return all books that were

5. You are entitled to have a hearing
without jury ☐
jury trial ☐

6. If you are 16 years of age, but have not reached 19, you may be entitled to be treated as a Youthful Offender, and no such determination shall disqualify you from holding public office, public employment or as a forfeiture of right to receive any license granted by a public authority and you cannot be denominated as a criminal nor shall such determination be deemed a conviction. ☐

**8**

# EXHIBIT B

STATE OF NEW YORK
COUNTY COURT : COUNTY OF TOMPKINS

In the Matter of the Application of
Cornell University to Unseal Records
from the Proceeding Captioned:

2007 Misc. Cr. 667

"People of the State of New York
                    vs.
        Kevin Vanginderen"

                    Defendant.

## MEMORANDUM DECISION AND ORDER

Pursuant to CPL §160.50(1)(d), Cornell University seeks unsealing of criminal records previously sealed by this Court in 1983, relative to the above referred action against Kevin Vanginderen. Mr. Vanginderen has filed a civil action against Cornell (now pending in the United States District Court, Southern District of California), involving causes of action for invasion of privacy and libel. The claims involve a publication on the Internet of the Cornell Chronicle on March 17, 1983, which republishes an account of Defendant's arrest on a charge of burglary.

Defendant opposes the motion, claiming that the United States District Court has sole authority at this stage of the proceedings to order such "discovery".

Pursuant to the provisions of CPL §160.50, this Court is authorized to unseal such records upon proper grounds. A civil action which places in issue the contents of the sealed records warrants unsealing of such records to a party in such action. Commercial Union Insurance Co. v. Jones, 216 AD2d 967 (4th Dept. 1995). There is no controlling authority that would require this Court to defer such a decision to any other state or federal court. These are New York sealed criminal records, governed specifically by the provisions of New York statutes.

Accordingly, the Court concludes that Cornell has provided sufficient grounds to grant the motion unsealing such records, held both by the Tompkins County District Attorney's Office, and the records held by the Cornell University Police, relative to the above-captioned criminal matter.

**EXHIBIT E, PAGE 3**

This Decision constitutes the Order of this Court, entered upon notice to all parties.


ENTER.


DATED:   November 16, 2007

M. JOHN SHERMAN
TOMPKINS COUNTY JUDGE

2

**EXHIBIT E, PAGE 4**

# CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

## INVESTIGATION REPORT

**OTHER AGENCY**

**CASE NO.** 83-422-

83-CO345-1

**1. COMPLAINT**

| | | | |
|---|---|---|---|
| C-1 | COMPLAINANT (LAST NAME) Baker | FIRST Richard | MIDDLE J | DOB 12/4/53 Grad |
| ADDRESS 134 Judd Falls Road | | COUNTY Tompkins | PHONE 257-2696 |
| EMPLOYER 312-C Fernow Hall 256-3191 | | OCCUPATION Grad Student |

PLACE OF OCCURRENCE / SPECIFIC LOCATION 312-C Fernow Hall (east)

| DATE REPORTED 3/5/83 | DAY REPORTED Sat | TIME REPORTED 1400 | DATE OCCURRED 3/4-3/5/83 | DAY OCCURRED Fri-Sat | TIME OCCURRED 2400-1200 |
|---|---|---|---|---|---|
| RECEIVED BY B. Brune | HOW RECEIVED In Person | WEATHER ☐CLEAR ☐FOG ☐RAIN ☐SLEET ☐CLOUDY ☐SNOW | | | |

CHARACTER OF CASE Burglary

**2. M.O.**

TYPE OF BLDG. Academic

SECURED UPS ENTRY
OCCUPIED Rink EXIT

MODE OF ENTRY OR MANNER COMMITTED T-climbed over partition and removed P-1 & P-2

TOOL, WEAPON OR METHOD USED

**3. PROPERTY**

CODE: STOLEN (S) USED IN CRIME (C) CRIM. MISCH. (M) RECOVERED (R) EVIDENCE (E) OTHER (O)

| | CODE | QTY. | DESCRIPTION | I.D. - SERIAL NUMBER | MONETARY VAL |
|---|---|---|---|---|---|
| P-1 | S | 1 | Biometry 2nd ed. by Robert R Sokal & F. James Rohlf | | 31.95 |
| P-2 | S | 1 | The Life of Birds 3rd ed. by Joel Carl Welty | | 22.45 |

**4. VEH**

V-1  ☐USED IN CRIME ☐ACC. NON-MV ☐CRIM. MISCH. ☐STOLEN ☐RECOVERED ☐OTHER

DESCRIPTION - MAKE          YR. MFG.    REG. NO.          STATE

COLOR      BODY - MODEL      VIN - ID NO.      STOLEN MV - KEY IN IGNITION  YES    NO
                                              RECOVERED - RUNNING CONDITION  YES    NO

**5. WEAPON**

W-1  ☐USED IN CRIME ☐LAWFUL SURRENDER ☐UNLAWFUL POSS. ☐STOLEN ☐OTHER

☐REVOLVER
☐PISTOL
☐RIFLE
☐SHOTGUN
☐OTHER

MAKE - TYPE/MODEL          CAL.-GA.    OWNER OR REGISTRANT

SERIAL NO.                              ADDRESS

FINISH:  ☐UNLOADED ☐LOADED    PISTOL PERMIT NO.    DATE ISSUED
BLUE ☐  SILVER ☐   TOT. CAPACITY
☐OTHER   ROS. FIRED   COUNTY OF ISSUE
         UNEXPENDED RDS.

**6. DOCUMENT**

D-1  TYPE DOCUMENT          NAME OF RECEIVER          REASON: ☐NO ACCT. ☐ACCT. CLOSED ☐INSUFF. FUNDS ☐FORGERY

NAME OF MAKER - I.D. OR ADDRESS GIVEN          IDENTIFIABLE: YES ☐ NO ☐

BANK DRAWN ON - ADDRESS          DOC. NO.    PHOTO - SUSPECT YES ☐ NO ☐

DOCUMENT AMOUNT    MONEY, PROPERTY OR SERVICE OBTAINED

**7. DAMAGE**

DESCRIBE OR LIST PHYSICAL DAMAGE OR ANY OTHER LOSS

54.40

**COPY**

**8. INSUR.**

PROPERTY INSURED  YES ☐ NO ☐    NAME OF INSURER          AMT. INSURANCE    TOTAL VALUE 54.40

**9. DISPO**

| NO. | DATE | DISPOSITION | | | |
|---|---|---|---|---|---|

CLOSED  C.R.C.  UNFOUNDED  INACTIVE  ACTIVE

3-5-83

**10. WITNESS**

WT-1  NAME (LAST, FIRST, MIDDLE) + ADDRESS          AGE    DOB

DO NOT REMOVE
MAY LATER

**EXHIBIT F, PAGE 5**

| CODE: | ASSAULT (A) HOMICIDE (H) SUICIDE (S) ATTEMPTED SUICIDE (AS) | | | | | | NATURAL DEATH (N) ACCIDENT VICTIM (AV) OTHER (O) | | |

**11** V I C T I M

| S-1 | CODE | NAME (LAST, FIRST, MIDDLE) | ADDRESS | | | | | SEX | AGE | DOB |
| NATURE OF INJURIES | | | HOSPITAL AND/OR PHYSICIAN | | | | | | | |
| DATE OF DEATH | CORONER OR M. E. | | AUTOPSY YES ☐ NO ☐ | PATHOLOGIST | | | | KIN NOTIFIED YES ☐ NO ☐ | | |

| S-2 | CODE | NAME (LAST, FIRST, MIDDLE) | ADDRESS | | | | | SEX | AGE | DOB |
| NATURE OF INJURIES | | | HOSPITAL AND/OR PHYSICIAN | | | | | | | |
| DATE OF DEATH | CORONER OR M. E. | | AUTOPSY YES ☐ NO ☐ | PATHOLOGIST | | | | KIN NOTIFIED YES ☐ NO ☐ | | |

| S-3 | CODE | NAME (LAST, FIRST, MIDDLE) | ADDRESS | | | | | SEX | AGE | DOB |
| NATURE OF INJURIES | | | HOSPITAL AND/OR PHYSICIAN | | | | | | | |
| DATE OF DEATH | CORONER OR M. E. | | AUTOPSY YES ☐ NO ☐ | PATHOLOGIST | | | | KIN NOTIFIED YES ☐ NO ☐ | | |

**12** T I T L E

| CODE: | UNK. SUBJ. (U) | PERPETRATOR (P) | DEFENDANT (D) | WANTED-WARRANT (W) | CRIM. SUM. (S) | ACCOMPLICE (A) | OTHER (O) |

| T-1 | CODE P | NAME (LAST, FIRST, MIDDLE) Vanginderen, Kevin Gordon CUID 222416 Ae 1.5 17 South Ave Ithaca NY | ADDRESS ALIAS | | 273-9597 | | SEX M | AGE 22 | DOB 10.23.61 |
| T-2 | | | | | | | | | |
| T-3 | | | | | | | | | |

**13** W A N T E D

| TITLE NO. | RACE | HT. | WT. | HAIR | EYES | CRIME | | SECTION | LAW |
| JUDGE - NAME, ADDRESS AND TITLE | | | | | | | COUNTY | DATE ISSUED | EXTRADITE YES ☐ NO ☐ |
| TITLE NO. | RACE | HT. | WT. | HAIR | EYES | CRIME | | SECTION | LAW |
| JUDGE - NAME, ADDRESS AND TITLE | | | | | | | COUNTY | DATE ISSUED | EXTRADITE YES ☐ NO ☐ |

**14** N Y S P I N

| INQUIRY | NYSIIS ☐ YES ☐ NO | NO. | FILE | DATE | STATION | | CANCEL | NO. | DATE |
| | NCIC ☐ YES ☐ NO | | | | | | | | |

**16** ID | PHOTOS TAKEN YES ☐ NO ☑ | BY WHOM | DUSTED FOR LATENT PRINTS YES ☐ NO ☐ | BY WHOM |

**17** OA | OTHER AGENCY NOTIFIED NONE | RESPONDED YES ☐ NO ☑ | IF "YES" NAME OF PERSON IN CHARGE - IF "NO" NAME OF PERSON NOTIFIED |

**18** SLA | IF INCIDENT OCCURRED WITHIN LICENSED S.L.A PREMISES | OWNER'S NAME | BUSINESS NAME | LIC. NO. |

**19** N A R R A T I V E

At approx 1400 hrs this date, while doing follow up work on CR # 83-421 (Burglary 312-F Fernow) this officer spoke with C-1. C-1 stated that upon his arrival to his office at approx noon this date he noticed the books on his shelf to be out of their normal order. Upon checking the shelf P-1 & P-2 were found to be missing. C-1 stated that he is positive the theft occured sometime late Friday 3/4/83 to early Saturday 3/5/83 as he used P-1 on 3/4/83.

All indications are that T-1 entered the office by climbing over the partition from the open hall way.

**20** ENC

1. Signature list from Triangle book shop (copy)

| SIGNATURE AND RANK | SHIFT | SHIELD NO. | | APPROVED |
| Barbara J. Bourne | | 20 | Ptl DCD | 3/5/83 |

**EXHIBIT F, PAGE 6**

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

## SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE _Burglary_       PAGE _3_

CASE NO. _83-422_
OTHER AGENCY _83-003451_

_1445 hrs  3/5/83_

This officer spoke with _Terry Hoover_ at Triangle Books to advise him of the stolen books. Mr. Hoover stated that both P-1 and P-2 were sold to him sometime before noon 3/5/83. Upon inspection of the books, the name _Richard Baker_ was partially scratched out, establishing these books as P-1 & P-2. Mr. Hoover further stated that the subject who sold the books was tall, approx 5'11" - 6 ft med. build with sandy colored hair. Mr. Hoover stated he felt he would recognize T-1 should he see him again. Mr. Hoover also provided this officer with a copy of the sign-in log used when books are sold to Triangle. The signature was not legible but the initials were obviously K. V. In the margin of the page was the ID # 222416. Mr. Hoover stated that T-1 had produced a college ID, but could not remember which school.

_1530 hrs. 3/5/83_

This officer checked the computer printout under the letter V to attempt to match the ID number. The result was the above listed information on T-1.

MASTER FILE
DO NOT REMOVE PO

_Barbara J. Bourne_   PO
Investigating Officer

_R. J. Imis_
Supervisor

Date of Investigation  3/5/83

Date of Approval  3/5/83

1/76-5M

**EXHIBIT F, PAGE 7**

*End #1*

*CR #83-422*

22      x Matt Heyland
25      x Tony Semerad
19      x Beth Rinton
 2        John Higgins
13.50   x Benjamin Bodyn
 2      [signature]
13      x Keith Hunn
26      x John B. Hall
12      s [signature]
20      Kidd Hunn
19      x Andrew L. Camm
22      x Paul Harriott
14      x N Razah
4.50    Gerald Meyer
 2      x Rafar Mann
 50     x [signature]
 08     x [signature]
43      x [signature]
19      x [signature]

**MASTER FILE**
**DO NOT REMOVE**

**EXHIBIT F, PAGE 8**



FINEPITCH FILE
DO NOT REMOVE

**MARILYN J. TRIVENTI**
Bergenfield, NJ
Camping, Student Government
Pre-Vet

**GLENN M. TROOST**
Staten Island, NY
Animals, Dancing
Pre-Law

**GILBERT T.Y. TSO**
Foster City, CA
Debating, Math
Engineering, Economics

**PHILIP W. TSUNG**
Norwood, NJ
Baseball, Chess
Chemistry

**PENNY J. TUCKER**
Skaneateles, NY
Animals, Soccer
Pre-Vet

**GLENN E. TUCKMAN**
Norwalk, CT
Music, Swimming
Hotel Administration

**DEBORAH A. TUOHEY**
N. Syracuse, NY
Animals, Horseback Riding
Science

**KEITH P. TURKEL**
Scarsdale, NY
Basketball, Soccer
Pre-Law

**STEPHEN R. TURNBULL**
Palo Alto, CA
Camping, Publications
Engineering

**JOHN J. TURNER**
Port Washington, NY
Animals, Running
Biological Sciences

**SUSAN H. TYLER**
La Jolla, CA
Hiking, Student Government
Engineering

**STEVEN W. TYNDALL**
Boca Raton, FL
Music, People
Science

**RANDI S. URBAN**
N. Woodmere, NY
People, Publications
Business

**OWEN URBAY**
West New York, NJ
Basketball, Scuba Diving
Pre-Med

**DAWN C. VADNEY**
Avon, NY
Photography, Publications
Consumer Economics

**JEFFREY L. VALLET**
Endwell, NY
Golf, Science
Pre-Vet

**DAVID M. VANBUREN**
Atlanta, GA
Football, Travel
Hotel

**GREGORY D. VAN DUYNE**
Savannah, NY
Basketball, Chess
Pre-Med

**KEVIN G. VANGINDEREN**
Carmel, NY
Animals, Baseball
Pre-Med

**GERRIT VAN LOON**
Claverack, NY
Skiing, Frisbee
Pre-Med

**CATHERINE VARDAKIS**
Elmira, NY
Dancing, Languages
Business

**SUSHEELA D. VASAN**
New Canaan, CT
Dancing, Gymnastics
Engineering

**CAROLEEN L. VAUGHAN**
Elmira, NY
Dancing, Drama
Humanities

**JOHN A. VAUGHAN**
Edmond, OK
Camping, Football
Engineering

64

**EXHIBIT F, PAGE 9**

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE _Burglary_          PAGE _6_

CASE NO. _83-4/22_
OTHER AGENCY _83-003951_

1640 hrs    3/5/83

This officer returned to Triangle Books and again spoke with Mr. Terry Hoover. This officer showed Mr. Hoover the enclosed 1979 picture of T-1. Mr. Hoover stated that although the hair is not the same, the facial features match. Mr. Hoover further stated he is certain that T-1 is the same subject who sold P-1 & P-2 to him earlier this date.

**MASTER FILE**
**DO NOT REMOVE**

_Barbara J. Bourne_    PO
Investigating Officer      Date of Investigation _3/5/83_

_R.J. Sims_
Supervisor      Date of Approval _3/6/83_

1/76-5M

**EXHIBIT F, PAGE 10**

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE ___Burglary_____ PAGE ___7___

CASE NO. ___83-422___
OTHER AGENCY ___83-003451___

0730 hrs. 3/6/83

A check was made of the lacation file for additional thefts from Fernow Hall. The following cases were found:

83-303, 83-306, 83-311, 83-333, 83-339, and 83-368.

Prior to 83-303 there were no reported thefts from 1981-1983.

83-306, investigated by PO Wittner includes a receipt for the sale of four books to the Campus Store. This receipt shows an ID # of 22416. (Note: T-1's ID number is 222416). PO Wittner indicated in his narrative that the clerk had not written down the full six digits of the subject's ID number. Further, the receipt shows an illegible signature of a subject with the initials K.V. A comparison was made of T-1's signature with that from the Campus Store receipt. While not identical the similarities, particularly in the formation of the K and the V, would indicated that both were made by the same individual.

The books recovered at the Campus Store in conjunction with 83-306 resulted in cases 83-333, 83-339 and 83-368, all previously undetected thefts.

The theft reported in 83-303 occured within the same time frome as 83-306 and its related cases.

The theft in 83-311 occured on or about 2/3/83 from room 306 Fernow; the site of several of the other related thefts.

It should be noted that all of the thefts from Fernow during this period have been from normally unsecured rooms and offices easily accessible other that through their doors. Note: the 312 office complex can be easilyy accessed by clombing over the partitions between offices. Three of the thefts

MASTER FILE DO NOT REMOVE

_Barbara J Bourne_                    PO          Date of Investigation  3/6/83
         Investigating Officer

_Al Rg Sims_                                      Date of Approval  3/6/83
         Supervisor

1/76-5M

**EXHIBIT F, PAGE 11**

EXHIBIT B,
Page 15

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE_____Burglary_____    PAGE ____8____

CASE NO. ___83-422___
OTHER AGENCY ___83-003451___

have occured in this complex (83-303, 83-421, and 83-422).

It is the opinion of this officer that all eight cases are related due to similaritites of time span, type of items taken and general method of the thefts.

1130 hrs. 3/6/83

PO Wittner contacted via telephone.  PO Wittner stated that at the time of the incidents in 83-306 the clerk at the Campus Store stated he could positivly identify the subject who sold him the books should he see him again.



Barbara J Bourn    PO
Investigating Officer

B R J Sims
Supervisor

Date of Investigation  3/6/83

Date of Approval  3/6/83

Voluntary Statement

STATE OF NEW YORK
COUNTY OF _Tompkins_
CITY, ~~TOWN~~, ~~or VILLAGE~~ OF _Ithaca_
Date _3/7/83_   Time _9:30 AM_   Place _TRIANGLE BOOK SHOP_
I, _TERRY HOOVER_   am _40_ years of age, born on _JAN 6, 43_
my address is _38 SALO DR TRUMANSBURG, NY_, and degree of education is _BS_
my occupation is _Ass't MGR_
I have been duly warned by _B.J. Bourne_, who has identified
himself as _Patrol Officer_

that I do not have to make any statement at all, and that any statement I make may be used in evidence against me in a court of law, and that I have the right to talk to a lawyer for advice before making this statement. Without fear or threat of physical harm upon me or another person, I freely volunteer the following statement to the aforesaid person.

On Sat March 5th a man came to Triangle Book Shop to sell books. The books were Welty, "Life of Birds, Sokol "Biometry, and Davis' "Quant Models for Mgt." I bought the books and paid $28.00 for them. I also ask for the sellers ID and made a note of the ID number beside his signature on one buy-back sheet. He was a moderately tall man with dark hair. Later, after the books were reported stolen, I was shown a picture by Cornell Safety from the freshman registry of the suspect. I was sure that it was the same man from whom I bought the above books.

MASTER FILE
DO NOT REMOVE

I have read this statement consisting of _1_ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Subscribed and sworn before me
this_____ day of_____, 19____

Affirmed under penalty of perjury
this _7th_ day of _MARCH_, 19 _83_

Signed by _Terry Hoover_

Page _1_ of _1_ page(s)

Title:

Witness: _Barbara J Bourne_

Witness: _____

5M - 3/82

**EXHIBIT F, PAGE 13**

EXHIBIT B,
Page 17

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE _Burglary_     PAGE _9_

0715   3/8/83

*The results of this investigation to this point show that   T-1*

**MASTER FILE**
**DO NOT [REMOVE]**

**RTC**

Kevin G. Vanginderen   dob 10/23/61
603 Winston Ct. Apt. #3   (P)
Ithaca, NY
Ag & LS '83
CU ID   222416

*is in some way involved with the following cases:*

83-303 — Burglary from 312 C Fernow
tape deck and calculator
on or about 2/10-2/12/83

83-306 — Petit Larceny from 207 Fernow
2 text books on or about
2/11/83

83-311 — Petit Larceny from 306 Fernow
1 text book believed to have been
taken on 2/2 or 2/3/83.

83-333 — Petit Larceny from 306 Fernow
1 text book unknown date
recovered in conjunction with 83-306

83-339 — Petit Larceny from 306 Fernow
2 text books unknown date recovered
in conjunction with 83-306

83-368 — Petit Larceny from 119 Fernow
1 text book on or about 2/10/83
recovered in conjunction with 83-306

Barbara J. Borne   PO     Date of Investigation 3/8/83
Investigating Officer

Barton R. Ingersoll   Sr.     Date of Approval 3/8/83
Supervisor

1/76-5M

CASE NO. 83-422
OTHER AGENCY 83-003457

**EXHIBIT F, PAGE 14**
EXHIBIT B,
Page 18

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE _Burglary_ _____ PAGE ___10___

CASE NO. _83-422_
OTHER AGENCY

83-421 — Burglary room 312-F Fernow
1 stereo tape player/recorder on or
about 3/5/83.

83-422 — Burglary room 312-C Fernow
2 text books on or about
3/5/83

83-426 — Burglary room 312-B Fernow
4 text books on or about 3/5/83

83-446 — Pet. Larceny room 308-Fernow
1 textbook sometime during
last 2 weeks. /jea


MASTER FILE
DO NOT REM...

Barbara J. Baum _____ PO    Date of Investigation _3/8/83_
Investigating Officer

Baxter R. Ingersoll, St. _____    Date of Approval _3/8/83_
Supervisor

1/7G-5M

**EXHIBIT F, PAGE 15**

EXHIBIT B,
Page 19

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE ___Burglary___                    PAGE __11__

CASE NO. __83-422__
OTHER AGENCY ___

<u>0730   3/8/83</u>

This officer and PO Wittner responded to 17 South Ave and spoke with the House President. The House President stated that T-1 resided at 603 Winston Court.

<u>0800</u>

This officer and PO Wittner responded to the Winston Court Apt. Office at 103 Salem Dr. Mr. Lucente advised us that T-1 resided in Apt. 3 of bldg. 603.

<u>0820</u>

This officer and PO Wittner arrived at 603 Winston Ct. Apt. 3 to speak with T-1.

<u>0825</u>

T-1 was advised of his rights by PO Wittner and agreed to come to Barton Hall for further questioning.

<u>0835</u>

T-1 was interviewed by PO Wittner (refer to page 15) in the presence of this officer.

<u>0850</u>

T-1 orally admitted to several thefts of books, a calculator, and two tape decks from both Fernow and Bradfield. T-1 was again given his rights by this officer

Barbara J. Burns                PO
_____
Investigating Officer

Barton R. Ingersoll        Lt.
_____
Supervisor

Date of Investigation ___3/8/83___

Date of Approval ___3/8/83___

**EXHIBIT F, PAGE 16**

MASTER FILE
DO NOT R___

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE ___Burglary___  MASTER FILE  12

DO NOT REMOVE

CASE NO. __83-422__

OTHER AGENCY ___

**0900**

T-1 signed a Waiver of Rights form.

T-1 then prepared a written statement confessing to the crimes.

**0930**

District Attorney Bucko notified at this time.

**0950**

This officer, PO Wittner and T-1 returned to his residence to pick up items T-1 stated he had obtained in other burglaries and had kept. T-1 signed a consent to Search form.

Found in T-1's bed room were the following

1) TI 55 Calculator   serial # 3896699   #83-240

2) Sanyo Tape recorder (cassette)   #83-241

3) JVC stereo cassette player/recorder   #83-236
serial # 17631022

**1000**

Upon return to Barton Hall the above listed items were tagged as evidence (tag #83-236) and a receipt given to T-1.   83-240
83-241

**1020**

T-1 was fingerprinted and photographed by PO Wittner.

**1035**

T-1 interviewed by Lt. Boice, refer to encl. #6 for details

Barbara J Bauer    PO    Date of Investigation  3/8/83
Investigating Officer

Burton R Ingersoll, St.    Date of Approval   3/8/83
Supervisor

**EXHIBIT F, PAGE 17**

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE  Burglary                                    PAGE  13

V.P. Gurowitz advised of this case by Capt. Murphy.

__1200__

T-1 was transported to City Court for arraignment before Judge Ward. T-1 was released in his own recognizance to appear at a Preliminary Hearing in City Court on March 18, 1983.

T-1 remained with Ithaca Police Dept. Detectives for further processing.

__1420__

This officer and PO Wittner responded to 312-C Fernow Hall and spoke with C-1.

C-1 stated that he had at no time authorized T-1 to remove any items from his office.

C-1 was shown the items obtained at T-1's residence for possible identification. C-1 identified the calculator and the Sanyo tape deck as those that were taken from his office on or about 2/10/83. (Refer CR 83-303) Enclosed is a signed statement to this effect from T-1.

__1500__

During the course of the interviews with T-1, T-1 repeatedly confessed to taking text books from room 411 Bradfield Hall during the course of the past year.

Barbara J Baum                    PO          Date of Investigation  3/8/83
Investigating Officer

Burton B. Ingwersen  Lt.                        Date of Approval  3/9/83
Supervisor

**EXHIBIT F, PAGE 18**

MASTER FILE
DO NOT REMOVE

CASE NO. 83-422
OTHER AGENCY

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

## SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE _____ Burglary _____        PAGE ____ 14 ____

CASE NO. 83-422
OTHER AGENCY

This confession establishes T-1 as the perpetrator of the following cases.

82-1670 — Petit Larceny from 411 Bradfield 3 text books unknown date

82-1685 — Petit Larceny 411 Bradfield 1 textbook on or about 10/28 - 11/15/82.

82-1686 — Petit Larceny 411 Bradfield 3 text books on or about 11/11 - 11/18/82

82-856 — Burglary 411 Bradfield 4 text books, 1 hand lens 1 dissecting kit sometime during May 1982.

82-868 — Petit Larceny 411 Bradfield 7 text books, unknown date reported 6/4/82.

<u>1530</u>

Dean Drinkwater notified of this case by Lt. Boice.

Barbara J Bowers      PO    Date of Investigation  3/8/83
Investigating Officer

Barton N Ingersoll Sr.           Date of Approval  3/8/18
Supervisor

1/76-5M

**EXHIBIT F, PAGE 19**

EXHIBIT B,
Page 23

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE __Burglary__                                           PAGE __15__

CASE NO. __83-422__ OTHER AGENCY

0855 hrs, 3-8-83, the defendant was interviewed by this officer about the books he sold over the past several weeks. He stated that he saw a list of books for sale in the laundry with a telephone number on it several weeks ago and that he called the number and arranged a meeting at Uris library with a hispanic male, bought books then resold them. He then said that he remembered the number on friday and called again, met with the subject and bought the books in CR#83-422, took them to triangle and sold them on saturday.

This officer then asked the defendant how it was possible that he bought the books on friday when C-1 stated that they were taken sometime late friday night or saturday morning. The defendant then admitted that he took the books from Fernow hall that he did not buy them. He said "I went into the rooms and took the books, stereo, calculator and tape deck. I am a poor student and sold the books to get money." He was then asked about other thefts from Fernow hall and he stated that he took the books. He was then asked about the book thefts from Bradfield Hall for the period from 1-2-82 to 11-15-82. He said that he took the books. When asked how he gained access to the building he said that he had worked in the lab (room 411) and was given a key to the building and the room, that when he quit no one asked him for the keys back. He was then asked how he got into Fernow Hall. He said that by using his key to the outside door to Bradfield and going into the basement that there is a tunnel that goes to Fernow and that the only door there has a crash bar on it. Once inside Fernow he went to the rooms and took the books.

Wayne L. Weltmer
_____
Investigating Officer

Baxter R. Ingersoll
_____
Supervisor

1/76-5M

MASTER FILE          Date of Investigation 3-8-83
DO NOT REMOVE          Date of Approval ___-83

**EXHIBIT F, PAGE 20**

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE _Burglary_____    PAGE __16__

CASE NO. __83-4632__    OTHER AGENCY _____

The two yale keys numbered BJ-1 and 6FX were taken as evidence and assigned evidence tags 83-237. When asked why he took the books he stated again that he was just a poor student and that he took them to have money to live on and he took the stereo, tapedeck and calculator for his own use. He wanted to know what took us so long to catch him, that he expected to be caught a year ago, and since he didnot he continued by taking things from Fernow Hall.

MASTER FILE
DO NOT REMOVE

_Wayne L. Wiltner_
Investigating Officer

_Barton R. Ingersoll_
Supervisor

Date of Investigation  3-8-83

Date of Approval  3-8-83

1/7G-5M

**EXHIBIT F, PAGE 21**

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE __Burglary__                                    PAGE __17__

CASE NO. 83-422

OTHER AGENCY

The following enclosures are continued from page #1.

#5. Voluntary statement from C-1

#6. Interview of Defend. by Lt. Boice

#7. Advice of Rights Form

#8. Consent to Search form

#9. Oral Admissions form

10. Written Admissions forms.

11. Accusatory Instrument.

12. Affidavit of Service form

MASTER FILE
DO NOT REMOVE

Closed refer to Ct.

TOTAL CASE Dent to I.P.D
4/8/83 1700hrs,

Barbara J Baum     PO
Investigating Officer          Date of Investigation  3/8/83

Barton R. Dryenel Jr
Supervisor          Date of Approval  3/8/83

1/76-5M

**EXHIBIT F, PAGE 22**

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

# SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE Burglary　　　　　　　　　　　　　　　　PAGE 18

1335 hrs, 3-9-83, Dawson Deanna K, 308 Fernow Hall reported that the text book, Natures & Properties of Soils, had been taken out of 308. CR # 83-446. This book has not been recovered.

0930 hrs, 3-10-83, this officer spoke with Hollenbeck, Lorraine A., Secretary, Plant Breeding, 252 Emerson Hall. Ms. Hollenbeck is in charge of key issue for Plant Breeding. Ms Hollenbeck said that the defendant was hired by Plant Breeding on 10-2-81 and worked untill 10-13-81. She said she could not be sure, but the records show that the defendant was terminated because of illness and she thought he was the one with mononecleosis. She also said that the defendant was issue the keys and that the department never asked for them back.

It is believed that the defendant was the perpetrator of the following thefts.

Bradfield Hall

82-856
82-868
82-1670
82-1685
82-1686

Fernow Hall

83-303
83-306
83-311
83-333
83-339
83-368
83-421
83-422
83-426
83-446

In his statement to Lt. Boice ENc#6, page 4 of this report he admitted to burglarizing Bradfield Hall 3 or 4 times and Fernow Hall 3 times.

Wayne L. Wittner
　　　　　　　Investigating Officer

　　　　　　　Supervisor

1/76-5M

Date of Investigation 3-11-83

Date of Approval 3-11-83

**EXHIBIT F, PAGE 23**

EXHIBIT B,
Page 27

Case 3:08-cv-00736-BTM-JMA   Document 15-2   Filed 05/05/2008   Page 29 of 157
Case 3:07-cv-02045-BTM-JMA   Document 13-3   Filed 12/12/2007   Page 20 of 31

ENC #3

STATE OF NEW YORK
COUNTY OF _Tompkins_
CITY, ~~TOWN, or VILLAGE~~ OF _Ithaca_
Date _3/7/83_   Time _7:20 AM_   Place _Triangle Book Shop_
I, _Terry Hoover_, am _40_ years of age, born on _Jan 6 43_
my address is _38 Salo Dr   Trumansburg NY_
my occupation is _Ass't Mgr_, and degree of education is _BS_
I have been duly warned by _E.J. Bourne_, who has identified
himself as _Patrol Officer_

that I do not have to make any statement at all, and that any statement I make may be used in evidence against me in a court of law, and that I have the right to talk to a lawyer for advice before making this statement. Without fear or threat of physical harm upon me or another person, I freely volunteer the following statement to the aforesaid person.

On Sat March 5th a [...] came to Triangle Book Shop to sell books. The [...] were [...] [...] [...] School Geometry and Davis "Quant Models of Triq" [...] bought the books and paid $83 [...] [...]. I checked [...] his Illus ID and [...] a note of the ID number [...] his [...] signature in our [...] book sheet. He was a moderately Tall [...] with dark hair. Later after the book was [...] [...] I was [...] a picture by [...] [...] the [...] [...] of the suspect. I was told that it was the same [...] [...] [...] when I bought the above books.

I have read this statement consisting of __1__ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Subscribed and sworn before me
this_____day of_____, 19____

Affirmed under penalty of perjury
this _7th_ day of _March_, 19 _83_

Signed by _Terry Hoover_

Page _1_ of _1_ page(s)

Title:_____

Witness: _Barbara J Bourne_

Witness:_____

5M - 3/82

**EXHIBIT F, PAGE 24**

EXHIBIT B,
Page 28

STATE OF NEW YORK
COUNTY OF __TOMPKINS__
CITY, TOWN OF VILLAGE OF _____   ITHACA
Date _3/8/83_   Time _9:10 AM_   Place __Barton Hall__
I, __Kevin G. Vanginderen__ am __21__ years of age, born on __10/23/61__
my address is __603-3 Winston Court Apartments__
my occupation is __Student__, and degree of education is __college senior__
I have been duly warned by __Barbara J. Bourne__, who has identified
himself as __Patrol Officer__

that I do not have to make any statement at all, and that any statement I make may be used in evidence against me in a court of law, and
that I have the right to talk to a lawyer for advice before making this statement. Without fear or threat of physical harm upon me or
another person, I freely volunteer the following statement to the aforesaid person.

I, Kevin G. Vanginderen, admit to taking a few books, a calculator, and two small
cassette decks from Fernow Hall.  I will return the calculator and tape decks for
I still possess them.  I also admit entering a lab at Bradfield Hall for the
purpose of taking a few textbooks.  All of these textbooks were sold to the
Campus Store and Triangle Book Store for cash.  This cash allowed me to survive
in poor times for I am an extremely poor college student deeply in debt with
little other options.

OFFICER WITTNER:  You stated that you took books from Bradfield Hall.  How did you
          gain entrance to Bradfield and the labs?

VANGINDEREN:  I had a key for the building and lab given to me when I had a lab
          job there two years ago and nobody asked for its return.

WITTNER:  The only things you took out of Bradfield were the books?

VANGINDEREN:  From that one lab.

WITTNER:  You didn't take anything else?

VANGINDEREN:  Not in Bradfield.

WITTNER:  How did you gain entrance into Fernow Hall?

VANGINDEREN:  A tunnel leading from the basement of Bradfield Hall to Fernow
          which is unlocked.  I gained entrance through it.

WITTNER:  The rooms you took the books from in Fernow -- were the rooms locked?

VANGINDEREN:  No.  The rooms I went into on the main corridor were unlocked.  The
          ones at the ends of the corridor had spaces above the doors, which I

I have read this statement consisting of __2__ page(s) and the facts contained herein are true and correct. I have also been told and I
understand that making a false written statement is punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law
of the State of New York.

Subscribed and sworn before me
this _____ day of _____, 19____

Title: _____

Affirmed under penalty of perjury
this __8th__ day of __March__, 19_83_

Signed by __Kevin Vanginderen__

Page _1_ of _2_ page(s)

Witness: __H. W. G. Price__

Witness: _____

TM - 3/72

**EXHIBIT F, PAGE 25**

EXHIBIT B,
Page 29

STATE OF NEW YORK
COUNTY OF __TOMPKINS__
CITY, TOWN, or VILLAGE OF _____    ITHACA
Date __3/8/83__    Time __9:10 AM__    Place    **MASTER FILE**
I, __Kevin G. Vanginderen__ , am __21__ years of age, born on __10/23/61__ , **DO NOT REMOVE**
my address is _____    603-3 Winston Court Apartments
my occupation is __Student__ , and degree of education is __college senior__
I have been duly warned by __Barbara J. Bourne__ , who has identified
himself as __Patrol Officer__

that I do not have to make any statement at all, and that any statement I make may be used in evidence against me in a court of law, and
that I have the right to talk to a lawyer for advice before making this statement. Without fear or threat of physical harm upon me or
another person, I freely volunteer the following statement to the aforesaid person.

jumped.

WITTNER:  All the books you took last year and this year were sold to Campus
          Store and Triangle Book Store.

VANGINDEREN:  Yes.

WITTNER:  Not to a private individuals

VANGINDEREN:  No.

I have read this statement consisting of __2__ page(s) and the facts contained herein are true and correct. I have also been told and I
understand that making a false written statement is punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law
of the State of New York.

Subscribed and sworn before me
this_____ day of _____, 19____

Title: _____

Affirmed under penalty of perjury
this __8th__ day of __March__, 19 __83__

Signed by __Kevin Vanginderen__

Page __2__ of __2__ page(s)

Witness: __JF W.G. Snell__

Witness: _____

5M - 3/72                    **EXHIBIT F, PAGE 26**

EXHIBIT B,
Page 30

_Voluntary Statement_

**STATE OF NEW YORK**
**COUNTY OF** _Tompkins_
**CITY, TOWN, or VILLAGE OF** _Ithaca_

~~MATERIAL FILE~~
~~DO NOT REMOVE~~

**Date** _3-8-83_ **Time** _1420_ **Place** _Fernow Hall_
I, _Richard J. Baker_, am _29_ years of age, born on _12/4/53_,
my address is _134 Judd Falls Rd., Ithaca, NY_,
my occupation is _Graduate Student_, and degree of education is _grad. student_
I have been duly warned by _Wayne L. Wittner_, who has identified
himself as _Cornell Patrol Officer_.

~~that I do not have to make any statement at all, and that any statement I make may be used in evidence against me in a court of law, and that I have the right to talk to a lawyer for advice before making this statement.~~ Without fear of threat of physical harm upon me or another person, I freely volunteer the following statement to the aforesaid person.

RJB On 2/10/83, I was in my office working. #On that day, I used my TI-55 calculator and a Sanyo cassette tape deck I had borrowed. When I returned to my office on 2/13/83, both were missing. I reported the theft to Cornell Public Safety on 2/14/83. On 2/24/83, I again worked in my office. On 3/25/83, I returned to my office and found two books: Life of Birds, Welty and Biometry, Sokol Rolf missing. I immediately reported these thefts to Public Safety. RJB

RJB At no time during this period had I given permission to anyone to borrow any of this material. RJB

RJB At ~2:30 pm, Officers Bourne & Wittner brought in my tape player and calculator. I positively identified these as mine. RJB

I have read this statement consisting of _1_ page(s) and the facts contained herein are true and correct. I have also been told and I understand that making a false written statement is punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law of the State of New York.

Subscribed and sworn before me
this_____day of_____, 19____

Title:_____

Affirmed under penalty of perjury
this _8_ day of _March_, 19_83_

Signed by _Richard J. Baker_

Page _1_ of _1_ page(s)

Witness: _Wayne L. Wittner_

Witness: _Barbara J. Bourne_

5M - 3/82

**EXHIBIT F, PAGE 27**

EXHIBIT B,
Page 31

Voluntary Statement

MASTER FILE
DO NOT REMOVE

STATE OF NEW YORK
COUNTY OF _Tompkins_
CITY, ~~TOWN, or VILLAGE OF~~ _Ithaca_
Date _3-8-83_   Time _1420_   Place _Fernow  Hall_
I, _Richard J Baker_, am _29_ years of age, born on _12/4/53_,
my address is _134 Judd Falls Rd., Ithaca NY_
my occupation is _Graduate Student_, and degree of education is _grad. student_.
I have been duly warned by _Wayne L. Wittner_, who has identified
himself as _Cornell Patrol officer._
~~that I do not have to make any statement at all, and that any statement I make may be used in evidence against me in a court of law, and~~
~~that I have the right to talk to a lawyer for advice before making this statement.~~ Without fear of threat of physical harm upon me or
another person, I freely volunteer the following statement to the aforesaid person.

RJB On 2/10/83, I was in my office working. On that day,
I used my TI-55 calculator and a Sanyo casette tape deck I had
borrowed. When I returned to my office on 2/13/83, both
were missing. I reported the theft to Cornell Public Safety on
2/14/83. On 2/25/83, I again worked in my office.
On 3/06/83, I returned to my office and found two books:
Life of Birds, Welty and Biometry, Sokol-Rolf missing. I
immediately reported these thefts to Public Safety. RJB
RJB At no time during this period had I given permission
to anyone to borrow any of this material. RJB
RJB At ~2:20pm, Officers Bourne & Witner brought in my
tape player and calculator. I positively identified these
as mine. RJB

I have read this statement consisting of _1_ page(s) and the facts contained herein are true and correct. I have also been told and I
understand that making a false written statement is punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law
of the State of New York.

Subscribed and sworn before me
this_____day of_____, 19____

Title: _____

Affirmed under penalty of perjury
this _8_ day of _March_, 19_83_

Signed by _Richard J Baker_

Page _1_ of _1_ page(s)

Witness: _Wayne L. Wittner_

Witness: _Barbara J Bourne_

5M - 3/82

Interview of Kevin G. Vanginderen by Lt. William Boice, Public Safety, recorded by Joelle Munson, Public Safety, took place in the Major Investigations Office at 1035 hours, March 8, 1983. Lt. Boice began by having Vanginderen read his previous brief statement, which Vanginderen approved as correct and signed. Lt. Boice then began the following line of questioning: (B - Boice; V-Vanginderen)

B - Please state the facts in your own words.

V - About two years ago, I had a lab job at Bradfield Hall, which gave me a key to the building and Room 411. I noticed while I was working there that there were a lot of students that had books from courses they were no longer taking. I took some of these books and sold them to Campus Store and Triangle Book Store for $10. I am only getting poorer as a college student. I have a job also but when I ran out of cash, I would go to the lab and take a few books. I would only get $15 or $20 for them at a time. I went to Bradfield a couple of times the last semester and a couple of times this year, only when I needed the cash. Last semester, they changed the lock to one of the labs. I noticed the tunnel to Fernow this semester and the door was unlocked as well as the rooms. It was the same as in Bradfield, with lots of books that people didn't need. I took a few of them. In one office, there was a calculator on a desk and cassette recorder; and in another room, there was a cassette deck. They were the only things besides books that I took.

B - What were the dates of your employment at Bradfield Hall?

V - Approximately October to December 1981 -- the first semester of my junior year.

B - You were employed on the fourth floor?

V - Yes, 411, I think.

B - When approximately did you find yourself in a position where you started stealing?

V - The next semester. I was amazed that no one asked for the key and I had noticed the books.

B - You did not commit any thefts in 1981?

V - No, only second semester.

B - Approximately when did you start?

V - It doesn't stick out.

B - I have one case here from June 1982 (CR82-856).

V - All the books may not have been discovered for a long time. I was not here over the summer. All the books were scientific.

B - This case occurred in May. Do you remember names and titles -- Principles of Plant Breeding and Plant Pathology?

V - They were all plant or scientific books -- all from labs or science offices.

B - Case 82-868 -- 8 books in Bradfield Hall, Room 411?

V - Yes

MASTER FILE
DO NOT REMOVE

**EXHIBIT F, PAGE 29**

INTERVIEW OF KEVIN G. VANGINDEREN -- March 8, 1983                    Page 2

B - List of books -- Breeding Field Crops, Soils and Soil Fertility, Mycogenetics, Statistics, Plant Pathology, Biochemstry, Toxins in Plant Disease, and Plant Breeding II.

V - Sounds it.

B - Case 82-1670 -- 411 Bradfield Hall -- three textbooks -- Property of Soil, Plant Structure and Function, and Plant Breeding -- November 1982?

V - Sounds it.

B - Case 82-1685 -- 411 Bradfield Hall -- November 1982 -- textbook -- Plant Mineral Nutrition?

V - If they're from 411 ... don't know exact titles.

B - Case 82-1682 -- three textbooks?

V - (Nodded yes)

B - Case 83-303 -- occurred February 10-12 -- Unlawful entry into Room 312C Fernow Hall in which a calculator, TI-55, and a Sanyo tape deck recorder were taken. Were you responsible for these?

V - Yes, they have them. (officers)

B - These are the two items that were recovered in your room?

V - (Nodded yes)  In the next room, there was another cassette deck.

B - Case 83-306 -- 207 Fernow Hall -- occurred February 11, 1983 -- two textbooks?

V - Yes

B - Case 83-311 -- February 2 and 3 -- Room 306 Fernow -- Textbook -- Aquatic Chemistry?

V - Not offhand; what room?

B - 306

V - I imagine.

B - Case 83-333 - 306 Fernow -- Approximately middle of February?

V - If the room is the same, they're probably just different discoveries of the same theft.

B - One textbook -- Biological Science?

V - (Nodded yes)

B - Case 83-421 -- March 3-5 -- 312F Fernow -- JCV stereo cassette player recorder taken on a Burglary where the subject climbed over a partition. Are you responsible for this?

V - Yes.  It was the last theft at 2 AM Saturday.

B - Case 83-422 - 312E Fernow -- March 4 and 5 -- Burglary -- theft of two textbooks -- Biometry and The Life of Birds.  Do you remember these two?

V - Sounds familiar.


MASTER FILE
DO NOT REMOVE

**EXHIBIT F, PAGE 30**

MASTER FILE
DO NOT REMOVE

INTERVIEW OF KEVIN G. VANGINDEREN -- March 8, 1983                    Page 3

B - They were the two you sold to Triangle Book Store.

V - (Nodded yes)

B - Case 83-426 -- 312B Fernow Hall -- March 5 -- Burglary -- four textbooks stolen --
Resource Economics; Applied Theory of Price; The Way of Chung Tzu; Leisure -- The
Basis of Culture. Are you familiar with this case?

V - Sounds familiar.

B - Where are these books now?

V - I have two paperbacks still. The others were sold to Campus Store and Triangle
Book Store, I believe.

B - Have you stolen from any other building besides Bradfield and Fernow?

V - I only stole from buildings that I had access to. I'm not a nervy person. I only
stole at night with a key. I didn't break down doors. The rooms were obviously
open and vulnerable.

B - Do you know anything about the theft of a dollar bill changer at the Multi-Cat?

V - No

B - Do you know anything about tampering with an element analyzer on the 8th floor of
Bradfield Hall?

V - Know nothing about it.

B - How about miscellaneous things like the theft of soda pop on the 8th floor of Bradfield
Hall?

V - I was never on the 8th floor.

B - Your residence is 603 Winston Court, Apartment 3. No problems up there?

V - (Shook head no) I only took books that I figured people didn't need.

B - Can you explain to me why?

V - I currently owe the university approximately $1,000, a fraternity $700, and living
expenses are high. I foresee myself graduating in debt. The job at Lynah's not
enough -- I could go hungry. I have $5 in my pocket now from the last books I sold.
My bank account is empty. I feel remorse and yet I would not have eaten otherwise.
A strange remorse -- I would not be at college. Tuition is up -- financial aid is
down. I'm a graduating senior -- though not in an honest fashion.

B - Are you involved in any other activities?

V - No

B - Is your roommate involved?

V - No. Obviously, I took things that were there for the taking. I didn't break in.
My friends are not like that.

**EXHIBIT F, PAGE 31**

INTERVIEW OF KEVIN G. VANGINDEREN -- March 8, 1983                    Page 4

B - How many times do you think you burglarized offices?

V - Bradfield -- three or four times -- maybe a little more.  Fernow -- three times.

B - Each time you entered Bradfield, did you use your key?

V - Yes

B - Was this after you were terminated from your job?

V - I was never officially terminated.  I had a lab job with a loose schedule -- I
came in when I wanted.  I didn't come in any more because I didn't get along
with my boss.  I figured that they would have taken my key back -- they never
asked for it.

B - You entered Fernow via the tunnel:

V - (Nodded yes) The unlocked door.

B - You entered offices by climbing over the doors?

V - No, open doors.  I only climbed over two doors.

B - Which cases were those?

V - The tape decks and the calculator.

MASTER FILE
DO NOT REMOVE

**EXHIBIT F, PAGE 32**

ENC # 7 83-A22

# INTERROGATION; ADVICE OF RIGHTS

## YOUR RIGHTS



PLACE _Benton Hall_
DATE _3/8/83_
TIME _0900_

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## WAIVER OF RIGHTS

I have read this statement of my rights an I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed _Kevin Vanguard_

Witness _Barbara J Bousso_

Witness _Wayne L Witten_

Time _0900_

**EXHIBIT F, PAGE 33**

CONSTITUTIONAL RIGHTS

CONSENT TO SEARCH

The right of the people to be secure in their papers, houses, persons
and effects, against unreasonable searches and seizures shall not be violated
and no warrants shall issue but upon probable cause supported by oath or affir-
mation and particularly describing the place to be searched and the persons or
things to be seized. (Fourth Amendment to the Constitution of the United States.)

I, Kevin G. Vanginderen        , having been informed of my
Constitutional Rights not to have a search made of the premises hereinafter
mentioned without a search warrant and of my right to refuse to consent to such
a search, hereby authorize Wayne Wittner   and Barbra Bourne      .
Officers of the Cornell University Safety Division to conduct a complete search
of my residence located at 603 Winston Ct. Apts.  Apt #5          .
These officers are authorized by me to take from my residence any letters, papers,
materials or other property which would be considered contraband.

This written permission is being given by me to the above named officers
voluntarily and without threats or promises of any kind, to commence at 0950
on 3-8-83        and to conclude by 0952   on 3-8-83          .

MASTER FILE
DO NOT REMOVE

_Kevin Vanginderen_
Signature

_Wayne L. Wittner_
Witness

_Barbra J. Bourne_
Witness

**EXHIBIT F, PAGE 34**



NOTICE OF INTENT TO USE ADMISSIONS
SCHEDULE A
* * * * * * * * * * * * * * * * *
ORAL ADMISSIONS

Date: 3-8-83                          Time: 0900 hrs.

Place: Barton Hall

Made To: Wayne L. Wittner

Substance of Admissions: "I went into the rooms and Took the books, stereo, calculator, and tape deck. I am a poor student and sold the books to get money"


Date:                                Time:

Place:

Made To:

Substance of Admissions:




Date:                                Time:

Place:

Made To:

Substance of Admissions:


STRICT ATTORNEY
OMPKINS COUNTY
CA. NEW YORK 14850

**EXHIBIT F, PAGE 35**

NOTICE OF INTENT TO USE ADMISSIONS
SCHEDULE B
* * * * * * * * * * * * * * * * * * *
WRITTEN ADMISSIONS
(Including Preliminary Oral Admissions)

Date: 3/8/83                              Time: 09/0

Place: Barton Hall

Made To: Barbara J. Bourne

Copy attached as Exhibit encl. #4 CR 83-422


Date:                                     Time:

Place:

Made To:                                  MASTER FILE

Copy attached as Exhibit _____         DO NOT REMOVE


Date:                                     Time:

Place:

Made To:

Copy attached as Exhibit _____


Date:                                     Time:

Place:

Made To:

Copy attached as Exhibit _____

STRICT ATTORNEY
TOMPKINS COUNTY
CA. NEW YORK 14850

**EXHIBIT F, PAGE 36**

**EXHIBIT B,**
**Page 40**

STATE OF NEW YORK : COUNTY OF TOMPKINS
CITY COURT    : CITY OF ITHACA

CR # 83-422

THE PEOPLE OF THE STATE OF NEW YORK

- vs -

Kevin G. Vanginderen   DOB 10/23/61

*Defendant*

ACCUSATORY
INSTRUMENT

MAS ___ LE
DO NOT REMOVE

## A C C U S A T I O N

BE IT KNOWN THAT, by this Accusatory Instrument, Barbara Bourne

as the Complainant herein, accuses  Kevin G. Vanginderen

the above named Defendant, with having committed the offense of

.......... Burglary in the third Degree

in violation of the Section  140.20 , Subdivision .......... of the  Penal  Law

of the State of New York,  xxViolationxxxxxxxxxxxxxxxxMisdemeanorxxx  a Class ........ D ..... Felony.

### F A C T S

On or about the .5th...... day of .March 1983........; the said defendant did, in the City of Ithaca, County
of Tompkins, New York,

did knowingly enter or remain unlawfully in a building , to wit: defendant entered at approx.

2:00AM room 312C Fernow Hall, Tower Road, Cornell University, City of Ithaca, N.Y., to commit

the crime of larceny therein by stealing books, with said office space belonging to Richard

J. Baker, with all action by defendant without authorization, are contrary to the provisions

of the Statute in case made and provided.

The above allegations of fact are made by the Complainant herein:

.......... upon direct knowledge

XXXXX  upon information and belief, with the sources of Complainant's information and the grounds for his

belief being  Investigation of case (Cornell) 83-422 and sworn confession of defendant

WHEREFORE, Complainant prays that a warrant be issued for the arrest of the said defendant.

Barbara Bourne
*Complainant*

## N O T I C E
(Penal Law, Section 210.45)

IT IS A CRIME, PUNISHABLE AS A CLASS A MISDEMEANOR UNDER THE LAWS OF THE STATE
OF NEW YORK, FOR A PERSON, IN AND BY A WRITTEN INSTRUMENT, TO KNOWINGLY MAKE A
FALSE STATEMENT, OR TO MAKE A STATEMENT WHICH SUCH PERSON DOES NOT BELIEVE
TO BE TRUE.

Affirmed under penalty of perjury this  8th

day of ..March.................., 19 83 .

Sworn to before me this ............... ...........day

of ............................., 19 .........

OR

Barbara Bourne
*Complainant*

Judge or Justice, Desk Officer or Superior, or
other authorized person.

### EXHIBIT F, PAGE 37

Court

NOTICE

To: _____ Kevin G. Vanginderen _____    D.O.B. ___10/23/61___

PLEASE TAKE NOTICE that you have been arrested for the commission of the crime of _____ Burglary in the third degree _____ D_____, a felony, in the City/Town/Village of __Ithaca_____ in Tompkins County, New York. Because this is a felony matter, a Tompkins County Grand Jury will hear evidence relating to the incident which served as the basis for your arrest upon this charge. If the Grand Jury finds that there is sufficient evidence, an indictment may be returned against you.

Pursuant to Section 190.50 of the Criminal Procedure Law of the State of New York, you have the right to appear before the Tompkins County Grand Jury considering your case and give testimony in your own behalf under a waiver of immunity.

If you wish to so give evidence on your own behalf before the Grand Jury, please serve upon me a written notice pursuant to Section 190.50 stating your desire to so give evidence. That notice should be served upon me immediately (if you wish to testify) as a Grand Jury may consider your case at any time without further notice, regardless of the action taken by the Court in which you now appear. That notice must contain an address to which you want me to send notice of a time for you to appear as a witness before the Grand Jury (if there is more than one such address, please provide all such addresses on your written notice). Thereafter, I will notify you relative to a time for your appearance.

JOSEPH JOCH  *Benjamin Bucko*
Tompkins County District Attorney
Tompkins County Court House
Ithaca, New York 14850
(607) 273-2080

## ADMISSION OF SERVICE

I acknowledge that I received a copy of this notice from __Barbara Bourne__ on the __8th__ day of __March_____, 19 _83_.

*[signature]*

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK :
COUNTY OF TOMPKINS :  SS.

_____ Barbara Bourne _____,being duly sworn, deposes and says that on the _____ __8th__ day of __March_____, 19 _83_, I served a copy of the notice set forth above upon _____ Kevin G. Vanginderen _____, the defendant charged with felony set forth herein, at the time of his arraignment before Honor-xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx of the xxxxxxCxxxxx

*Barbara J Bourne*

Sworn to before me this _____8th_____

day of ___March_____,

19 83  *[signature]*
        Notary Public

BARTON R. INGERSOLL
Notary Public, State of New York
No. 4703936
Qualified in Tompkins County
Commission Expires March 30, 19 84

**EXHIBIT F, PAGE 38**

MASTER FILE
DO NOT REMOVE

CORNELL UNIVERSITY DEPARTMENT OF PUBLIC SAFETY

## SUPPLEMENTARY INVESTIGATION REPORT

OFFENSE_____Burglary_____PAGE__13__

CASE NO.__83-422
OTHER AGENCY  Burglary

09/08/83 - Contacted ADA Mulvey regarding the return of evidence in the Vanginderen case. Per ADA Mulvey, County Court had previously dismissed the Grand Jury Indictment based on a typographical error, to wit: Vanginderen indicted on Burglary 3rd and Criminal Possession of Stolen Prop 2nd but DA's office presented it as Burglary 2nd. ADA Mulvey advised that Vanginderen plead guilty in City Court of Criminal Possession of Stolen Property 3rd Degree — Class A Misdemeanor and was given a conditional discharge.

09/08/83 & 09/09/83 - all evidence was returned to respective owners.

MASTER FILE DO NOT REMOVE

H. W. G. Boice
Investigating Officer

Date of Investigation    09/22/83

Supervisor

Date of Approval

**EXHIBIT F, PAGE 39**

To: _____ Kevin G. Vanginderen _____    D.O.B. _____ 10/23/61 _____

PLEASE TAKE NOTICE that you have been arrested for the commission of the crime of _____ Burglary in the third degree _____ D
_____, a felony, in the City/Town/Village of _____ Ithaca _____ in Tompkins County, New York. Because this is a felony matter, a Tompkins County Grand Jury will hear evidence relating to the incident which served as the basis for your arrest upon this charge. If the Grand Jury finds that there is sufficient evidence, an indictment may be returned against you.

Pursuant to Section 190.50 of the Criminal Procedure Law of the State of New York, you have the right to appear before the Tompkins County Grand Jury considering your case and give testimony in your own behalf under a waiver of immunity.

If you wish to so give evidence on your own behalf before the Grand Jury, please serve upon me a written notice pursuant to Section 190.50 stating your desire to so give evidence. That notice should be served upon me immediately (if you wish to testify) as a Grand Jury may consider your case at any time without further notice, regardless of the action taken by the Court in which you now appear. That notice must contain an address to which you want me to send notice of a time for you to appear as a witness before the Grand Jury (if there is more than one such address, please provide all such addresses on your written notice). Thereafter, I will notify you relative to a time for your appearance.

JOSEPH JOCH  *Benjamin Bucko*
Tompkins County District Attorney
Tompkins County Court House
Ithaca, New York 14850
(607) 273-2080

# ADMISSION OF SERVICE

I acknowledge that I received a copy of this notice from _____ Barbara Bourne _____ on the _____ 8th _____ day of _____ March _____, 19 83 .

_Kevin Vanginderen_

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK    :
COUNTY OF TOMPKINS:    SS.

_____ Barbara Bourne _____, being duly sworn, deposes and says that on the _____ 8th _____ day of _____ March _____, 19 83 , I served a copy of the notice set forth above upon _____ Kevin G. Vanginderen _____, the defendant charged with felony set forth herein, at the time of his arraignment before Honor- xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx of the xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx xxxxCourt

Sworn to before me this _____ 8th _____ 
day of _____ March _____ ,

19 83 .

_Barbara J Bourne_

_Barton R. Ingersoll_
Notary Public

BARTON R. INGERSOLL
Notary Public, State of New York
No. 4708935
Qualified in Tompkins County
Commission Expires March 30, 19 84

**EXHIBIT F, PAGE 40**

# SUBPOENA

FILE NO. .......83-113..

## In the Name of the People of the State of New York

TO   RICHARD BAKER, 134 Judd Falls Road
     312 C. Terrace  6-3191

YOU ARE HEREBY COMMANDED to appear before a Grand Jury held in and for the County of Tompkins and State of New York at the Grand Jury Room in the Tompkins County Court House in the City of Ithaca in the County of Tompkins and State of New York on Tues., May 24, 1983 at 2:30 A.M./P.M. as a witness in an investigation regarding

KEVIN VANGILDER

and to also appear as aforesaid on any recessed or adjourned date of the said investigation, and for a willful failure to so appear you will be deemed guilty of a Criminal Contempt of Court and will be liable for the punishment provided therefor by law.

Dated at the City of Ithaca in the County of Tompkins and State of New York this ....20th.. day of ............May.........., 19..83..

_Benjamin J. Bucko_

District Attorney of Tompkins County   BCM/dk1

*(left margin, rotated text)*

NOTICE — You should appear promptly at the time set in the Subpoena, and you may report to the District Attorney's Office rather than waiting in the public corridor outside the grand jury room, if you desire. The grand jury does not always meet in the same place. You should also turn in your subpoena to the District Attorney's Office for reimbursement of your mileage expenses. This Subpoena is hereby continued until such time as you are expressly discharged by the District Attorney, an Assistant District Attorney, or the Court.

REPORT OUTSIDE THE GRAND JURY ROOM OR TO THE DISTRICT ATTORNEY'S OFFICE AND REMAIN AVAILABLE UNTIL DISCHARGED.

---

STATE OF NEW YORK       :
                        : ss
COUNTY OF _Tompkins_    :

### AFFIDAVIT OF SERVICE

I, the undersigned, being duly sworn, do hereby state that I served a true copy of the within subpoena upon the person named therein at _12:20_ A.M./P.M. on _5-20-83_ at _FERNOW HALL_ in the
                            (date)                  (place)
City/Town/Village of _Ithaca_ in the County of _Tompkins_ and State of _N.Y._

_Susan Schwan_

Sworn to before me this _20TH_

day of _MAY_ 19_83_

_David R. Fisher_
Notary Public

DAVID R. FISHER
Notary Public, State of New York
No. 4708934
Qualified in Tompkins County
Term expires March 30 19 84

**RETURN THIS COPY OF SUBPOENA TO DISTRICT ATTORNEY AT LEAST 24 HOURS BEFORE RETURN DATE WITH AFFIDAVIT SERVICE COMPLETED.**

## EXHIBIT F, PAGE 41

EXHIBIT B,
Page 45

# SUBPOENA

FILE NO. ............

## In the Name of the People of the State of New York

TO ....................................

YOU ARE HEREBY COMMANDED to appear before a Grand Jury held in and for the County of Tompkins and State of New York at the Grand Jury Room in the Tompkins County Court House in the City of Ithaca in the County of Tompkins and State of New York on ................................ at ......... A.M./P.M. as a witness in an investigation regarding

........................................

........................................

........................................

........................................

........................................

and to also appear as aforesaid on any recessed or adjourned date of the said investigation, and for a willful failure to so appear you will be deemed guilty of a Criminal Contempt of Court and will be liable for the punishment provided therefor by law.

Dated at the City of Ithaca in the County of Tompkins and State of New York this 20th day of .......... MAY .........., 19 83

Benjamin J. Bucko
District Attorney of Tompkins County

NOTICE — You should appear promptly at the time set in the Subpoena, and you may report to the District Attorney's Office rather than waiting in the public corridor outside the grand jury room, if you desire. The grand jury does not always meet in the same place. You should also turn in your subpoena to the District Attorney's Office for reimbursement of your mileage expenses. This Subpoena is hereby continued until such time as you are expressly discharged by the District Attorney, an Assistant District Attorney, or the Court.

REPORT OUTSIDE THE GRAND JURY ROOM
OR TO THE DISTRICT ATTORNEY'S OFFICE
AND REMAIN AVAILABLE UNTIL DISCHARGED.

---

STATE OF NEW YORK :
: ss
COUNTY OF Tompkins :

AFFIDAVIT OF SERVICE

I, the undersigned, being duly sworn, do hereby state that I served a true copy of the within subpoena upon the person named therein at 11:52 A.M./P.M. on May 20, 1983 at Barton Hall in the City/Town/Village of Ithaca in the County of Tompkins and State of New York

Robert J. Sims

Sworn to before me this 20TH day of MAY, 19 83

David R. Fisher
Notary Public

DAVID R. FISHER
Notary Public, State of New York
No. 4708934
Qualified in Tompkins County
Term expires March 30, 19 84

**RETURN THIS COPY OF SUBPOENA TO DISTRICT ATTORNEY AT LEAST 24 HOURS BEFORE RETURN DATE
WITH AFFIDAVIT SERVICE COMPLETED.**

## EXHIBIT F, PAGE 42

EXHIBIT B,
Page 46

# SUBPOENA

FILE NO. _____

## In the Name of the People of the State of New York

TO  BARBARA BOURNE, CLRK

YOU ARE HEREBY COMMANDED to appear before a Grand Jury held in and for the County of Tompkins and State of New York at the Grand Jury Room in the Tompkins County Court House in the City of Ithaca in the County of Tompkins and State of New York on Tues., May 24, 1983 at 9:30 AM/P.M. as a witness in an investigation regarding

KEVIN VANDERBOK

and to also appear as aforesaid on any recessed or adjourned date of the said investigation, and for a willful failure to so appear you will be deemed guilty of a Criminal Contempt of Court and will be liable for the punishment provided therefor by law.

Dated at the City of Ithaca in the County of Tompkins and State of New York this 20th day of May , 19 83

Benjamin J. Bucko
District Attorney of Tompkins County, NEW YORK

Margin text (left side, vertical):

NOTICE — You should appear promptly at the time set in the Subpoena, and you may report to the District Attorney's Office rather than waiting in the public corridor outside the grand jury room, if you desire. The grand jury does not always meet in the same place. You should also turn in your subpoena to the District Attorney's Office for reimbursement of your mileage expenses. This Subpoena is hereby continued until such time as you are expressly discharged by the District Attorney, an Assistant District Attorney, or Court.

REPORT OUTSIDE THE GRAND JURY ROOM OR TO THE DISTRICT ATTORNEY'S OFFICE AND REMAIN AVAILABLE UNTIL DISCHARGED.

---

STATE OF NEW YORK : ss
COUNTY OF TOMPKINS :

### AFFIDAVIT OF SERVICE

I, the undersigned, being duly sworn, do hereby state that I served a true copy of the within subpoena upon the person named therein at 3 A.M./P.M. on 5/21/83 at CORNELL PUBLIC SAFETY in the
(date)                    (place)
City/Town/Village of ITHACA in the County of TOMPKINS and State of New York

Elbert J. Smith

Sworn to before me this _____

day of _____, 19____

_____
Notary Public

**RETURN THIS COPY OF SUBPOENA TO DISTRICT ATTORNEY AT LEAST 24 HOURS BEFORE RETURN DATE WITH AFFIDAVIT SERVICE COMPLETED.**

## EXHIBIT F, PAGE 43

EXHIBIT B,
Page 47

# SUBPOENA

### In the Name of the People of the State of New York

FILE NO. ...........................

TO   WAYNE MCINTOSH, M.D.

YOU ARE HEREBY COMMANDED *to appear before a Grand Jury held in and for the County of Tompkins and State of New York at the Grand Jury Room in the Tompkins County Court House in the City of Ithaca in the County of Tompkins and State of New York on* TUES. MAY 24, 1983 *at* 9:30 A.M./P.M. *as a witness in an investigation regarding*

ROGER MCINTOSH

*and to also appear as aforesaid on any recessed or adjourned date of the said investigation, and for a willful failure to so appear you will be deemed guilty of a Criminal Contempt of Court and will be liable for the punishment provided therefor by law.*

*Dated at the City of Ithaca in the County of Tompkins and State of New York this* .......... *day of* ................. May ..........., 19 83

*Benjamin Bucko*

District Attorney of Tompkins County ...........

NOTICE — You should appear promptly at the time set in the Subpoena, and you may report to the District Attorney's Office rather than waiting in the public corridor outside the grand jury room, if you desire. The grand jury does not always meet in the same place. You should also turn in your subpoena to the District Attorney's Office for reimbursement of your mileage expenses. This Subpoena is hereby continued until such time as you are expressly discharged by the District Attorney, an Assistant District Attorney, or the Court.

REPORT OUTSIDE THE GRAND JURY ROOM OR TO THE DISTRICT ATTORNEY'S OFFICE AND REMAIN AVAILABLE UNTIL DISCHARGED.

---

STATE OF NEW YORK    :
                   : ss
COUNTY OF TOMPKINS    :      AFFIDAVIT OF SERVICE

I, the undersigned, being duly sworn, do hereby state that I served a true copy of the within subpoena upon the person named therein at 4:25 A.M./P.M. on 5/20/83 at C-11 BARTON HALL in the

(date)        (place)

City/Town/Village of ITHACA in the County of TOMPKINS and State of NEW YORK

*Robert G. Vanbaugh Jr.*   LT #11

Sworn to before me this 20TH

day of MAY ..........., 19 83

............................
Notary Public

DAVID R. FISHER
Notary Public, State of New York
No. 4708934
Qualified in Tompkins County
Term expires March 30, 19 84

**RETURN THIS COPY OF SUBPOENA TO DISTRICT ATTORNEY AT LEAST 24 HOURS BEFORE RETURN DATE WITH AFFIDAVIT SERVICE COMPLETED.**

## EXHIBIT F, PAGE 44

Dist. Atty. File # _____
TOMPKINS COUNTY GRAND JURY
Originally Convened 4/25/83
Reconvened _____

STATE OF NEW YORK
COUNTY  COURT  COUNTY OF TOMPKINS

------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

vs.

KEVIN VANGINDEREN

------------------------------------

GRAND JURY
MINUTES

Indictment Number _____

Grand Jury Convened by HON. BETTY D. FRIEDLANDER, County Court Judge

Present at Grand Jury proceedings were witnesses named herein and the
following persons:

ROBERT C. MULVEY, ESQ.
Assistant  District Attorney

CAROL DICKINSON,
Foreman

DOROTHY M. BURDORF,
Stenographer

Grand Jurors

THE DISTRICT ATTORNEY OF TOMPKINS COUNTY
Tompkins County Court House   Ithaca, New York, 14850   (607) 274-5461

**EXHIBIT F, PAGE 45**

**EXHIBIT B,
Page 49**

1

## I N D E X

2      Witness                                    Page

3      Instructions                                3, 22

4      Barbara Bourne                                6

5      Wayne Wittner                                11

6      William G. Boice                             13

7      Richard Baker                                18

8

9                    E X H I B I T S

10     Grand Jury                                   Page
       Exhibit No.                                  Marked

11     1
                                                     3
12     2      Transcript of Interview
13            w/Vanginderen                          3

14     3      Statement                              3

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT F, PAGE 46**

Case 3:08-cv-00736-BTM-JMA    Document 15-2    Filed 05/05/2008    Page 52 of 157
Case 3:07-cv-02045-BTM-JMA    Document 13-3    Filed 12/12/2007    Page 43 of 91
Instructions

1              Grand Jury Exhibits 1, 2 and 3

2              marked for identification.

3  MR. MULVEY:         Good afternoon.  This is

4      the case of People versus Kevin

5      Vanginderen, O.K., and your charge

6      sheets show one count of burglary

7      in the third degree.  I would like

8      you to change that to two counts

9      of burglary in the third degree,

10     and I will read the law to you

11     now.

12             Section 140.20 of the

13     Penal Law defines burglary in

14     the third degree as follows:

15     A person is guilty of burglary in

16     the third degree when he knowingly

17     enters or remains unlawfully in a

18     building with intent to commit a

19     crime therein.

20            I will read you the defini-

21     tion of a building.  The defini-

22     tion is its ordinary meaning to

23     you as far as what a building is,

24     but it goes further to say:  Where

25     a building consists of two or

**EXHIBIT F, PAGE 47**

Instructions

1    more units separately secured

2    or occupied, each unit shall be

3    deemed both a separate building

4    in itself and a part of the main

5    building.  Now, in this case

6    there may be testimony about

7    office space within a building.

8    I would ask you to consider that

9    as a separate unit within a build-

10   ing and, therefore, also a build-

11   ing under this definition.

12        Now, Enter or Remain

13   Unlawfully is defined as follows:

14   A person enters enters in premises --

15   unlawfully in or upon premises when

16   he is not licensed or privileged

17   to do so.  A license or privilege

18   to enter or remain in a building

19   which is only partly open to the

20   public is not a license or privilege

21   to enter or remain in that part of

22   the building which is not open to

23   the public.

24        Now, there may or may not

25   be testimony about public access

**EXHIBIT F, PAGE 48**

Instructions

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

to a part of this building.  So
I would like you to keep that in
mind.

Are there any questions on
the law or the definitions?

**EXHIBIT F, PAGE 49**

Barbara Bourne

1    BARBARA BOURNE, called as a witness and

2    being duly sworn by Carol Dickinson, Foreman

3    of the Grand Jury, testified as follows:

4    EXAMINATION BY MR. MULVEY:

5    Q    Would you state your name and address

6         for the record, please?

7    A    Barbara J. Bourne, 1380 Coddington Road,

8         Brooktondale, New York.

9    Q    Are you employed, Barbara?

10   A    Yes, I am.

11   Q    And where are you employed?

12   A    Cornell University, Department of Public

13        Safety.

14   Q    And what is your position there?

15   A    Patrol officer.

16   Q    Were you so employed in February and March

17        of 1983?

18   A    Yes, I was.

19   Q    Did you have occasion to make the acquaintance

20        of a gentleman by the name of Kevin Vanginderen?

21   A    Yes, I did.

22   Q    Could you please tell the Grand Jury the

23        circumstances involved leading up to your

24        acquaintance with him?

25   A    March 5th, on a Saturday, I received a

**EXHIBIT F, PAGE 50**

Barbara Bourne

1    complaint of a theft from Fernow Hall.

2    It was on the third floor, and a

3    gentleman by the name of Paul Sheppard

4    was the first complaint I got. He had

5    a JVC stereo taken from his locked office

6    sometime between Friday night and Saturday

7    morning. There are other offices in the

8    area, and the indication from what evidence

9    was available was that the person had

10    climbed over the partitions between the

11    offices. There is a space of about one

12    and a half feet to two feet. Somebody

13    could have climbed over. So I left a note

14    for the other graduate students in that

15    office to contact me as they came in.

16    About 2:00 o'clock in the afternoon I spoke

17    with Richard Baker. He had noticed the

18    two textbooks were missing about the same

19    time. It's normal procedure, when we get

20    textbook thefts, to report it to Triangle

21    Book Store, and I spoke with the manager,

22    Mr. Terry Hoover. He stated that he had

23    the two books that Mr. Baker had reported

24    stolen, and that someone had sold them back

25    to him. I went down to Triangle and spoke

**EXHIBIT F, PAGE 51**

Barbara Bourne

1   with him in person.  He showed me the list

2   where they -- when they buy books, the person

3   that sells them signs it, and they have to

4   show some form of I.D.  He showed me the

5   name on the page with the I.D. number next

6   to it, and he gave me a copy, photostat

7   copy of it.  The I.D. number was legible,

8   but the signature wasn't.  The only thing

9   you could really make out was the first

10  initial was "K," and the last initial was

11  "V."  What I did then was, I went to our

12  computer printout of all the students

13  listed and looked under the last names

14  beginning with the letter, "V," and I found

15  Kevin Vanginderen, and the I.D. number

16  matched exactly.  At that point I was made

17  aware by some other officers who were on

18  duty -- I don't recall exactly who it was --

19  that Officer Wittner had investigated a

20  similar incident that had taken place in

21  February.  I went to our files and pulled

22  out the cases from that and found there a

23  signed receipt from the Cornell Campus

24  Store with a signature not identical, but

25  the formulation of the "K" and "V" were

**EXHIBIT F, PAGE 52**

1    so similar I was convinced it was the same

2    individual.  The person in the Campus

3    Store had written the I.D. number in-

4    correctly.  They put down five digits

5    instead of the usual six, but the five digits

6    they put down were exactly the same as five

7    of the six of Mr. Vanginderen's I.D. number.

8    Q    O.K., and what did you do then?

9    A    We found a copy of the 1979 Cornell Freshman

10   Register.  We only knew Mr. Vanginderen was

11   a Senior.  The only picture we could find

12   of him was in the 1979 Freshman Register.

13   I took that book down to the Triangle Book

14   Store and showed it to Mr. Hoover and asked

15   him if there was anyone on the page, the two

16   pages there, he would recognize.  He pointed

17   to Mr. Vanginderen's picture and said, "The

18   hair is different, but the facial features

19   are the same, and I'm quite certain it's

20   the same person."

21   Q    Did there come a time when you approached

22   Mr. Vanginderen about these incidents?

23   A    Yes.  On Tuesday, the 8th, myself and Officer

24   Wittner.  At that time we had thought that

25   Mr. Vanginderen lived on -- in one of the

**EXHIBIT F, PAGE 53**

Barbara Bourne

1    fraternities, and we went down to the

2    fraternity and spoke to the House President.

3    It was determined he no longer lived there;

4    he lived in Winston Court Apartments. We

5    went there and spoke with the manager of

6    the apartments and found he lived in 603,

7    Apartment 3. It was about 8:00 o'clock in

8    the morning, 8:00, 8:30. We knocked on

9    the door; spoke with Mr. Vanginderen. We

10    read him his rights, told him what we were

11    inquiring about and asked him to come to

12    Barton Hall for some further questioning.

13  Q    O.K., and did there come a time when other

14    members of the department interviewed

15    Mr. Vanginderen?

16  A    Yes. At first it was myself and Officer

17    Wittner, with Officer Wittner doing the

18    questioning for the most part. I was

19    there as a witness to the interview.

20    When Mr. Vanginderen started confessing,

21    we read him his rights again, and it just

22    went on. Eventually Lieutenant Poice

23    also interviewed Mr. Vanginderen, which

24    produced a sworn statement from Mr. Vanginderen.

25  Q    O.K. Are there any further questions for

26    Officer Bourne? Thank you.

**EXHIBIT F, PAGE 54**

Wayne Wittner

1       WAYNE WITTNER, called as a witness and

2  being duly sworn by Carol Dickinson, Foreman

3  of the Grand Jury, testified as follows:

4       EXAMINATION BY MR. MULVEY:

5  Q    Could you state your name and address for

6       the record, please?

7  A    Wayne Wittner, 15 Meadow Drive, Freeville,

8       New York.

9  Q    And are you employed, Mr. Wittner?

10  A    Yes.  Cornell University Department of

11       Public Safety as a patrol officer.

12  Q    Were you so employed in March of 1983?

13  A    Yes, sir, I was.

14  Q    Did you have occasion to make the acquaintance

15       of a Kevin Vanginderen?

16  A    Yes, sir.

17  Q    Could you please briefly tell the Grand Jury

18       the circumstances involved with your meet-

19       ing Mr. Vanginderen?

20  A    When I came to work at 7:00 o'clock in the

21       morning, Officer Bourne informed me that

22       she had found a possible subject of the

23       book thefts out of Fernow Hall.  At that

24       time the address that we  had for him was

25       17 South Ave.  We went over at that time, and

**EXHIBIT F, PAGE 55**

Wayne Wittner

1   the House President told us that he lived

2   in Winston Court Apartments.  We went there

3   to his apartment and spoke with the gentle-

4   man.  At that time I read him his Miranda

5   warnings and asked him about the books.

6   He told me at that time that he had bought

7   them from a hispanic in front of the

8   libraries on the campus.  So we then took

9   him back to Barton Hall.  I started question-

10  ing him at that time about the thefts, and

11  he broke down and admitted to taking the

12  books, and I quote, "I went into the rooms

13  and took the books. stereo, calculator and

14  tape deck.  I am a poor student and sold

15  the books to get money."

16  Q   Did you have any further conversation

17      with him?

18  A   At that time I did not.

19  Q   O.K.

20  A   Officer Bourns and Lieutenant Boice finished

21      up with him at that time.

22  Q   O.K.  So Lieutenant Boice conducted a further

23      interview.

24  A   Yes, sir.

25  Q   Are there any questions for Officer Wittner?

26      Thank you, sir.

**EXHIBIT F, PAGE 56**

William G. Boice

1    WILLIAM G. BOICE, called as a witness and

2    being duly sworn by Carol Dickinson, Foreman of

3    the Grand Jury, testified as follows:

4    EXAMINATION BY MR. MULVEY:

5    Q    Would you state your name for the record,

6         please?

7    A    William G. Boice, B-o-i-c-e.

8    Q    Are you employed, sir?

9    A    I am, sir.

10   Q    Where are you employed?

11   A    Cornell Public Safety. I'm a Police Lieutenant

12        in charge of major investigations.

13   Q    O.K., Lieutenant, were you so employed on

14        March 8, 1983?

15   A    Yes, sir.

16   Q    O.K. Do you recall conducting an interview

17        with a man by the name of Kevin Vanginderen

18        that day?

19   A    Yes, sir.

20   Q    Will you please briefly tell the Grand Jury

21        the substance of that interview?

22   A    Approximately 9:10 in the morning Officer Bourne

23        stated that she had -- well, in the course of

24        the investigation she had interviewed Kevin,

25        and he admitted to several larcenies and

**EXHIBIT F, PAGE 57**

William G. Boice

1   several burglaries in offices in Fernow

2   and Bradfield Hall.

3   Q   There was a transcript made of that inter-

4       view?

5   A   Yes, sir.

6   Q   Do you have a copy of that with you?

7   A   Yes, sir.

8   Q   O.K.  I'm going to briefly show you Grand

9       Jury Exhibit 2 and ask you to identify that

10      for us.

11  A   It's a question and answer interview I

12      conducted with Kevin at approximately 10:35

13      on March 8th.

14  Q   O.K.  Do you have a copy of that with your

15      own packet of papers?

16  A   Yes, sir.

17  Q   O.K.  I would like you to open that up and

18      look at it, if you will, Lieutenant.  I

19      direct your attention to the lower portion

20      of Page 2 of that transcript, specifically

21      the second to last question on that page.

22      Would you please tell us or read that question

23      to the Grand Jury?

24  A   The question I posed to Kevin regarding Case

25      Number 83-421 occurring March 3 to March 5,

**EXHIBIT F, PAGE 58**

William G. Boice

| | | |
|---|---|---|
| 1 | | 312F Fernow Hall, involving JVC cassette |
| 2 | | stereo player recorder which was taken on |
| 3 | | the burglary where the subject climbed over |
| 4 | | a partition, and I asked, "Are you responsible |
| 5 | | for this?" and Kevin responded, "Yes. That |
| 6 | | was the last theft on 2:00 A.M. on Saturday." |
| 7 | Q | So did you determine what day it was in |
| 8 | | March that he committed that burglary? |
| 9 | A | I don't recall specifically the date that |
| 10 | | the burglary occurred. The report came |
| 11 | | sometime within the 3rd to the 5th. So |
| 12 | | whichever Saturday fell on March 3rd was |
| 13 | | it. |
| 14 | Q | I'm going to direct your attention to |
| 15 | | further up on that page, about one-third |
| 16 | | of the way down, where it begins, |
| 17 | | "Case 83-303." Will you please read that |
| 18 | | question to the Grand Jury? |
| 19 | A | Again, I was questioning. I asked of Kevin |
| 20 | | regarding Case 83-303, occurring sometime |
| 21 | | between February 10 and February 12, 1983, |
| 22 | | regarding unlawful entry into Room 312-C, |
| 23 | | Fernow Hall, in which a calculator, a |
| 24 | | Texas Instrument, TI 55, and a Sanyo |
| 25 | | tape deck recorder were taken. I asked |

**EXHIBIT F, PAGE 59**

16

William G. Boice

1       him specifically, "Were you responsible

2       for these items?" and he responded,

3       "Yes, they have them," and indicated that

4       the officers had them.

5    Q   O.K., Lieutenant, did -- I would like you

6       to look in your packet and tell us if you

7       have a copy of Grand Jury Exhibit 3.

8    A   Yes, sir.

9    Q   O.K. I would like you to open up to

10      that page.

11   A   O.K.

12   Q   Will you identify that for us?

13   A   It's a written statement voluntarily given

14      by Kevin at approximately 9:10 A.M.,

15      morning of March 8, in my office.

16   Q   O.K. Will you read the first line of

17      Mr. Vanginderen's statement to us?

18   A   "I, Kevin G. Vanginderen, admit to taking

19      a few books, a calculator and two small

20      cassette decks from Fernow Hall."

21   Q   O.K. I direct your attention to the fourth

22      line up from the bottom, beginning, "Wittner."

23      Will you please read that for us?

24   A   "Wittner: How did you gain entrance into

25      Fernow Hall? Vanginderen: A tunnel leading

**EXHIBIT F, PAGE 60**

William G. Beice

1    from the basement of Bradfield Hall to Fernow,

2    which is unlocked.  I gained entrance through

3    it.  Wittner:  The room you took the books

4    from in Fernow, were the rooms locked?

5    Vanginderen:  No.  The rooms I went into

6    on the main corridor were unlocked.  The

7    ones at the ends of the corridor had spaces

8    above the doors, which I jumped."

9  Q  O.K.  I have no further questions for

10    Lieutenant Beice.  Do any of the Grand

11    Jurors have any questions?  Thank you,

12    sir.

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT F, PAGE 61**

Richard Baker

1        RICHARD BAKER, called as a witness and

2    being duly sworn by Carol Dickinson, Foreman

3    of the Grand Jury, testified as follows:

4        EXAMINATION BY MR. MULVEY:

5    Q    Would you state your name and address for

6         the record, please, sir?

7    A    Richard Baker.  My home address is

8         134 Judd Falls Road, Ithaca.

9    Q    O.K.  Are you employed, sir?

10   A    I'm a graduate student at Cornell University.

11   Q    O.K., Mr. Baker, did there come a time

12        when you made a report to the Cornell Public

13        Safety regarding some items that were miss-

14        ing from your offices?

15   A    Yes.  I made a report on February 14th that

16        some items were missing.

17   Q    Can you tell us where your office is

18        located?

19   A    My office is 304C Fernow Hall.  It's --

20   Q    O.K.  Can you tell us what those offices

21        are for?

22   A    They're solely for graduate students,

23        the entire third floor.

24   Q    O.K.  Can you tell us what you keep

25        in that office?

**EXHIBIT F, PAGE 62**

Richard Baker

1   A   All the material that's associated with

2       my studies, my books, papers, other items

3       that you use.

4   Q   In February what items did you notice

5       missing?

6   A   On February 13th I noticed that my cal-

7       culator, TI 55, and a cassette tape deck

8       that I borrowed were missing.

9   Q   O.K.  Did there come a time in March when

10      you noticed anything missing from your

11      office?

12  A   Yes.  Again on March 5th I found that there

13      were some books missing.

14  Q   O.K.  Did you report that to the Cornell

15      Public Safety?

16  A   Yes, I did.

17  Q   O.K.  Do you keep your office locked?

18  A   Yes, I do, always.

19  Q   O.K.  So when you leave your office on

20      a daily basis, you lock it as you leave.

21  A   Yes.

22  Q   Do you know a man by the name of Kevin

23      Vanginderen?

24  A   No, I don't.

25  Q   O.K.  Had you ever given Kevin Vanginderen

**EXHIBIT F, PAGE 63**

EXHIBIT B,
Page 67

Richard Baker

1   permission to be in your office between the
2   dates of February 10th, 1983 and February 12th,
3   1983?

4   A   No.

5   Q   O.K.  I ask you the same question for March 5,
6       1983.

7   A   I never did, no.

8   Q   So you never gave him permission to be
9       there on that date either.

10  A   No.

11  Q   O.K.  Is that a public building?

12  A   In what sense do you mean public?

13  Q   Is it -- are the main doors to the building
14      open at all times to the public?

15  A   During the daytime they are.  At night
16      they're locked.

17  Q   How does one gain access to the building?

18  A   Only with a key.

19  Q   O.K., and how do you obtain that key?

20  A   Through the Administrative Manager of
21      the apartment.

22  Q   I see. Well, I have no further questions
23      for Mr. Baker.

24      JUROR:            Were your items ever
25      recovered?

**EXHIBIT F, PAGE 64**

Richard Baker

1    A   Yes, they were.

2        JUROR:        From Vanginderen or

3        you don't know where?

4    A   To the best of my knowledge they were

5       recovered by Public Safety from him, yes.

6    Q   Any more questions?  Well, thank you, sir.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT F, PAGE 65**

Instructions

1    MR. MULVEY:              I would ask you to

2         separate the two counts for the

3         following dates.  I believe you

4         heard testimony based on

5         Mr. Vanginderen's admission that

6         he made entry between the dates

7         of February 10 and February 12, 1983.

8         I would ask you to consider that

9         as one date for a burglary.  I

10        would also ask you to consider

11        March 5 as another date for

12        Count 2 for burglary.  You recall

13        there was testimony regarding his

14        statement that he made an entry

15        on March 5.  So those are the two

16        counts. Any questions?  O.K.

17        Thank you.

18

19

20

21

22

23

24

25

**EXHIBIT F, PAGE 66**

CERTIFICATION

1    I, Dorothy M. Burdorf, duly appointed Grand

2    Jury Stenographer, County of Tompkins, State of

3    New York, do certify that in such capacity I took

4    the minutes of the County Court Grand Jury con-

5    vened on April 25, 1983, in the within matter of

6    The People of the State of New York against

7    KEVIN VANGINDEREN; that I have transcribed the same,

8    and the foregoing is a true copy of such

9    transcript, to the best of my ability, and of

10   the whole thereof.

**EXHIBIT F, PAGE 67**

83-1136

RECEIVED/SENT
TOMPKINS COUNTY
DISTRICT ATTORNEY
MAY 25  3 48 PM '83

## ADAMS, THEISEN & NASH
ATTORNEYS AND COUNSELORS AT LAW
301 THE CLINTON HOUSE
103 WEST SENECA STREET
ITHACA, NY 14850

HENRY W. THEISEN
RALPH W. NASH

STEPHEN M. BOWMAN

ARMAND L. ADAMS
1911-1983

607-272-3442

May 25, 1983

Hon. Benjamin J. Bucko
Tompkins County District Attorney
Tompkins County Courthouse
Post Office Box 326
Ithaca, New York 14850

                    Re:  People v. Vanginderen

Dear Ben:

        My client has asked me again whether there is any possibility
of his meeting with you personally on this matter in an effort to resolve
it.  If such is not possible, he would like to be arraigned as soon as
possible, so that it will interfere minimally with his employment.

        Thank you for your attention to this matter.

                            Yours very truly,

                            ADAMS, THEISEN & NASH

                            Ralph W. Nash

RWN/dh

*Ralph —* 5/27/83

*The matter has been presented to the
Grand Jury and the indictment will be
handed up next Tuesday.*

*Ben*

**EXHIBIT F, PAGE 68**

EXHIBIT B,
Page 72

STATE OF NEW YORK
COUNTY COURT   :   COUNTY OF TOMPKINS

----------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK,

                    Plaintiff

          vs.                                    INDICTMENT

KEVIN G. VANGINDEREN,                   Index No. 83-46

                    Defendant

----------------------------------------

COUNT I

        The Grand Jury of the County of Tompkins and State of
New York, by this Indictment, hereby accuses KEVIN G. VANGINDEREN
of the crime of BURGLARY IN THE SECOND DEGREE in violation of
Section 140.25 of the Penal Law of the State of New York, com-
mitted as follows:

        Between the hours of 12:00 A.M. on February 10, 1983
and 11:59 P.M. on February 12, 1983, the exact time and date
being unknown, at Fernow Hall in the City of Ithaca, County of
Tompkins and State of New York, the said KEVIN G. VANGINDEREN
did knowingly enter or remain unlawfully in said building with
intent to commit a crime therein.

COUNT II

        The Grand Jury of the County of Tompkins and State of
New York, by this Indictment, hereby accuses KEVIN G. VANGINDEREN
of the crime of BURGLARY IN THE SECOND DEGREE in violation of
Section 140.25 of the Penal Law of the State of New York, com-
mitted as follows:

        Between the house of 12:00 A.M. and 11:59 P.M. on March 3,
1983, the exact time being unknown, at Fernow Hall in the City of
Ithaca, County of Tompkins and State of New York, the said KEVIN
G. VANGINDEREN did knowingly enter or remain unlawfully in said
building with intent to commit a crime therein.

        Signed this 7th day of June, 1983 in the City of Ithaca,
County of Tompkins and State of New York.

DISTRICT ATTORNEY
TOMPKINS COUNTY
ITHACA, NEW YORK 14850

s/Carol T. Dickinson                    s/Benjamin J. Bucko
--------------------                    ---------------------
      FOREMAN                             DISTRICT ATTORNEY

**EXHIBIT F, PAGE 69**

RECEIVED/SENT
TOMPKINS COUNTY
DISTRICT A~~~~~

JUL 15  1 29 PM '83

STATE OF NEW YORK
COUNTY COURT  :  COUNTY OF TOMPKINS

THE PEOPLE OF THE STATE OF NEW YORK,  :

        -vs-  :

KEVIN G. VANGINDEREN,  :

            Defendant. :

NOTICE OF MOTION

Indictment No. 83-46

      PLEASE TAKE NOTICE that upon the annexed Affidavit of Ralph W. Nash, sworn
to the 15th day of July, 1983, the Exhibits attached thereto and all prior pro-
ceedings herein, the undersigned will move this Court at a Criminal Motion Term
thereof to be held on the 1st day of August, 1983, at 9:30 A.M., or as soon there-
after as counsel may be heard for Orders on behalf of the Defendant (A) for dismissal
of the indictment as defective; (B) for inspection of the Grand Jury minutes and for
dismissal of the indictment for legal insufficiency of the evidence; (C) for
dismissal in the interests of justice; (D) for suppression of the statements
allegedly made by Defendant; (E) for discovery pursuant to a Demand to Produce; and
(F) for such other and further relief as to this Court may seem just and proper.

DATED:  July 15, 1983

RALPH W. NASH, ESQ.
Attorney for Defendant
Office and P.O. Address:
ADAMS, THEISEN & NASH
301 The Clinton House
103 West Seneca Street
Ithaca, New York 14850
Tel.:  (607) 272-3442

TO:  HON. BENJAMIN J. BUCKO
    Tompkins County District Attorney
    Office and P.O. Address:
    Tompkins County Courthouse
    Post Office Box 326
    Ithaca, New York 14850

**EXHIBIT F, PAGE 70**

STATE OF NEW YORK
COUNTY COURT    :    COUNTY OF TOMPKINS

THE PEOPLE OF THE STATE OF NEW YORK    :

                    -vs-                :                    AFFIDAVIT

                                                            Indictment No. 83-46
KEVIN G. VANGINDEREN,                   :

                        Defendant.  :

_____

STATE OF NEW YORK  )
                   ) SS:
COUNTY OF TOMPKINS )

      RALPH W. NASH, being duly sworn, does depose and say:

      1.  That he is the attorney for the Defendant herein and is fully familiar with the facts and circumstances of this case.

      2.  That the Defendant was arraigned on the above numbered Indictment on June 10, 1983, and entered a plea of not guilty to both counts of the Indictment at that time.

      3.  At arraignment, your deponent was directed to file pre-trial motion papers on or before July 15, 1983, making the motions returnable at the next appropriate motion term of this Court.

MOTION TO DISMISS INDICTMENT AS DEFECTIVE:

      4.  Indictment No. 83-46 charges the Defendant with two counts of Burglary in the Second Degree upon identical factual allegations that the Defendant "did knowingly enter or remain unlawfully in said building (Fernow Hall) with the intent to commit a crime therein."

      5.  Said factual allegation does not substantially conform to the requirements for indictments as provided in the Criminal Procedure Law

**EXHIBIT F, PAGE 71**

EXHIBIT B,
Page 75

6.  As can be seen by Exhibit "A" attached hereto, no factual allegation consistent with the crime charged can be made

### MOTION TO INSPECT THE GRAND JURY MINUTES AND DISMISS INDICTMENT ON GROUND OF INSUFFICIENCY OF GRAND JURY EVIDENCE:

7.  Count I of the Indictment alleges that the Defendant committed a burglary sometime within a 72-hour period commencing at midnite on February 10, 1983, and concluding at one minute to midnite on February 12, 1983.  It appears therefrom that no evidence was introduced to the Grand Jury as to the actual entry of and/or failure to leave Fernow Hall of the Defendant.

8.  As appears from Exhibit "A" attached hereto, Fernow Hall was open to the public during most of the period in which it is alleged that the burglary occurred.

9.  Upon information and belief, therefore, it is contended that no evidence was submitted to the Grand Jury that the Defendant did knowingly enter or remain unlawfully in Fernow Hall as alleged in the Indictment.

10.  Upon the aforesaid information, the People could not meet its burden of proof upon the charge stated in Count I of the Indictment or any lesser included charge thereof

11.  Upon the same argument, the People likewise could not meet its burden of proof upon the charge stated in Count II of the Indictment or any lesser included charge thereof

### MOTION TO DISMISS IN THE INTERESTS OF JUSTICE:

12.  At the time of his arrest in this matter, Kevin Vanginderen was a senior at Cornell University.  He has subsequently graduated and is looking for permanent employment.

-2-

**EXHIBIT F, PAGE 72**

13.  During his entire attendance at Cornell University Kevin was beset by economic problems, which said problems do not justify any wrongdoing, but do offer some explanation thereof.  Your deponent believes that this case presents an excellent opportunity for a dismissal in the interests of justice, (if this Indictment is not dismissed because of the foregoing legal contentions), because of the following factors which are arranged in the order provided by Criminal Procedure Law §210.40:

(a)  The offense involved constitutes at most a petty theft with no overtones of threat to persons or their residences, or unlawful entry into any building.

(b)  The harm caused by the offense is limited to the transitory loss of personal property of minimal value.

(c)  The evidence of guilt of a burglary as charged in the Indictment is minute, while the evidence of a petty theft rests solely upon the admission of Defendant, which may be ruled inadmissible.

(d)  The Defendant Kevin Vanginderen has no prior criminal record, nor as can be seen by Exhibit "B" attached hereto, any record of wrongdoing at Cornell University.  He has worked to the best of his ability to obtain a college diploma from Cornell University and he has worked to support himself with very limited assistance from his parents during this period.  See Exhibit "B" and "C".

His character is such that he suffers sincere remorse for any theft he may have committed, and it is certainly to be expected that a recurrence of such activity will never happen; this, without the necessity of imposing a criminal conviction and attendant punishment.  A criminal conviction will have prohibitive effect on Kevin's future at this critical time of seeking employment after graduation.  His Indictment in this matter has already caused him considerable problems in this regard.

ADAMS & THEISEN · ATTORNEYS AT LAW · ITHACA, NEW YORK

-3-

**EXHIBIT F, PAGE 73**

It is submitted that the circumstances of this case and the character of the Defendant made this case an ideal one for diversion referral, which was denied by the District Attorney's Office.

(e)  Your deponent believes that the law enforcement officials at Cornell University unfairly and unconstitutionally wrested a confession from Defendant by arresting him at his residence in the early morning hours and threatening to prosecute him for several serious thefts at Cornell University if he did not make a full confession.  In addition, it appears that the District Attorney's Office has over-indicted Kevin based upon the facts of this case.

(f)  No positive purpose and effect can be visited upon the Defendant by a felony sentence in this matter.  Kevin's character is such that it has reacted tremendously to the shame and indignity of a publicized arrest and prosecution.  To visit upon him the stigma of a felony conviction at this critical time of his life would serve no useful purpose and would only show vindictiveness and failure to make even the most basic observations regarding human behavior.

(g)  It is respectfully contended that the public does believe that "the quality of mercy is not strained."  It is respectfully submitted that the public is in favor of a first-time offender with an otherwise unblemished and exemplary record getting a break.  To brand every first-time offender as a criminal would be counter-productive.  The impact of a dismissal upon the confidence of the public in the criminal justice system would be salutory.

(h)  There would be no adverse impact of a dismissal on the safety or welfare of the community.  Dean Drinkwater, who speaks on behalf of the Cornell community, certainly evidences no concern on this matter and recommends liberal treatment of Kevin's case.  Considering Kevin's character as therein attested and proven by his past conduct, no negative impact exists.

ADAMS & THEISEN · ATTORNEYS AT LAW · ITHACA, NEW YORK

-4-

**EXHIBIT F, PAGE 74**

Based upon all of the foregoing, your deponent believes that a dismissal in the interests of justice is indeed appropriate in this case, if this Indictment is not for other reasons dismissed.

### MOTION FOR SUPPRESSION OF STATEMENT:

14.  If the Indictment is not dismissed in this matter upon the foregoing motions, your deponent does request a hearing to determine the admissibility of certain statements allegedly made by the Defendant herein.

15.  That your deponent has been served with a notice of intent to use admissions, the original of which has been filed in the County Clerk's Office and it is as to these alleged statements that your deponent requests an Order of Suppression upon the basis that they were unconstitutionally obtained from the Defendant, and/or taken from the Defendant after he had been unconstitutionally arrested or otherwise restricted in his freedom.

### MOTION FOR DISCOVERY:

16.  Attached hereto and made a part hereof, as Exhibit "D", is the Demand to Produce made pursuant to CPL §240.20.  While I do not anticipate that the People will refuse to comply with these demands, I here incorporate these Demands in order that they may be before this Court for a ruling pursuant to CPL §240.40 in the event of the People's refusal.

17.  Your deponent reserves the right to amend or supplement this motion if made necessary or appropriate by future disclosure by the District Attorney.

_____
RALPH W. NASH

Sworn to before me this
15th day of July, 1983.

Notary Public

-5-

**EXHIBIT F, PAGE 75**

STATE OF NEW YORK
COUNTY COURT    :    COUNTY OF TOMPKINS

THE PEOPLE OF THE STATE OF NEW YORK           :

                    —vs—                      :                    AFFIDAVIT

KEVIN G. VANGINDEREN,                         :                    Indictment No. 83-46

                         Defendant.           :


STATE OF NEW YORK    )
                     ) SS:
COUNTY OF TOMPKINS   )

ELIZABETH DEMPSEY, being duly sworn, does depose and say:

1. That she is the Administrative Manager of the School of Natural Resources at Cornell University in Ithaca, New York.

2. That Fernow Hall, located on the campus of Cornell University in Ithaca, New York is operated by the School of Natural Resources which is a within the College of Agriculture and Life Science statutory college under the jurisdiction of the State of New York.

3. That Fernow Hall contains academic offices, classrooms and laboratories only and contains no residential areas for either student or faculty living.

4. That Fernow Hall is open to the general public on weekdays during the academic school year from the hours of 6:00 A.M. to 5:00 P.M. daily.

5. That there were no academic vacation periods on Thursday, February 10, 1983; Friday, February 11, 1983; or Thursday, March 3, 1983, and Fernow Hall was open to the general public from the hours of 6:00 A.M. to 5:00 P.M. on those days.

_____
ELIZABETH DEMPSEY

Sworn to before me this

21st day of June, 1983.

_____
Notary Public

RALPH W. NASH
Notary Public, State of New York
No. 02 NA 4600490, Req. in Tompkins County
My Commission Expires March 30, 1984

**EXHIBIT F, PAGE 76**



OFFICE OF THE DEAN OF STUDENTS
103 BARNES HALL
ITHACA, NEW YORK 14853
(607) 256-4221

26 April, 1983

Ralph W. Nash Esq.
Adams, Theisen & Nash
301 Clinton House
103 West Seneca Street
Ithaca
New York 14850

Dear Mr. Nash:

I am happy to comply with your request for a general letter of reference concerning Kevin Vanginderen, who is currently a Senior in the College of Agriculture and Life Sciences.

I have known Mr. Vanginderen for nearly three years as a result of inquiries he made concerning eligibility for student employment. Our acquaintance has not been regular in that he appears to have had no difficulties as a student and has not had to use the resources of the Dean of Students office. Consequently, I have asked about his status and am informed by College officials that he has made steady progress towards his degree and has a sound record in terms of behavior.

At the time of our initial discussion, I was impressed by his concern that he should be able to find employment at Cornell and be able to underwrite some of his educational costs—in short, to stand on his own two feet. Family cirumstances made it necessary that he should do so, and he showed initiative in pursuing all options. From recent conversations, I gather that family financial constraints are still a problem—I know that these constraints are real—and contributed to his actions.

Mr. Vanginderen seems to me to be a generally well-balanced young man, not an outstanding scholar, but a person who has worked at his studies and who has participated in normal campus activities. He seems to recognize that what he did was wrong and has been very open in confronting the extent of his error, although it would have been easy for him not to do so. This openness is in character and coincides with my earlier impressions of him.

Please do not hesitate to call me if you have further questions.

Sincerely,

David Drinkwater
Dean of Students.

**EXHIBIT F, PAGE 77**

Exhibit "B"

EXHIBIT B,
Page 81



DEPARTMENT OF PHYSICAL EDUCATION AND ATHLETICS
**INTRAMURAL DIVISION**

HELEN NEWMAN HALL

256-2315

RECEIVED

MAR 26 1983

ALAN E. GANTERT, *Director*
MARIA L. WEST,
*Associate Director*

ADAMS & THEISEN   March 24, 1983

Mr. Ralph Nash
Attorney at Law
103 W. Seneca Street
Ithaca, New York  14850

Dear Mr. Nash:

   This letter is in answer to your request that I state in writing
that Kevin G. Vangindren has been employed in this department for the
past several years as an Equipment Manager for Intramural Ice Hockey
and Box Lacrosse.

                              Sincerely yours,

                              Maria L. West
                              Associate Director of Intramural Sports

mlw:m

Exhibit "C"

STATE OF NEW YORK
COUNTY COURT   :   COUNTY OF TOMPKINS

THE PEOPLE OF THE STATE OF NEW YORK   :

                  -vs-                 :          DEMAND TO PRODUCE

KEVIN G. VANGINDEREN,                  :          Indictment No. 83-46

                        Defendant.     :

TO:  HON. BENJAMIN J. BUCKO
     Tompkins County District Attorney

          Pursuant to CPL §240.20, DEMAND is herewith made that you supply or make

available to the undersigned for inspection, photographing, copying and/or testing

the following property:

          (a)  Any written, recorded or oral statement of the Defendant, and of a

Co-Defendant to be tried jointly, made, other than in the course of the criminal

transaction, to a public servant engaged in law enforcement activity or to a person

then acting under his direction or in cooperation with him;

          (b)  Any transcript of testimony relating to the criminal action or pro-

ceeding pending against the Defendant, given by the Defendant, or by a Co-Defendant

to be tried jointly, before any Grand Jury;

          (c)  Any written report or document, or portion thereof, concerning a

physical or mental examination, or scientific test or experiment, relating to the

criminal action or proceeding which was made by, or at the request or direction of

a public servant engaged in law enforcement activity, or which was made by a person

whom the Prosecutor intends to call as a witness at trial, or which the People

intend to i n troduce at trial;

          (d)  Any photograph or drawing relating to the criminal action or pro-

ceeding which was made or completed by a public servant engaged in law enforcement

                        EXHIBIT "D"

Sworn to before me, this        day of              19              **EXHIBIT F, PAGE 79**

activity, or which was made by a person whom the Prosecutor intends to call as a witness at trial, or which the People intend to introduce at trial;

    (e)  Any other property obtained from the Defendant, or a Co-Defendant to be tried jointly, and any property which will be alleged was stolen by Defendant.

    (f)  Any tapes or other electronic recordings which the Prosecutor intends to introduce at trial, irrespective of whether such recording was made during the course of the criminal transaction;

    (g)  Anything required to be disclosed, prior to trial, to the Defendant by the Prosecutor, pursuant to the constituion of this State or of the United States;

    (h)  The approximate date, time and place of Defendant's arrest.

DEMAND is further made that any refusal to supply any of the demanded material be made in writing setting forth the grounds for such refusal pursuant to CPL §240, and that a copy of such writing be served upon the undersigned and filed with the Court within ten (10) days from receipt by you of this Demand.

DATED:  July 15, 1983

RALPH W. NASH, ESQ.
Attorney for Defendant
Office and P.O. Address:
301 The Clinton House
103 West Seneca Street
Ithaca, New York 14850
Tel.:  (607) 272-3442

"D-2"

STATE OF NEW YORK
COUNTY COURT : COUNTY OF TOMPKINS

THE PEOPLE OF THE STATE OF NEW YORK        :

                vs.        :        MEMORANDUM OF LAW

      KEVIN G. VANGINDEREN,        :        Indictment No. 83-46

              Defendant.        :

## MOTION TO DISMISS INDICTMENT AS DEFECTIVE

Criminal Procedure Law §210.20(a) provides for dismissal of an indictment or any count thereof upon the ground that "such indictment or count is defective, within the meaning of section 210.25." Criminal Procedure Law §210.25(1) provides that an indictment or count thereof is defective when "it does not substantially conform to the requirements stated in article two hundred." Criminal Procedure Law §200.50(7) provides that the indictment must contain with respect to each count, "facts supporting every element of the offense charged and the defendant's commission thereof."

Indictment No. 83-46 charges the Defendant with two counts of Burglary in the Second Degree upon identical factual allegations that the Defendant "did knowingly enter or remain unlawfully in said building (Fernow Hall) with the intent to commit a crime therein." Said allegations are insufficient and render the indictment defective for failure to allege an element of the offense of Burglary in the Second Degree, to wit: that the building is a dwelling. Penal Law §140.25. Without such allegation and proof thereof, a defendant cannot be convicted of the crime of Burglary in the Second Degree. See Practice Commentaries to McKinney's Penal Law §140.25. p. 46-48 main volume.

**EXHIBIT F, PAGE 81**

Recent Court of Appeals decisions relaxing standards for allegations to support an indictment have not altered the necessity for an indictment to comply with CPL §200.50 nor the necessity of alleging in the indictment every material element of the crime charged. See People v. Iannone 45 NY2d 589 at page 598 where the requirements of CPL §200.50 are specifically approved as fulfilling the constitutional protections of prosecution by indictment; and at page 600 wherein the Court states that "an indictment will be jurisdictionally defective if... it fails to allege that a defendant committed acts constituting every material element of the crime charged."

It is clear from the indictment that the People did not allege the material element of the crime of Burglary in the Second Degree that the building entered was a dwelling.  It is also clear from the Affidavit attached to the Defendant's motion papers as Exhibit "A" that no allegation could in fact be made, as no one dwells in Fernow Hall.  Further, the indictment cannot be amended to allege the charge of Burglary in the Third Degree for two reasons.  First, the People have not so moved.  Criminal Procedure Law §210.25(1).  Secondly, an indictment may not be amended "for the purpose of curing:  (a) a failure thereof to charge or state an offense; or (b) legal insufficiency of the factual allegations." CPL §200.70(2).  This, of course, accords with the holding in Iannone, supra, that an indictment defective in these regards is jurisdictionally defective.

### MOTION TO INSPECT THE GRAND JURY MINUTES AND
DISMISS INDICTMENT ON GROUND OF INSUFFICIENCY OF GRAND JURY EVIDENCE

CPL §210.20(1)(b) provides that an indictment or any count thereof may be dismissed upon the ground that "the evidence before the grand jury was not legally

-2-

**EXHIBIT F, PAGE 82**

*(left margin, vertical)* ADAMS & THEISEN  ·  ATTORNEYS AT LAW  ·  ITHACA, NEW YORK

sufficient to establish the offense charged or any lesser included offense."

Both Burglary in the Second Degree and Burglary in the Third Degree require that a person "knowingly enters or remains unlawfully in a building with intent to commit a crime therein." Penal Law §140.25 and §140.20. As can be seen from the indictment and the Affidavit attached to Defendant's motion papers as Exhibit "A", the People have failed to allege and provide proof, prima facie, that Defendant knowingly entered or remainded unlawfully in Fernow Hall, which is an essential element of the crime of burglary. People v. Letko 60 AD2d 661, reversed on other grounds 47 NY2d 257; and People v. Miles 85 AD2d 610 (2nd Dept., 1981).

It seems clear that the indictment in this matter could support only a charge of larceny in Fernow Hall. Larceny is not a lesser included offense of burglary. Rather criminal trespass is. See Practice Commentaries to McKinney's Penal Law §140.20 and §140.25, main volume. Larceny is not a lesser included offense of burglary since it is possible to commit a burglary without committing a larceny (a building may be entered with intent to commit a crime without committing a larceny). CPL §1.20(37) and People v. Brown 53 NY2d 979(1981).

## MOTION TO DISMISS IN THE INTERESTS OF JUSTICE

Defendant's affidavit and supporting exhibits provide ample support for a dismissal in the interests of justice in this case, if the indictment is not dismissed for other reasons. Such a dismissal has "a respected place in common law... its thrust, even to the disregard of legal or factual merit, has been "to allow the letter of the law gracefully and charitably to succomb to the spirit of justice." People v. Rickert 58 NY2d 122(1983). It is respectfully contended

-3-

**EXHIBIT F, PAGE 83**

*(left margin, vertical text)* ADAMS & THEISEN · ATTORNEYS AT LAW · ITHACA, NEW YORK

that the facts of this case do not warrant a felony conviction for Kevin G.

Vanginderen and the effects of same would not be salutary.  It is precisely

the blanket policy of the District Attorney's Office and the failure to consider

individual factors which warrants judicial correction in this matter.  See

Rickert, supra.  A hearing is respectfully requested upon this motion.  People

vs. Clayton  41 AD2d 204 (Third Dept.,1973).

ADAMS, THEISEN & NASH
Ralph W. Nash, Esq. of Counsel
Attorneys for Defendant
Office & P.O. Address:
301 The Clinton House
Ithaca, New York  14850
(607)-272-3442

ADAMS & THEISEN · ATTORNEYS AT LAW · ITHACA, NEW YORK

-4-

**EXHIBIT F, PAGE 84**

## THE DISTRICT ATTORNEY OF TOMPKINS COUNTY

Tompkins County Courthouse
P.O. Box 326
Ithaca, New York 14851-0326

(607) 274-5461

BENJAMIN J. BUCKO
District Attorney

July 21, 1983

Assistant District Attorneys:

Frank Smithson
William A. Lange, Jr.
John Alden Stevens
Robert C. Mulvey
Pamela A. Clermont

Ralph Nash, Esq.
The Clinton House
Ithaca, NY  14850


Re:  People v. KEVIN G. VanGINDEREN
     Indictment No. 83-46
     Our File No. 83-1136

Dear Ralph:

Enclosed please find the People's Answering Affidavit with respect to the above entitled matter.

By copy of this letter I have today filed the original of the same with the Tompkins County Clerk.

Very truly yours,

ROBERT C. MULVEY, ESQ.
Assistant District Attorney

RCM/dkl

Enclosure

cc:  Tompkins County Clerk


**EXHIBIT F, PAGE 85**

STATE OF NEW YORK
COUNTY COURT    :    COUNTY OF TOMPKINS

------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK,

                      Plaintiff

         vs.

KEVIN G. VanGINDEREN,

                    Defendant

------------------------------------------

ANSWERING AFFIDAVIT

Index No. 83-46

STATE OF NEW YORK    :
                 :  ss.
COUNTY OF TOMPKINS    :

      ROBERT C. MULVEY, being duly sworn, deposes and says:

      1.  That he is an Assistant District Attorney in and for the County of Tompkins and State of New York and he makes this Answering Affidavit in response to the Defendant's Notice of Motion returnable on August 1, 1983.

<u>SUFFICIENCY OF INDICTMENT</u>

      2.  That your deponent denies the allegations set forth in Paragraphs 4 and 5 of Attorney Nash's Affidavit and submit that both counts of the Indictment are sufficient pursuant to the requirements of the Criminal Procedure Law.

      3.  That the definition of a building as set forth in Article 140 of the Penal Law establishes that a factual allegation consistent with the crime can be made.

DISTRICT ATTORNEY
TOMPKINS COUNTY
ITHACA, NEW YORK 14850

**EXHIBIT F, PAGE 86**

## SUFFICIENCY OF GRAND JURY EVIDENCE

4.    That the evidence presented to the Grand Jury with respect to both Counts I and II consisted of full and detailed admissions by the Defendant corroborated by the testimony of others.

5.    That "Exhibit A" submitted by the Defendant is irrelevant to this prosecution inasmuch as the burglaries occurred in locked, private offices within Fernow Hall.  The Defendant may request a Bill of Particulars to amplify the Indictment.  Further, the Defendant is fully aware of the nature of the charges against him by virtue of his detailed confession.

6.    That Attorney Nash has failed to set forth the grounds for his information and belief as set forth in Paragraph 9.

## INTERESTS OF JUSTICE

7.    That the People oppose dismissal of the Indictment in the interests of justice.

8.    That an "explanation" for wrongdoing is insufficient unless it constitutes actual physical duress, coercion or insanity. The allegation that the Defendant suffered from economic duress and therefore deserves sympathy while attending one of the most expensive private universities in the United States is ludicrous. Adjudication of felony charges with respect to a Cornell student must be based on the same factors as those applied to other criminals in Tompkins County.

DISTRICT ATTORNEY
TOMPKINS COUNTY
ITHACA, NEW YORK 14850

**EXHIBIT F, PAGE 87**

9.   That the full confession was obtained by law enforce-
ment officials in full compliance with constitutional standards
and was not "unfairly and unconstitutionally wrested" from
Defendant.

10.   The District Attorney's Office has not over-indicted
Mr. VanGINDEREN as is shown in the evidence presented to the
Grand Jury.

11.   The District Attorney's Office is not vindictive and
it is submitted that Attorney Nash's sworn allegations in that
regard and his allegations about "failing to make even the most
basic observations regarding human behavior" are highly inap-
propriate and should be stricken from the record of this case.

### STATEMENT

10.   The People consent to an immediate <u>Huntley</u> Hearing so
that the case can go to trial forthwith.

### DISCOVERY

11.   a)   Previously provided.

b)   Not applicable.

c)   Not applicable.

d)   Not applicable.

e)   A notice pursuant to Section 450.10 of the Penal
Law was made and the Defendant and his attorney
has failed to take any steps to inspect, photo-
graph or appraise the property.  Thus, the
deponent requests an Order permitting return to
the lawful owners.

**EXHIBIT F, PAGE 88**

f)    Not applicable.

g)    The deponent is fully aware of the prosecutor's
continuing duty to disclose such material.

h)    Arrest:      3/8/83
                 9:00 A.M. (approximately)
                 Ithaca, New York

_____
ROBERT C. MULVEY

Sworn to before me this
21st day of July, 1983.

_____
NOTARY PUBLIC

DEBORAH K. LISK
Notary Public, State of New York
No. 4753815
Qualified in Tompkins County
Term Expires March 30, 19_4

DISTRICT ATTORNEY
TOMPKINS COUNTY
ITHACA, NEW YORK 14850

**EXHIBIT F, PAGE 89**

*VANGINDEREN*

MOVE TO
   AMEND INDICTMENT →FROM $B^2$ TO

   1) Instructions to Grand Jury
      were for $B^3$

   2) Facts can only show $B^3$

   3) CPL 200.70 only bar amendments
      which changes the theory
      of prosecution as reflected
      in evidence before Grand
      Jury which filed it
                TAYLOR 43 AD2d 519 (1973)
      Can't amend to charge
      crime other than found by
      grand jury

   ERROR (OBVIOUS)
   ̲̲̲̲̲̲̲̲̲̲̲̲
                NOT
   INADVERTENT CITATION OF STATUTE
   NO PREJUDICE

**EXHIBIT F, PAGE 90**

ADAMS, THEISEN & NASH

ATTORNEYS AND COUNSELORS AT LAW
301 THE CLINTON HOUSE
103 WEST SENECA STREET
ITHACA, NY 14850

RECEIVED/SENT
TOMPKINS COUNTY
DISTRICT ATTORNEY
AUG 4  2 14 PM '83

HENRY W. THEISEN
RALPH W. NASH

STEPHEN M. BOWMAN

ARMAND L. ADAMS
1911-1983

607-272-3442

August 3, 1983

Hon. Benjamin J. Bucko
Tompkins County District Attorney
Post Office Box 326
Ithaca, New York 14850

Re: People v. Kevin G. Vanginderen

Dear Ben:

This letter will confirm my telephone message of yesterday,
wherein I indicated that Kevin will agree to plea to a misdemeanor in
City Court in lieu of having this matter re-submitted to another Grand
Jury, upon condition that the People agree to recommend no harsher
penalty than probation upon his plea.

I am enclosing a copy of my proposed Order submitted to
Judge Kepner today. I will be on vacation until August 15, but have
several other matters pending that morning. Kevin and I would like to
appear in City Court on Monday, August 22, for purposes of the afore-
mentioned plea. If this is agreeable, I will make arrangements with
City Court.

Regarding the actual charge which Kevin will plead to in
City Court, I suggest either Criminal Trespass 3° or Petite Larceny.
I note that Criminal Trespass 2° requires entry into a dwelling.

Thank you for your attention to this matter.

Yours very truly,

ADAMS, THEISEN & NASH

Ralph W. Nash

RWN/dh
Enclosures

**EXHIBIT F, PAGE 91**

**ADAMS & THEISEN**
ATTORNEYS AND COUNSELORS AT LAW
THE CLINTON HOUSE, SUITE 201
103 WEST SENECA STREET
TELEPHONE (607) 272-2442

ARMAND L. ADAMS
HENRY W. THEISEN

RALPH W. NASH

ITHACA, NEW YORK 14850

August 3, 1983

Hon. George S. Kepner, Jr.
Otsego County Office Building
Cooperstown, New York 13326

Re:  People v. Kevin G. Vanginderen
     Tompkins County Indictment No. 83-46

Dear Judge Kepner:

Please find enclosed proposed Order in this matter, pursuant to
your Decision after oral argument at a Tompkins County Motion Term on
August 1, 1983, in Ithaca, New York.  I have provided a stamped, self-addressed
envelope for your convenience in returning the signed Order.

Thank you for your attention to this matter.

Yours very truly,

ADAMS, THEISEN & NASH

Ralph W. Nash

RWN/dh
Enclosures

cc:  Hon. Benjamin J. Bucko

**EXHIBIT F, PAGE 92**

RECEIVED/SENT
TOMPKINS COUNTY
DISTRICT ATTORNEY

STATE OF NEW YORK
COUNTY COURT    :    COUNTY OF TOMPKINS

Aug 4   2 14 PM '83

THE PEOPLE OF THE STATE OF NEW YORK    :

    —vs—    :    ORDER

KEVIN G. VANGINDEREN,    :    Indictment No. 83-46

    Defendant.    :

The Defendant having duly moved this Court at a Motion Term thereof, held in and for the County of Tompkins on August 1, 1983, for an Order dismissing the Indictment herein upon the ground that it is defective under the Criminal Procedure Law, and having duly presented his Notice of Motion and Affidavit of Ralph W. Nash, Esq., duly verified July 15, 1983,

And the People having opposed said motion at said time and duly presented their Answering Affidavit of Robert C. Mulvey, Esq., duly verified July 21, 1983, and oral argument having been had at such Motion Term, and the Defendant having presented his Memorandum of Law thereon, and a Decision having been rendered at the conclusion of oral argument; now, after due deliberation, upon motion of Ralph W. Nash, Esq., attorney for Defendant, it is hereby

ORDERED that Indictment 83-46 charging the Defendant Kevin G. Vanginderen with two counts of Burglary in the Second Degree is DISMISSED as being defective under the Criminal Procedure Law, with leave to the People to re-submit the matter to another Grand Jury of this Court.

ENTER,

GEORGE S. KEPNER, JR.,
Acting Tompkins County Judge

DATED: August    , 1983

    Cooperstown, New York

**EXHIBIT F, PAGE 93**

OFFICE OF SUPREME AND COUNTY COURT CLERKS
STATE OF NEW YORK   COUNTY OF TOMPKINS
320 NORTH TIOGA STREET
ITHACA, NEW YORK 14850

NANCY M. JOCH
CT CLERK COMBINED COURTS

PUBLIC SAFETY

APR 11 1985

CORNELL

SUPREME COURT

COUNTY COURT

Sir:

Please take notice that the within is a true copy of an Order duly entered in the Office of the Clerk of Tompkins County.

Dated: _____ March 5, 1985 _____

Nancy M. Joch
Chief Clerk III
County of Tompkins
320 North Tioga Street
Ithaca, New York 14850

( ) To the Commissioner of Division of Criminal Justice Services
(X) To the Commissioner of _Cornell Safety_ Police Department
( ) To the Commissioner of _____ Department of Correction
(X) To the District Attorney of Tompkins County
( ) To the Sheriff of Tompkins County
(X) To the Clerk of the _Ithaca City_ Court
( ) To _____

**EXHIBIT F, PAGE 94**

EXHIBIT B,
Page 98

Check One:      ☐ CPL 160.50 (ACD) Seal Order (F/P will be retained*)
                ☒ CPL 160.50 Seal Order
                ☐ CPL 160.55 Seal Order

COURT: _____County Court – Tompkins County_____

COURT ADDRESS: _320 North Tioga Street. Ithaca, New York 14850_

DEFENDANT'S NAME: _Kevin G. VanGinderen_

DEFENDANT'S ADDRESS: _____

NYSID NUMBER: _5037768 J_    ARREST DATE: _3-8-83_    DOB: _10-23-6_ SEX: _M_

DOCKET/INDICTMENT/CASE NUMBER TO BE SEALED: _____83-46_____

ARREST CHARGES TO BE SEALED: _Burglary, Second Degree (2 counts)_

RELATED DOCKET/INDICTMENT/CASE NUMBER NOT TO BE SEALED AND FINAL DISPOSITION:

_____    _____

_____    _____

☒ To Commissioner of Division of Criminal Justice Services
☒ To Commissioner of _____Cornell Safety_____ Police Department.
☐ To Commissioner of _____ Dept. of Correction
☒ To District Attorney of _____Tompkins_____ County.
☒ To Sheriff of _____Tompkins_____ County.
☐ To Clerk of the _____ Court.
☒ To _____Federal Bureau of Investigation_____

The above captioned criminal action having on _____Aurgust 4,_____, 19 _83_, been terminated in favor of the above named defendant in accordance with Section 160.50 or 160.55 of the Criminal Procedure Law and it appearing that no other criminal action or proceeding is pending against that person, it is ordered that every photograph, photographic plate or proof and all palmprints, and fingerprints, and all duplicates taken pursuant to Article 160 of the Criminal Procedure Law in regard to this action or proceeding be returned to such person or the attorney who represented him.* Departments or Agencies who transmitted or otherwise forwarded copies of such to any agency of the United States or any other state or jurisdiction outside New York State shall request in writing that all copies be returned to the police department or law enforcement agency which transmitted or forwarded them and upon such return said department or agency shall return them as provided above. All official records and papers relating to the arrest or prosecution BE SEALED and not made available to any person or public or private agency, except as provided in section 160.50 (1) (d).

DEFENDANT'S ATTORNEY: _____    Enter,
      _Ralph Nash, Esc._
ATTORNEY'S ADDRESS: _The Clinton House_
      _Ithaca, New York 14850_      (JUDGE XXXXXXXXXX)
                                    George S. Kepner, Jr.
                                    Acting Tompkins County Judge

                                    COURT SEAL

**EXHIBIT F, PAGE 95**

# EXHIBIT C

# Cornell Chronicle

Volume 14, Number 24

Thursday, March 17, 1983



With careful maneuvering and some help from Masahiro Shioji, right, Thomas "Tuck" Staggs parks a 10-foot-wingspan sailplane in an 11-by-17-foot "hangar," his Room 6321 of Sperry Hall. Staggs, a freshman in mechanical and space engineering, spent 300 hours building the larger remote-control model and 100 hours on the plane on the ceiling.

# State Will Support Biotechnology Center Here

## Cornell One of Four Advanced Technology Centers Named

Cornell is one of four New York state universities to be designated "centers for advanced technology" by the state Science and Technology Foundation and Gov. Mario M. Cuomo.

Cuomo announced in Albany Tuesday that Cornell, Rochester, Polytechnic Institute of New York and the State University of New York at Stony Brook have been designated as centers. The center here will specialize in biotechnology.

The governor's executive budget proposes an appropriation of $2.5 million to support the program. That could mean as much as $600,000 to each of the universities.

In addition, several New York companies, including Eastman Kodak, Xerox, Bausch and Lomb, IBM and American Telephone and Telegraph, have committed more than $2.5 million to the program.

In an Albany press conference, Cuomo said "this program will create job opportunities in the years ahead" and that "thanks to the corporations and the univer-

sities, New York is once again taking a lead in shaping tomorrow's economy."

President Frank Rhodes said the designation "is a source of tremendous pride to everybody associated with the university." He called it "meaningful recognition of Cornell's continuing contribution to the vitality of our region and our state."

"The promise and the potential in our

Center for Biotechnology mean an exciting future not only for the Ithaca area, but also for the State of New York, and for Cornell as a whole.

Cornell announced last year its plans to develop a biotechnology institute here. The New York State Center for Biotechnology is another component of the biotechnology program at Cornell.

The biotechnology institute is expected to be a collaboration between Cornell and several corporations that will support it. Corporate scientists will work with Cornell faculty on campus in a basic research program. All institute programs will be open and its findings available to the public.

Continued on Page 6

## University, Plants Union Reach 7¼% Agreement

A one-year contract agreement was reached Monday night between the university and Local 71-71A of the International Union of Operating Engineers, which represents 35 employees at the Central Heating, Walter Filtration and Chilled Water Plants.

The agreement calls for a 7¼ percent wage increase "as well as other contractual improvements designed to bring con-

tract language into line with policy and benefit improvements provided under university policy," according to a joint statement released by the negotiating teams at the conclusion of talks. Union members had ratified the agreement in a meeting Monday evening.

A previous three-year agreement was due to expire at midnight Monday.

Senior Vice President William G.

Herbster said, "We view this as a fair agreement. It demonstrates what can be achieved when both parties go to the table in good faith, make reasonable proposals, have realistic expectations and negotiate responsably."

The university and the union met seven times during this series of contract talks.

The operating engineers' union was organized at the plants three years ago.

Case 3:08-cv-00736-BTM-JMA    Document 15-2    Filed 05/05/2008    Page 103 of 157

# Potpourri

# Annual Vet College Open House to Be April 16

Saturday, April 16, has been set as the date for the 16th annual Open House of the State College of Veterinary Medicine.

Organized by the students of the state's only veterinary medicine college, the open house each year attracts thousands of visitors including families, school and club organizations and prospective students.

The 1983 Open House is scheduled from 9 a.m. to 4 p.m. Admission is free.

Tours of the college's research and teaching laboratories, operating rooms and animal care facilities will include more than two dozen demonstrations and exhibits, many with opportunities for visitor participation.

Visitors will be introduced to a variety of exotic animals — among them, birds and snakes — as well as the more familiar household pets and farm animals. Scheduled again this year are the popular tours of the Cornell Equine Research Park, home to more than 200 horses and ponies.

Included in the features of the 1983 Open House are presentations on pet bird nutrition, nuclear medicine, pregnancy diagnosis, preparation for surgery, care of aging animals, poisonous plants, and parasites.

Making a return at the 1983 Open House are the painted horse and the painted cow, with their internal organs outlined and labeled. Those who are more curious or courageous will want to peer — with the help of a flashlight — inside one of the stomachs of the fistulated cow. Endoscopy, EKG's and auscultation (use of the stethoscope), malformations, animal breeds, mastitis, radiology, heartworms, large and small animal skeletons, and milking machines are the subjects of other presentations.

Admissions officers will be on hand to discuss careers in veterinary medicine and requirements for admission into the college, which is one of 29 in the United States.

The Open House is scheduled rain or shine. Convenient free parking can be found in the "B" lot, off New York Route 366 between Varna and Ithaca.

## Nabokov's Friend to Give Talks

A Russian scholar, novelist and poet who knew author Vladimir Nabokov when they lived in Europe will be the second speaker in this spring's Nabokov Festival here.

Nina Berberova will deliver two lectures. The first, in Russian, is set for 4:30 p.m. Monday, March 21, in 202 Uris Hall "Gift." The second, in English, will be at 4:30 p.m. Tuesday, March 22, at the A.D. White House on "Nabokov's British Ancestry," and will deal with Nabokov's readings from 1910 to 1930.

Nabokov, who died in 1977, wrote his best-known novel, "Lolita," while a member of the Cornell faculty from 1948 to 1958. He is being honored here this semester by a program that includes speakers, a film series and an Olin Library exhibition, both of which continue through March.

Berberova, who lived in several European countries before coming to the United States in 1950, describes her meeting with Nabokov in her autobiography, "Italics Are Mine." She is now at Princeton University preparing an updated edition of the work.

After becoming well-known in Europe in the 1920s for her poetry, Berberova published her first novel, "The Last and the First." It was acclaimed as the best work by a Russian emigre, about Russian emigre life.

She published three more novels while in Europe, including "Cape Storm," written while she lived in France during the 1940s and assisted victims of the Nazi occupation.

Berberova has written biographies of the composers Tchaikovsky and Borodin. Her most recent book, "Iron Woman," is the biography of a Russian woman who was the mistress and wife of many celebrities including H.G. Wells.

Next speaker in the Nabokov Festival will be author Herbert Gold. He will do a reading on April 13 and a lecture on April 14, both at 4:30 p.m. in the Hollis Cornell Auditorium of Goldwin Smith Hall.

## TIAA/CREF Rates Listed

Teachers Insurance Annuity Association and the College Retirement Equity Fund (TIAA/CREF) recently announced both future investment returns for TIAA funds and last year's performance levels for CREF funds. Various university retirement plans for statutory and endowed employees are funded through TIAA and CREF.

Effective March 1, 1983, TIAA's new effective annual interest rate will be 12¼ percent. This rate will be applied to all premiums credited to accumulating annuities on or after Jan. 1, 1982.

Any annuity balances resulting from premiums paid between Jan. 1, 1979, and Dec. 31, 1981, will be credited with a total effective annual rate of 11 percent, for the current year. All balances resulting from premiums and dividends credited prior to 1979 will receive a total effective rate of 9¼ percent, for this year.

TIAA rates are declared annually for all balances and apply for a 12-month period. This year's rate period runs from March 1, 1983, through Feb. 29, 1984.

CREF's net rate of investment return was 22.1 percent for the twelve-month period ending Dec. 31, 1982. This includes both market value changes and dividend income, less expenses. CREF's unit value was $58.93 on Feb. 28, 1983, and had increased by 3 percent above that level as of March 9, 1983.

The CREF accumulation unit value is determined monthly, based on changes in the market or capital value of CREF's portfolio. For the most recent CREF accumulation unit value, participants can call the toll-free telephone number (800) 522-5622 from within New York State, or (800) 223-1200 from outside New York State.

## Discretionary Fund for CIS

A matching grant of $150,000 from the William and Flora Hewlett Foundation will help Cornell endow a discretionary fund for its Center for International Studies.

Cornell has agreed to match the foundation grant on a two-to-one basis over the next three years. University President Frank Rhodes said Cornell "is fully prepared to undertake this fund-raising campaign — with the Hewlett Foundation's splendid challenge grant as its keystone."

Milton J. Esman, director of the center, said the CIS would use the endowed discretionary fund for two main purposes: to foster innovations in international studies, both on substantive problems and on research methodologies, and to provide research opportunities for graduate students and junior faculty.

"Two examples of new problem areas the CIS would like to investigate in greater depth are the political effects of the chronic unemployment crisis in the Caribbean, and the implications of the current wave of neutralism and pacifism among European youth," Esman said.

The fund would also alleviate the problem of finding money to support research out of the country by advanced graduate students and junior faculty, according to Esman.

"First class research in international and comparative studies usually requires some travel and residence abroad," he said. "The center has been attempting to help young scholars in these ways, but available resources have been too limited to meet the legitimate demand.

The center, established in 1961, sponsors and supports international and comparative teaching and research university-wide, principally through a network of interdisciplinary faculty and graduate student committees.

## Bethe Lecturer to Return

"Basic Research for Culture and Profit" will be the topic for high-energy physicist Leon M. Lederman in a lecture directed toward the general public at 8 p.m. Wednesday, March 23, in Cornell University's Rockefeller A.

Lederman, the director of the Fermi National Accelerator Laboratory and the Eugene Higgins Professor of Physics at Columbia University, is returning to campus for the spring portion of the 1982-83 Bethe Lecture Series.

The internationally known specialist in high-energy physics will speak on the topic of "The New Accelerators" in a lecture geared to a general scientific audience at 4:30 p.m. Thursday, March 24, in Rockefeller A. Admission to the lectures is free.

Created by the Cornell College of Arts and Sciences and the Physics Department, the lecture series honors Nobel Laureate Hans Bethe.

Lederman has been associated with Columbia as a student and faculty member for more than 25 years. He received a B.A. from City College in 1943 and the M.A. and Ph.D. from Columbia in 1948 and 1951, respectively.

---

## Cornell Chronicle

Editor: Randall E. Shew. Staff writers: H. Roger Segelken, Robert W. Smith, Barbara Jordan-Smith, Martin B. Stiles. Photographer: Sol Goldberg. Circulation Manager: Joanne Hanavan (USPS 456-650)

Published weekly during the academic year and once each in June and August. Distributed free of charge to Cornell University faculty, students and staff by the University News Bureau. Mail subscriptions $13 per year. Make checks payable to Cornell Chronicle and send to Editorial Office, 110 Day Hall, Ithaca, N.Y. 14853.
Telephone (607) 256-4206
Second-Class Postage Rates paid at Ithaca, N.Y.
POSTMASTER: Send address changes to the Cornell Chronicle (USPS 456-650), Cornell University, 110 Day Hall, Ithaca, N.Y. 14853.

It is the policy of Cornell University actively to support equality of educational and employment opportunity. No person shall be denied admission to any educational program or activity or be denied employment on the basis of any legally prohibited discrimination involving, but not limited to, such factors as race, color, creed, religion, national or ethnic origin, sex, age or handicap. The university is committed to the maintenance of affirmative action programs which will assure the continuation of such equality of opportunity.

# Jobs

The following job openings are new this week. For information on vacant positions listed in previous issues of the Chronicle, contact Personnel Staffing Services, 130 Day Hall. Cornell is an affirmative action employer.

**NOTICE**
**TO ALL APPLICANTS**
**Job Opportunities** will publish vacancy announcements on a limited basis until further notice.

Staffing Services will continue to accept employment applications and employee transfer requests. However, these items will be processed only after individuals with official University Layoff Status are given preferential consideration.

**Administrative/Professional**
Applications Programmer II (Computer Services—APS)
Executive Staff Assistant I (Graduate School)
Administrative Manager II (ILR) (Albany)
**Clerical**
Administrative Aide, GR21 (Clinical Sciences)

Accounts Assistant, GR19 (Office of the Bursar)
Searcher, GR18 (Acquisition—University Libraries)
**General Services**
Duplicating Machine Operator, SO26 (Media Services—Printing)
**Part-time**
Judicial Adviser (Judicial Advisor's Office)
Secretary, GR18 (Library Administration—Collection Development)
Department Secretary, GR17 (Ornithology)
Office Assistant, GR17 (Architecture, Art and Planning)
Department Secretary, GR18 (CISER)
Secretary, GR18 (Plant Introduction, Geneva)
**Technical**
Computer Production Controller, GR20 (Clinical Sciences)
**Temporary**
Temporary Interviewer, T-3 (Human Service Studies) (4)
**Academic**
Faculty Position in Ophthalmology (Clinical Sciences, Vet. Medicine)

**Cornell Chronicle**



One of the dangers of studying outdoors during early springtime in Ithaca is the wind, as George Chew, a freshman in the College of Agriculture and Life Sciences, discovers.

## Governance Campaigning Opens April 5

Campaigning by candidates for Student and Employees Assembly and for Trustee seats begins Monday, April 4, for employees and Tuesday, April 5, for students. Student elections will take place Tuesday, April 12, and Wednesday, April 13. Employees will vote by mail ballot, which will be sent Monday, April 18. Graduate and professional student ballots will be mailed Wednesday, April 6.

Employees will elect seven people for membership on the Employee Assembly and one employee trustee. Students will elect 23 people for membership on the Student Assembly and two student trustees.

Petitioning for students ends March 23; for employees petitioning will continue until March 31. Petition challenges should be filed at 165 Day Hall no later than 4 p.m. Monday, April 4, for employees and 4 p.m. Tuesday, April 5, for students.

Campaign spending for assembly candidates is limited to $50 each. Trustee candidates are limited to $100 each. Candidates will receive 150 fliers free of charge. Poster designs should be submitted to 165 Day Hall for reproduction and should measure 8½ x 11 inches.

Each candidate has the right to submit a neatly typewritten biography and personal statement suitable for photographic reproduction. Statements will be included with the ballots.

Student elections will be held by paper ballot in the following locations: 10 a.m.-3 p.m.—Carpenter Hall, Goldwin Smith Hall main lobby and Uris Hall ground floor entrance; 10 a.m.-5 p.m.—Willard Straight Hall lobby and Mann Library lobby; 4-8 p.m.—Noyes Center lobby and Robert Purcell Union lobby.

Students will be required to present a valid Cornell ID in order to vote. Candidates will also be allowed to campaign within 50 feet of the polling areas and they may not linger in polling areas.

All ballots must be submitted in a double envelope. The outside envelope will require the printed name and signature of the voter. If the envelope does not contain this information, the ballot will be voided.

## Washington Air Service Restored

On April 1, Empire Airlines will restore non-stop Metroliner service between Ithaca and Washington, D.C. The flight schedule will be:

| | From Ithaca | | |
|---|---|---|---|
| LV | Flt. No. | Arr. | Frequency |
| 7:45A | 141 | 8:55A | Ex. Sunday |
| 12:50P | 541 | 1:55P | Ex. Sat. & Sun. |
| 5:40P | 941 | 6:45P | Ex. Sat. & Sun. |
| 7:10 | 971 | 8:10P | Sunday Only |
| | From Washington, D.C. | | |
| 9:30A | 241 | 10:35A | Ex. Sunday |
| 2:55P | 818 | 4:00P | Ex. Sat. & Sun. |
| 7:10P | 911 | 8:15P | Ex. Sat. & Sun. |
| 8:40P | 970 | 9:45P | Sunday Only |

The one-way fare will be $138, with Supersaver discounts applying where applicable conditions of sale are satisfied.

The Cornell Travel Office is notifying its clients who have placed reservations for Washington service on April 1 or thereafter.

## Health Education Service at Gannett Clinic Helps Make Responsible Health Decisions

The Health Education Service at Gannett Health Center was launched in the fall of 1980 to provide opportunities for members of the Cornell community to develop health-promoting skills and attitudes necessary to make responsible decisions about personal health.

When the University Health Services expanded medical services to faculty and staff on a fee-for-service basis, the department also expanded its health education activities beyond students. The focus of our patient and community education programs is to emphasize accident and disease prevention and the self-care skills necessary to maintain and promote a high level of well-being," according to Janis Talbot, health educator.

Each semester, a number of specialized workshops are offered which provide information on topics such as first aid, CPR, nutrition, weight control and exercise, and smoking. Therapists from the Psychological Service sponsor groups to enhance emotional health and discuss topics such as anxiety, depression, procrastination, emotional crisis and relationships.

Probably the most prevalent communicable disease on campus today is the common cold, according to Talbot. Although there is no known cure, there are effective means available to reduce discomfort temporarily.

"We have a variety of self-care display which contains several pamphlets describing self-care procedures for colds," Talbot said. "It is designed to help people learn how to identify symptoms that may indicate a need for professional medical assistance."

Throughout the year professional support is given to student organizations, such as ALERT and Alpha Epsilon Delta, that work on educational projects. Upon request, the health center provides guest speakers to groups in dorms, fraternities and sororities.

Patient education has traditionally been an essential part of medical care at the health center: fact sheets, pamphlets and bulletin board displays have been prepared to supplement clinical counseling. In addition a consumer library, located on the third floor, has been established to help patients find more in-depth information on a variety of sexual health concerns.

"A new attitude that has gained in popularity and recognition is that good health is not just the absence of disease nor is it a commodity that can be bought or sold," Talbot said. "Optimal health is something one must work for and it demands time and energy and a belief that the individual must assume primary responsibility for their own health."

Talbot and her assistant, Nancy Carrey-Beaver, are always interested in receiving suggestions. Numerous volunteer opportunities are available. They can be reached by calling 256-4782.

## Magic Lanterns Turn Up in Large Quantity

### Chronicle Notice Does the Job; Now for a Screen

Archivist Gould P. Colman's search for a lantern projector through the pages of the Chronicle earlier this month not only uncovered a number on campus and elsewhere but also uncovered the information that they are called magic lanterns and that there are organizations in this country, Canada and Great Britain devoted to them.

Within a few hours of a news notice appearing in the Chronicle, Colman said he had 18 phone calls notifying him of the locations of at least 20 magic lanterns on campus, some still being used.

He needs one to be able to project nearly 6,000 glass slides in University Libraries Archives, mostly scenes of the campus and Ithaca area between 1900 and 1940.

Of the many offers of a machine, Colman has settled on a mint-condition projector with all five lenses still intact to arrive any day now from the Cornell operated National Astronomy and Ionosphere Center at Arecibo in Puerto Rico.

He has also discovered that there is a Magic Lantern Society of the United States and Canada, founded in 1977. It is an offshoot of a magic lantern society in Great Britain, a group of long standing.

The American group, which held its first national convention in Rochester in 1881, prints a newsletter with all sorts of lantern and slide information and features. A recent story dealt with Lewis Carroll's interest in magic lanterns and its possible influence on his writings.

The society's chairman is Joe Koch, 819 14th Street N.E., Auburn, Wash., 98002.

Colman learned of the society from Harriet A. Peters, assistant director of placement for the Graduate School of Business and Public Information.

Incidentally, the dozen I own a projector yet, but does have a number of slides, several of them action shots from the Russo-Japanese War.

Colman said how much he appreciated the "wonderful response" to his earlier request for a projector. He wondered if the Chronicle might mention that now he needs a screen.

"A five-by-eight foot roll-down screen with or without a stand will do fine," he said.

4        Thursday, March 17, 1983

# Calendar

| 1983 | | MARCH | | | | 1983 |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

All items for publication in the Calendar section, except for Seminar notices, must be submitted (typewritten, doublespaced) by mail or in person to Fran Apgar, Central Reservations, 532 Willard Straight Hall at least 10 days prior to publication. Seminar notices should be sent to Barbara Jordan-Smith, News Bureau, 110 Day Hall, by noon Friday prior to publication. Items should include the name and telephone number of a person who can be called if there are questions, and also the subheading of the Calendar in which it should appear (lectures, colloquia, etc.). ALL DEADLINES WILL BE STRICTLY ENFORCED.

*—Admission charged.

## Announcements

**Weigh Station Meetings**
Weigh Station (Skinny Minnies) meetings discontinued. Other classes, call 257-0853

**Grads for Grads**
Grads for Grads is sponsoring an ice-skating party at Lynah Rink on Monday, March 21 from 8-9 p.m. All grad students, spouses and guests are welcome. Come early to rent skates.

**Al-Anon**
Al-Anon offers confidential group support for friends and relatives of people with drinking problems. Meets every Thursday evening. 8:15-9:15 p.m. in Anabel Taylor Founders Room. No dues or fees.

**Human Ecology Sophomores and Juniors**
Announcing applications for the 1983-84 Fleischmann Scholarship for an upperclass student in Human Ecology with a background of course work in communication arts and with career interests combining the two fields. Applications are available in the Human Ecology Counseling Office, Room N107, MVR, and must be returned by April 8, 1983.

**Poetry Reading**
Gail Mazur, poet, editor, and director of the Blacksmith House Poetry Reading Series in Cambridge, Mass., will be reading her poetry on Thursday, March 17, at 4 p.m. in the Temple of Zeus, Goldwin Smith Hall. Sponsored by the Creative Writing Reading Committee of the English Department, Cornell.

**Disarmament Study Group Breakfast**
Held every Thursday morning at 7:30 a.m. in the One World Room of Anabel Taylor Hall. All welcome. 50 cents to $1 charged to cover cost of breakfast.

## Colloquia

**Thursday**
Mar. 17, 4:30 p.m. Space Sciences 105. Astronomy and Space Sciences "Timing Observations of Pulsars: Binaries and Otherwise" Professor J. Taylor, Physics Department, Princeton University

**Friday**
Mar. 18, 12:15-1:15 p.m. Uris Hall 202. Sociology "Small Area Demographics on a Microcomputer: A Demonstration Using NYS Data on an Osborne I." Thomas G. Exter, Visiting Fellow, CISER, Dept. of Sociology, Cornell.

**Thursday**
Mar. 24, 4:30 p.m. Space Sciences 105. Astronomy and Space Sciences "Three Mars Years" Mutch Memorial Station / Viking Lander I Imaging Observations), Professor R. Arvidson, Department of Earth Sciences, Washington University, St. Louis.

## Dance

**Every Thursday**
Anabel Taylor One World Room. 8 p.m. 8-9 p.m. teaching, 9-11 p.m. requests. Beginners through advanced. Everyone welcome

**Every Sunday**
Willard Straight North Room, 7:30 p.m. 7:30-8:30 p.m. teaching, 8:30-10:45 p.m. requests. Beginners and dancers at all levels welcome. Cornell International Folk Dancers.

**Every Monday**
Anabel Taylor Auditorium, 7:30-9:30 p.m. The Ithaca Scottish Country Dancers are looking for new members - both beginners and experienced dancers. Beginning instruction at 7:30 p.m. Free and open to the community. Call Phil Dixon at 257-2618 for more information.

**Wednesday**
Mar. 23, 7:30-11 p.m. Risley Dining Room, Ground Floor. International Folk Dancing teaching 7:30-8:30 p.m. Requests 8:30-11 p.m. Beginners and dancers at all levels.

## Exhibits

Olin Library Vladimir Nabokov: his correspondence, photographs, first editions, butterflies. through Mar. 29. On Sat., Mar. 19, the Rare Book Room of Olin Library, which is usually closed Saturdays, will be open from 11 a.m.-3 p.m. for the benefit of visitors who are unable to get to see the exhibit during the week. Uris Library Puppets and marionettes and their theatres Through Mar. 23.

Herbert F. Johnson Museum An exhibition of works by artist Joshua Neustein, "Bethlehem Series" through April 17. "Prints by William Blake and His Followers" through April 17. "Emerging from the Shadows: The Art of Martin Lewis, 1881-1962" through Apr. 24. Museum hours, 10 a.m.-5 p.m. Tuesday through Sunday.

Laboratory of Ornithology "The Shorebirds of North America." An exhibit of accomplished bird artist Robert Verity Clem. These 29 opaque watercolors were used to illustrate the book "The Shorebirds of North America." Prints of his works are for sale at the Laboratory for $20. Exhibit runs through April. Laboratory hours Monday through Thursday, 8 a.m.-5 p.m., Friday 9 a.m.-4 p.m., Saturday and Sunday, 10 a.m.-5 p.m. Laboratory is located at 159 Sapsucker Woods Road.

## Films

Unless otherwise noted films are under sponsorship of Cornell Cinema

**Thursday**
Mar. 17, 4:30 p.m. Goldwin Smith Hollis Cornell Audit Gay Films: Jan Oxenberg's "A Comedy in Six Unnatural Acts" and the Australian documentary "Witches and Faggots, Dykes and Poofters" will be shown. Admission is free. The films are sponsored by the Gay and Lesbian Information Project.

Mar. 17, 7:30 p.m. *Uris Hall Auditorium. "Not a Love Story" (1981), directed by Bonnie Scherr-Klein, with Linda Lee Tracy, Robin Morgan, Kate Millett. Co-sponsored by Ithaca College Department of Women's Studies at Cornell. Rated X.

**Friday**
Mar. 18, 8 p.m. *Statler Auditorium, "Quadrophenia" (1979), directed by Franc Roddam, with Phil Daniels. Sting.

Mar. 18, 10 p.m. *Uris Hall Auditorium "Not a Love Story" (1981). Rated X.

Mar. 18, 10:30 p.m. *Statler "Raiders of the Lost Ark" (1981), directed by Steven Spielberg, with Harrison Ford, Karen Allen.

**Saturday**
Mar. 19, 7 & 9:30 p.m. *Statler "Raiders of the

Lost Ark"
Mar. 19, 8 p.m. Risley Music Room. Risley Free Films Series. "The Awful Truth"

Mar. 19, 8 & 10 p.m. *Uris Hall Auditorium. "The Devil's Playground", (1976), directed by Fred Schepisi, with Arthur Dignam, Simon Burke.

Mar. 19, 12 mid. *Statler Auditorium "Quadrophenia" (1979).

**Sunday**
Mar. 20, 2 p.m. *Uris Hall Auditorium. Raiders of the Lost Ark"

Mar. 20, 7 p.m. *Uris Hall Auditorium "A Portrait of the Artist as a Young Man" (1978), directed by Joseph Strick, with T.P. McKenna, Sir John Gielgud. Co-sponsored by the English Department.

**Monday**
Mar. 21, 7 p.m. *Uris Hall Auditorium. "Rare parts of Clay" (1970), directed by Jean-Louis Bertucelli. with native cast. Co-sponsored by Department of Near Eastern Studies.

Mar. 21, 9 p.m. *Uris Hall Auditorium. "The pocket" (1961) directed by Robert Bresson, with Martin Lasalle, with "The Smiling Madame Beudet". Film club members.

**Tuesday**
Mar. 22, 4:30 p.m. Rockefeller D, "The Masked Dance". The story of the now-deposed Prime Minister of Thailand Kukrit Pramoj.

Mar. 22, 8 p.m. *Uris Hall Auditorium. "Letter to Jane" (1972) directed by Jean-Luc Godard and Jean-Pierre Gorin. Also shown "Ways of Seeing #1" directed by John Berger

**Wednesday**
Mar. 23, 7 p.m. *Uris Hall Auditorium "How Much is Enough?" directed by Andrew A. Stern, with documentary cast. Co-sponsored by Physics and Government Depts.

Mar. 23, 9:30 p.m. *Uris Hall Auditorium "Despair", (1977), directed by R.W. Fassbinder, with Dirk Bogarde, Andrea Ferreal.

**Thursday**
Mar. 24, 7:30 p.m. Stimson G-1 Jordani Natural History Society films. "Jackass Penguins" and "Guanaco of Patagonia."

Mar. 24, 8 p.m. *Uris Hall Auditorium CUSLAR Free Films: "The Traitors". This dramatic portrayal of the life of a trade union leader defines the political context of the Argentine labor movement from 1956 to 1973

**Friday**
Mar. 25, 8 p.m. *Statler "Romeo and Juliet" (1968) directed by Franco Zeffirelli, with Leonard Whiting. Olivia Hussey.

**Saturday**
Mar. 26, 8 p.m. *Uris Hall Auditorium. "Death in Venice" (1971) directed by Luchino Visconti, with Dirk Bogarde. Sylvana Mangano.

**Sunday**
Mar. 27, 8 p.m. *Uris Hall Auditorium "Lawrence of Arabia" (1962), directed by David Lean, with Peter O'Toole, Omar Sharif.

## Lectures

**Thursday**
Mar. 17, 12:30 p.m. 102 West Ave Southeast Asia Program brown-bag seminar. "Methods of Understanding the Aesthetic Preconceptions of the Balinese" Professor Hildred Geertz, Dept. of Anthropology, Princeton University.

Mar. 17, 4 p.m. Malott Hall Bache Auditorium "Symposium on Corporate Social Responsibility." Sponsored by Graduate Business Students Committee on Professional Ethics

Mar. 17, 4:30 p.m. McGraw 165 "Renquincers as Protesters: Pre-Modern India" Professor Romila Thapar. Jawaharlal Nehru University, New Delhi, and A.D. White Professor-at-Large

Mar. 17, 4:30 p.m. Goldwin Smith 24 Delacroix's Liberty Leading the People. Revolutionary Romance or Political Party Pris" Michael J. Marrinan. Lecturer in History of Art, Columbia University. Sponsored by Department of the History of Art.

Mar. 17, 4:30 p.m. Goldwin Smith Kaufmann Auditorium. "On Being Half Romantic," Carl Woodring, Dept. of English & Comparative Literature, Columbia University. Sponsored by Society for the Humanities.

Mar. 17, 7:30 p.m. Stimson G-1 Jordani Natural History Society. "Sex Among the Rocks: the Making of Small Sticklebacks." Hal Weeks.

Mar. 17, 7:30 p.m. Uris Hall Auditorium. Film and discussion "Not a Love Story" directed by Bonnie Scherr Klein. Discussants: Sandra Bem, Professor, Psychology; Women's Studies; Cornell; Zillah Eisenstein, Professor Politics, Ithaca College. Moderator: Patty Zimmermann, Cinema Photography, Ithaca College Co-sponsored by Women's Studies, Cornell, Cornell



This carving is on view at the Herbert F. Johnson Museum of Art in its China collection. The carving is on loan to the museum from Mary Palmer Rockwell. Museum hours are 10 a.m.-5 p.m. Tuesday through Sunday.

5    **Cornell Chronicle**

Cinema, Ithaca College.

Mar. 17, 7:30 p.m. Anabel Taylor Auditorium. Zen Master: Joshu Sasaki: "Zen: the Heart of the Great Matter." Sponsored by Cornell University Summer Session. Department of Asian Studies and The Ithaca Zen Center.

Mar. 17, 9 p.m. Straight Browsing Library. Rendezvous with ideas: "Why You Shouldn't Go to Professional School." Ronald Hoffman. Sponsored by Willard Straight Program Board.

**Friday**

Mar. 18, 4 p.m. Goldwin Smith 124. "After Novissimus Fut: Trajan's Column and Flavian Epic Tradition." Steve Farrand. Sponsored by Classics Discussion Group.

Mar. 18, 8 p.m. Goldwin Smith Hollis Cornell Audit. "Come, Let Us Rebuild the Walls." Dr. Perkins, Founder and President Emeritus of Voic of Calvary Ministries. Sponsored by Cornell Graduate Christian Forum.

**Sunday**

Mar. 20, 8 p.m. Statler Auditorium. Julian Bond, state senator from Georgia and national civil rights leader, will speak on "The University and Investments in South Africa." Free. Sponsored by the South African Divestment Coalition.

**Monday**

Mar. 21, 4:30 p.m. Goldwin Smith 177. "Poetic Devices and Structural Themes in 'The Gift'." Nina Berberova, Poet, Novelist, Biographer, Professor. Lecture in Russian. Sponsored by Department of Russian Literature.

Mar. 21, 4:30 p.m. Goldwin Smith Kaufmann Auditorium. "Mutual Recognition and Peace-The Two State Solution: An Israeli Perspective." Professor Meir Pa'il, former member of the Israeli Knesset and Professor of Military History. Tel Aviv University. Sponsored by the Committee to support Israeli Peace Groups, the Palestine Human Rights Committee, the Progressive Zionist Alliance, the Government Department, Cornell United Religious Work, Peace Studies, and the International Student Programming Board

Mar. 21, 7:30 p.m. Phillips Hall 101. "Creativity in Northernel Wreath, Senior Engineering Fellow at DuPont and artist. Sponsored by the School of Electrical Engineering. Reception in 101 lower at 4 p.m.

Mar. 22, 4:30 p.m. Andrew D. White House. Nina Berberova lecture on "Nabokov's British Ancestry: Nabokov's Readings: 1910-30."

**Thursday**

Mar. 24, 12:20 p.m. McGraw 165. "Recent investigations into the Paleolithic and Neolithic at Mt. Carmel, Israel." Dr. Avraham Ronen. Sponsored by the Intercollege Program in Archaeology.

Mar. 24, 4:30 p.m. James Law Auditorium. NYS College of Veterinary Medicine. Fourth Lecture in the 1982-83 James Law Distinguished Lecturer Series: "Hormonal and Genetic Control of Sex Differentiation." Dr. Jean D. Wilson, Professor of Internal Medicine, University of Texas. The public is invited.

## Music

Mozart Music to be Featured

Music by Mozart will be featured in an annual concert at 8:15 p.m. Saturday, March 19, in Barnes Hall. The performing artists in the free public event are fortepianists Robert Levin and Malcolm Bilson.

Included in the program are two Mozart pieces for piano four hands: Andante and Five Variations in C Major: K. 501 and Sonata in C Major, K. 521. Also two for two pianos: Larghetto and Allegro in E flat Major and Sonata in D Major, K. Mozart's works for four hands and two pianos are among the earliest examples of a genre which gained prominence in the 19th century.

Dating from 1786, the Andante and Variations was composed originally for two pianos but was changed to the more usual four-hand combination at the suggestion of Mozart's publisher. The C Major Sonata was composed in 1787, the D Major Sonata in 1781. The Larghetto and Allegro was discovered approximately 20 years ago in Czechoslovakia as a fragment of manuscript in the archives of Archduke Rudolf. Several writers have undertaken completions of the work. The completion for this concert was composed in 1982 by Robert Levin and, according to his notes, prepared for joint performance with Bilson.

The two fortepianos which will be played are replicas of two from Mozart's day: one was built in 1970 by Philip Belt after a Louis Dulcken original housed in the Smithsonian Institution. The other was built in 1972 by Thomas McCobb

from Belt's drawings of an original in the Toledo Museum of Art.

Levin's interest in Mozart performance dates from undergraduate years at Harvard. In his thesis "The Unfinished Works of W.A. Mozart" he analyzed three Mozart fragments and provided completions which were later published and recorded. He has received commissions to complete additional fragments and write cadenzas for leading artists. Levin headed the theory department of Curtis Institute of Music from 1968 to 1973 at the invitation of Rudolf Serkin. Since 1972 he has been a professor of music at the School of the Arts, SUNY Purchase.

Bilson has been a professor of music at Cornell since 1968, coming to Ithaca from the University of Illinois. Both Bilson and Levin perform extensively and both are deeply involved in the performance practices of the 18th century and its composers.

Bilson currently records primarily for Nonesuch Records. Other releases are on the Titanic, Cambridge and Advent labels. This spring he will begin recording all of the Mozart Piano Concerti for Deutsche Grammophon-Archiv, with John Eliot Gardiner and the English Baroque Soloists. Levin has made recordings for Candide, CRI, Deutsche Grammophon, Nonesuch and Turnabout.

Bilson and Levin will present the same program in New York's Merkin Concert Hall March 12.

**Thursday**

Mar. 17, 8:30 p.m. Straight Memorial Room. Straight Program Board Coffeehouse with Lisa Hens. Free and open to the community.

**Saturday**

Mar. 19, 8 p.m. Anabel Taylor Auditorium. Federation of Alumni from Taiwan presents "Chinese Cantata: Song of Eternal Sorrow" featuring Hsiang Yin Chorus of New York.

Mar. 19, 8:15 p.m. Barnes Hall. Malcolm Bilson and Robert Levin, fortepiano. Works of Mozart.

**Sunday**

Mar. 20, 7:30 p.m. "Bailey Hall. Cornell Glee Club and Chorus with Cayuga Chamber Orchestra, conducted by Karel Husa. Works of Bruckner, Vivaldi, Ruggles.

**Thursday**

Mar. 24, 8:30 p.m. Straight Memorial Room. Straight Program Board Coffeehouse with guest artist. Free and open to the community.

## Religious Activities

**Every Friday**

Anabel Taylor Founders Room. 8 p.m. Weekly Christian Fellowship. All welcome to attend. Sponsored by Inter-Varsity Christian Fellowship.

**Friday**

Mar. 18, 5-15 p.m. Anabel Taylor Founders Room. Slide show about Ethiopian Jewry before Candlelighting.

## Religious Services

**Baptist**

Every Sunday, Ithaca Baptist Church. 1825 Slaterville Road; 9:45 a.m. Bible Study; 11 a.m. Worship Service; 6 p.m. Discipleship Training; 7 p.m. Worship Service.

**Catholic**

Every Mon.-Fri., 12:15 p.m. Catholic Mass. Anabel Taylor G-19. Every Sat., 5 p.m. Mass. Anabel Taylor Chapel. Every Sun. 9:30, 11 a.m. and 5 p.m. Masses, Anabel Taylor Auditorium. Sacrament of Reconciliation by appointment.

**Christian Science**

Every Thurs., 7 p.m. Anabel Taylor Founders Room. Every Sun. 10:30 a.m. First Church of Christ, Scientist, Univ. Ave. at Cascadilla Park.

**Episcopal**

Every Sun., 9:30 a.m. Anabel Taylor Chapel.

**Friends (Quakers)**

Every Sun 9:45 a.m. Anabel Taylor Edwards Room. 9:45 a.m. adult discussion, 11 a.m. meeting for worship.

**Jewish**

Call Hillel Office, 256-4227 for exact times and locations.

**Lutheran**

Every Sun. 10:45 a.m. Lutheran Church, Oak Ave. at College Ave.

**Muslim**

Every Mon-Thurs : 1 p.m. Anabel Taylor 218. Every Fri. 1 p.m. Anabel Taylor Edwards Room.

**Protestant**

Every Sun., 11:15 a.m. Anabel Taylor Chapel.

**Friday**

Mar. 18, 5:30 p.m. Anabel Taylor Chapel. Hillel Services (Reform).

Mar. 18, 5:30 p.m. Anabel Taylor Founders Room. Hillel Services (Conservative/Egalitarian).

**Sunday**

Mar. 20, 11 a.m. Sage Chapel. Sage Chapel Services. Robert L. Johnson, Director, C.U.R.W.

Mar. 20, 11:15 a.m. Anabel Taylor Chapel. Protestant Cooperative Ministry Services: Robert V. Smith, Chaplain Protestant Cooperative Ministry.

Mar. 20, 11 & 11:15 a.m. University Recess. There will be no Sage Chapel Service or Protestant Cooperative Ministry Service

## Seminars

**Agronomy:** "Nickel—A New Essential Element for Legumes and Possibly other Higher Plants." Ross M. Welch. 4 p.m. Thursday, March 17. 135 Emerson Hall.

**Atomic and Solid State Physics: Theory Seminar:** "Interaction of Hydrogen Molecules with Metal Surfaces." B. Lundqvist, Chalmers Institute of Technology, University of Goteborg. 1:15 p.m. Thursday, March 17, 701 Clark Hall.

**Biochemistry:** "Molecular Analysis of Replication Control Functions in ColE1 DNA." Barry Polisky, University of Indiana. 4:30 p.m. Friday, March 18, 204 Stocking.

**Biochemistry:** "DNA Replication in Yeast, Bik-kwoon Tye, 12:30 p.m. Monday, March 21, 125 Riley Robb

**Biophysics:** "Immobilized Enzymes: Preparation and Characterization," Howard Metzall, Corning Glass, 4:30 p.m. Wednesday, March 23, 700 Clark Hall.

**Chemistry: Baker Lecture Series:** "Magic-angle-spinning NMR: Its Value as a Structural Tool for the Chemist, Geochemist, Physicist and Materials Scientist." John M. Thomas, Cambridge. 11:15 a.m. Tuesday, March 22, 200 Baker. Thomas will also conduct an informal discussion on "The Structures of Caesium-containing Minerals: Their Relevance to the Chemical Problem of the Disposal of Radioactive Wastes," at 4:30 p.m. Wednesday, March 23, 132 Baker. He will also speak on "Compton Scattering and the Chemist," at 11:15 a.m. Thursday, March 24, in 200 Baker.

**China-Japan Program:** "Corporate Careers," Warren Harms. Eastman Kodak; Marjorie Rath, Bank of New England, David Shapiro, Mitsubishi International, 4:30 p.m. Friday, March 18, 251 Malott Hall.

**CISER Program on Life Studies:** "Class in Children's Lives: Why Does it Matter?" Urie Brunfenbrenner, Marion Campbell, Rich Savin-Williams, with Glen Elder, moderating. 12:15 p.m. Wednesday, March 23, 202 Uris Hall.

**Consumer Economics and Housing: Human Service Studies / Field Studies/City and Regional Planning:** "Chicago Politics 1983," Lew Kreinberg, Jewish Council on Urban Affairs, Center for Neighborhood Technology, Chicago. co-author "Street Signs Chicago: Neighborhood and Other Illusions of Big City Life," 4 p.m. Thursday, March 17, N-225 MVR.

**Cornell Education Society/Education Field Seminar:** "Educating and Conceptual Development in Disadvantaged Pre-Nursing Baccalaureate Nursing Students," Kathleen Byrne Colling. 4:20 p.m. Monday, March 21. Stone Hall Lounge.

**Ecology and Systematics:** "The Serial Discontinuity Concept of Lotic Ecosystems," James V. Ward. Colorado State University. 4:30 p.m. Wednesday, March 23, Morison Seminar Room, Corson Hall.

**Floriculture and Ornamental Horticulture:** "Soil Compaction and Its Effect on Turfgrass Rootgrowth." Steve Cuddeback, 12:15 p.m. Thursday, March 17, 37 Plant Science.

**General Chemistry:** "Active Sites in Copper Proteins," Edward I. Solomon, Stanford University, 3:15 p.m. Friday, March 18, 119 Baker Laboratory.

**Geological Sciences:** "Burial of Organic Carbon and Sulfur During the Paleo(cene-Steady State or Episodic." Michael A. Arthur, University of South Carolina, 4:30 p.m. Tuesday, March 22, 205 Thurston.

**Geological Sciences:** "Identification of a Precambrian Rift Zone through Missouri by Digital Image Processing of Geophysical and Remote Sensing Data." Ray Arvidson. Washington University. 4:30 p.m. Wednesday, March 23, 205 Thurston.

**Housing:** "Neighborhood and Housing Issues, Lew Kreinberg, Center for Neighborhood Technology, Chicago, 2 p.m. Friday, March 18, 208 Sibley Hall.

**Immunology:** "Immunological Aspects of Dendritic Cells," William Bowers, Mary Imogene Bassett Hospital. 12:15 p.m. Friday, March 18, G-3 Vet Research Tower.

**JUGATAE:** "Host Plant Relationships of the Colorado Potato Beetle: Modification by Plant Seasonality and Potato Fungicide," J. Daniel Hare, Connecticut Experiment Station. 4 p.m. Monday, March 21, 100 Caldwell Hall.

**Materials Science and Engineering:** "Epitaxial Growth of Fluorides on Semiconductors." Julia Phillips, Bell Labs. 4:30 p.m. Thursday, March 17, 140 Bard Hall.

**Mechanical and Aerospace Engineering:** "Growth of Turbulent Spots in Plane Poiseuille Flow." Sheila Widnall, MIT. 4:30 p.m. Tuesday, March 22, Grumman Hall

**Microbiology:** "Genetic and Biochemical Analyses of Branched-chain Amino Acid Biosynthesis in Bacillus subtilis: Evidence for an ilvBC-leu Operon." Robert Lapsky. 4:30 p.m. Thursday, March 24, 124 Stocking Hall.

**Natural Resources:** "Wilderness Preservation and the Concept of Carrying Capacity," F.H. Kuss. 4 p.m. Thursday, March 17, 304 Fernow.

**Neurobiology and Behavior:** "Primitive Social Behavior of Halictine Bees," George Eickwort. 12:30 p.m. Thursday. March 17. Morison Lecture Hall, Seeley G. Mudd Hall.

**Ornithology:** "Did the Downy Eat the Beetle That Ate the Wasp That Ate the Fly That Ate the Fly That Ate the Goldenrod?" Jon Confer. Ithaca College. 7:45 p.m. Monday, March 21, Stuart Observatory, Sapsucker Woods.

**Physiology:** "Physiological Studies of Olfactory Receptor Neuron." Robert O'Connell, Worcester Foundation for Experimental Biology. 4:30 p.m. Tuesday, March 22, G-3 Vet Research Tower.

**Plant Biology:** "Electrogenic H+ transport by the Neurospora Plasma Membrane ATPase," David Perlin, University of Rochester. 11:15 a.m. Friday, March 18, 404 Plant Science.

**Plant Breeding:** "Recent Trends in Potato Breeding." Robert L. Plaisted. 12:20 p.m. Tuesday. March 22, 404 Plant Science

**Pomology:** "Endogenous GA and Cytokinin-like Compounds in Developing Sweet Cherry (Jewels)," Kathy Williams, 11:15 a.m. Monday, March 21, 114 Plant Science Building.

**Poultry Biology:** "Textural Changes in Frozen Gadoid Minces," Allan Samson. 4:30 p.m. Thursday. March 17, 300 Rice Hall.

**Psychology:** The Perceptive Structure of the Optic Array: Information for Spatial Layout," Harold Sedgwick, SUNY. 3:30 p.m. Friday, March 18, 202 Uris Hall.

**Remote Sensing:** "Remote Sensing Applications to Air Pollution Monitoring," W.R. Hafker, Exxon Research and Engineering Co. 4:30 p.m. Wednesday, March 23, B14 Hollister

**Reproductive Physiology-Endocrinology:** "Mutagenicity and Teratology Drug Testing with Emphasis on Embryonic Development," John Kille, Ortho Pharmaceuticals, 4:30 p.m. Wednesday, March 23, 342 Morrison Hall

**Statistics:** "Simultaneous Pairwise Comparisons in Mixed ANOCVA Models," Yosee Hochberg, New York University. 3:30 p.m. Wednesday, March 23, 105 ILR Conference Center.

**Toxicology:** "Drugs, Thermogenesis and the Regulation of Body Weight." David A. Levitsky, 12:20 p.m. Friday, March 18, 100 Savage Hall

**Women in International Development:** "Women's Groups Addressing Women's Problems: Vocational Alternatives to Prostitution in Southeast Asia." Carol Compton, 12:15 p.m. Monday, March 21, 202 Uris Hall.

**Vegetable Crops:** "Effect of Regulated White Clover Living Mulch Sods on Nitrogen Availability and Sweet Corn Yield in a Sweet Corn Living Mulch Cropping System," Tom Vrabel. 4:30 p.m. Thursday. March 17, 404 Plant Science.

**Vegetable Crops:** "History of Horticulture at Cornell." D. Boynton. 4:30 p.m. Thursday. March 24, 404 Plant Science

## Sports

**Sunday**

Mar. 19, 8:15 p.m. Oxley Polo Arena. Women's PoloAlumni.

## Intramurals

**Intramural Box Lacrosse (Men, Women)**
Deadline on entries is Noon, Mar. 21 at 4 p.m. in the Intramural Office, located in Helen Newman Hall. Play starts Sun., Apr. 10 in Lynah Rink. Please specify your preferred day of play when entering: 1st, 2nd, 3rd choice, Mon. through Thurs. (Fri. if necessary). Each team will probably play one Sunday, to be decided by the IM Office. A fee of $30 per team and your roster to enter, Checks only (payable to Dept. of Phys. Ed. & Ath. Intra Div Minimum of 10 to enter team consist of 4 players. Players must supply their own stick. Rules pages G-6 of IM Handbook.

**Intramural Horseshoes (Men, Women, Co-ed)**
Deadline on entries is Tues., Mar. 22 at 4 p.m. in the Intramural Office. Helen Newman Hall. 2 to enter straight elimination. Tournament starting Mon., Apr. 11 or Mon., Apr. 18. Fee of $2 per team due with your roster to enter. Checks only, payable to Dept. of Phys. Ed. & Ath. Intra. Div.

6      **Thursday, March 17, 1983**

## Theater

**Savoyards Present 'Patience'**

The Cornell Savoyards will present Gilbert and Sullivan's "Patience, Or Bunthorne's Bride" at 8:15 p.m. April 8, 9, 15 and 16 and 2 p.m. April 10 in Statler Auditorium.

The Savoyards will perform "Patience" under the dramatic direction of Victoria Kummer and the musical direction of Charles Fritz. First performed in 1881, "Patience" is the story of a group of rapturous maidens and the men they love. The principals in the production include Diane Dunn, administrative manager in computer sciences, as Patience; Fred Ahl, professor of classics, as Bunthorne, and Graham Stewart, an Ithaca College student, as Grosvenor.

"Patience" is one of two Gilbert and Sullivan operettas the Savoyards will perform this year. The theater group, with members from the academic and non-academic community, has presented the witty musical drama of Gilbert and Sullivan to Ithaca audiences each spring and fall for nearly 30 years. Past productions have included "H.M.S. Pinafore," "The Mikado," and most recently "The Pirates of Penzance."

Tickets for "Patience" are $5 for the evening performances and $3.50 for the matinee. Group rates are available. Tickets will go on sale at the Statler Box Office beginning Monday, March 28. The box office is open 2-6 p.m. Monday through Saturday. For further information call 256-7283.

**Thurs. through Sat.**

Mar. 17-19, 8:15 p.m. *Lincoln Drummond Studio* Theatre Cornell presents Molière's classic farce, "The Imaginary Invalid" translated by the late Professor Morris Bishop.

**Sunday**

Mar. 20, 2:30 p.m. *Lincoln Drummond Studio* Theatre Cornell present Molière's "The Imaginary Invalid."

**Thur. through Sat.**

Mar. 24-26, 8:15 p.m. *Lincoln Drummond Studio* Theatre Cornell presents Molière's "The Imaginary Invalid."

## Graduate Bulletin

* The deadline for initial course registration/adding courses was Friday, Feb. 11. All students who are late in turning in these forms will be charged a $10 processing fee.

The final date for course change or drop without special processing fee of $10 is tomorrow, March 18.

**Graduate and Professional School Financial Aid** statements (GAPSFAS) for 1983-84 should have been filed with the Office of Financial Aid by March 15, 1983.

April 15: **Indonesia Fulbright Grants** — The Institute of International Education (IIE) announces the availability of approximately 3 grants for the 1983-84 academic year (12 months). These grants are intended for recent recipients of bachelors degrees, or students enrolled in master's programs, in the fields of creative & performing arts, Indonesian & regional languages (advanced) and literature. Applications can be picked up from Linda Kao, 190 Sage Graduate Center.

April 15: **North Africa/South Asia Fulbright Grants** — New programs have been announced with 8 countries in the North African/South Asian areas. Graduating seniors and graduate students up to the Ph.D. level will be accepted as candidates for grants, subject to individual country preferences. For further information and applications, please contact Linda Kao, 190 Sage Graduate Center.

Singapore, Malaysia, Thailand-1983-84 **Fulbright Study Abroad Program** — The USIA announces the availability of up to 10 grants in all fields of study. Applicants must have a bachelor's degree by the beginning date of the grant, and not hold a Ph.D. at the time of application. For information and applications, contact L.S. Kao in the Graduate Deans' Office.

**Campus deadline has been extended to April 15.**

Note: DEADLINE FOR SUBMITTING 1983-83 GUARANTEED STUDENT LOAN APPLICATIONS TO THE STATE LOAN OFFICE, 124 DAY HALL IS MAY 1, 1983.

Veterinary Medicine students should submit applications to the VET Financial Aid Office, 101-D James Law Auditorium.

Business and Public Administration students should submit applications to the BPA Financial Aid Office, 313 Malott Hall.

Law School students should submit applications to the Law Admissions Office, Myron Taylor Hall.

1983-84 Guaranteed Student Loans — Cornell University's State Loan Office, 124 Day Hall, will accept guaranteed student loan applications for the 1983-84 academic year beginning April 4, 1983. Students applying for a guaranteed student loan for the 1983-84 academic year are required to complete a "Needs Test." This form is expected to be available at your lender or the State Loan Office by April 4th. The Needs Test must be completed and attached to your guaranteed student loan application before the application can be submitted to the State Loan Office for processing.

Veterinary Medicine students should submit applications to the VET Financial Aid Office, 101-D James Law Auditorium.

Business and Public Administration students should submit applications to the BPA Financial Aid Office, 313 Malott Hall.

Law School students should submit applications to the Law Admissions Office, Myron Taylor Hall.

Applications for 1983 Graduate School Summer Fellowships and Summer Tuition Awards should be available after March 31, 1983. Summer Fellowship applications may be obtained at the office of your graduate faculty representative. Summer Tuition Award applications will be available at the Fellowship Office, 116 Sage Graduate Center.

REMINDER: All graduate students who are NYS residents and who receive tuition from Cornell administered sources must apply for a 1982-83 Tuition Assistance Program (TAP) award. The deadline to file is March 31, 1983 for the 1982-83 academic year. TAP applications and TAP acceptance forms are available at the Bursar's Office, 260 Day Hall and at the Fellowship Office, 116 Sage Graduate Center. Questions should be referred to the Bursar's Office, 6-6414 or the Fellowship Office, 6-6884.

## Blotter Barton

Department of Public Safety officials have charged Kevin G. Vangunderen of 603 Winston Court Apartments with third degree burglary in connection with 10 incidents of petit larceny and five burglaries on campus over a period of a year. Safety reported recovering some $474 worth of stolen goods from him.

Also, according to the morning reports of the department for the period March 7 through 13, there were 23 thefts on campus involving a total of $1,850 in cash and valuables. These included five wallets and one purse with contents estimated at $250. Three license plates were stolen from cars parked at various locations on campus.

Safety recovered a $1,000 computer terminal stolen from a room in Uris Hall. Based on an anonymous phone call, safety officials found the terminal and a desk phone in a parking lot in Ithaca.

Two students were referred to the Judicial Administrator for walking on the hoods of cars in the West Campus Parking Lot. Two automobile tires valued at a total of $340 were slashed on a car parked in front of 726 University Avenue.

## CIVITAS

TRAINED GYMNAST SOUGHT FOR SATURDAY MORNING PROGRAM: In downtown Youth Center which has just received a lot of new gym equipment. There is an assistant ready to help, but the Center hopes to find a volunteer trained instructor. Saturday mornings, for a couple of hours, between 9 a.m. -1 p.m.

OLDER WOMAN, FEARFUL OF GOING OUT ALONE: Would like someone to go shopping and maybe have lunch with her every other week. She needs guidance in stores as she gets confused and can't find what she needs. Tues. and Thurs. are the most desirable days, from 10 a.m. -1 p.m. more or less.

SOME NEW REQUESTS FOR HIGH SCHOOL TUTORS: Who are willing to go to Ithaca High School or help their tutees: 1) A geometry tutor 12:55 - 1:40 p.m. any day. M-F. 2) A tutor in first year French, 12:55 - 1:40 p.m. One week either Mon., Wed., or Fri., the next week, Tues. or Thurs.

COMMUNITY PROGRAM WORKING WITH JAIL INMATES: Announces training program for volunteers to help prisoners in the Tompkins County Jail on a case-to-case basis. Volunteers establish supportive relationships with prisoners, help them deal with problems of incarceration and then continue contact upon release. Training starts April 13 (7-10 p.m.) and continues April 14 (7-10 p.m.), April 16 (10-3 p.m.), April 17 (12-5 p.m.), April 18 (7-10 p.m.), April 21 (7-10 p.m.) and April 28 (7-10 p.m.). Training will enable you to work through the summer (if you plan to be in Ithaca) or as soon as the fall term starts in Sept. Come to CIVITAS for an appointment with the program soon. We also have some written information for you to read.

DOWNTOWN YOUTH CENTER NEEDS GOPHER: To help put up posters around the Cornell and/or Ithaca College campus and/or downtown every other week for an hour or two.

TUTOR NEEDED FOR HIGH SCHOOL STUDENT STUDYING BOOKKEEPING: This student can meet you on campus after 3 p.m. Mon and Wed. are the best days for her, but other times are possible.

FIFTH GRADER, AGED 10, HOPES TO FIND MENTOR: To teach him a skill: model building, electronics, bicycle repair, small engine repair, or computer programming. He could come to Cornell after school (about 3 p.m.) one day a week.

GIRL SCOUT CO-LEADERS NEEDED IMMEDIATELY: For two Junior Troops who meet on Mon. afts., one from 2:30-4 p.m.; the other from 3-4:30 p.m., but for the former you will need your own transportation. Commitment for the rest of the semester.

TO OFFER YOUR HELP: Come to CIVITAS, 119B Anabel Taylor Hall, or call 256-7513. Open Mon., Wed., Fri., 9-3, and Tues., Thurs., 10-2. Funded in part by the Student Finance Commission and open to the entire Cornell community.

## New Personnel Director Pledges Accessibility to Employees

At an employee trustee-sponsored brown bag luncheon recently, Lee M. Snyder, director of University Personnel Services, told attendees that he would be personally available to employees and that he was interested in suggestions as to how Personnel Services could improve policies and procedures.

Snyder noted that his current schedule included tours of worksites around the Ithaca campus and that visits to the agricultural sites would include Geneva.

Snyder told the group he was impressed with the many channels of input into the decision-making process at Cornell and the many avenues of communication. "I assure you, this does not happen at all universities," he said. Snyder also assured the group of his commitment to maintain these levels of participation and communication and remarked that University Personnel Services does not make decisions without seeking the thoughts of a large number of people.

The roles of the Employee Assembly and Personnel Support Group in personnel matters will continue to be supported by University Personnel Services, Snyder said. He cited the development of the Employee Complaint and Grievance Procedure for non-academic staff as examples of the constructive activities University Personnel Services will continue to pursue.

He said his department would continue striving to serve both Cornell's departments and its employees. Stating that he is looking forward to reviewing the results of the recent survey of employees, Snyder promised to "take a look at critical issues and improve what we can."

The Long Term Disability plan, the prescription drug program, and the conversion of the endowed non-exempt employees to the Cornell University Retirement Plan were among the significant improvements in employee benefits over the past five years, increasing basic benefits expenditures significantly, Snyder said. He emphasized that these expenditures were generated through the university policy-making structure, not required by law.

This spring, for the first time, employees will receive personalized detailed statements for their benefits, he said. The individualized, computer-generated statements will be mailed to the homes of all regular full-time and part-time non academic staff and all academic staff whose appointments are 50 percent of full time or greater, by the end of May. Snyder responded to questions from the brown bag lunch group with a discussion of differing benefits philosophies.

Noting improvements each year in the promotion of employees from within Cornell, the new personnel director said the university will continue working on programs to advance current employees. He mentioned the concept of career ladders as a means to help employees identify their potential to progress along a planned path of career advancement. He said general guidelines to be developed by Personnel Services would recognize that not every employee takes the same path or pursues the same goals.

Snyder also expressed enthusiasm for the Recreation Club and other employee-generated programs, saying, "it takes a lot of employee involvement to make these things work," he said, and he encourages employees to get involved in such programs.

## James Law Lecture Scheduled

The fourth lecture in the 1982-83 James Law Distinguished Lecturer Series will be given at 4:30 p.m. Thursday, March 24, in the James Law Auditorium, by Dr. Jean D. Wilson, professor of Internal Medicine, University of Texas. Dr. Wilson's topic is the "Hormonal and Genetic Control of Sex Differentiation." Admission is free and the public is invited.

Dr. Wilson will examine the development of male and female embryos, particularly the formation of the male phenotype and the role secretions of the fetal testes play in sex differentiation. Of these secretions, testosterone is responsible for virilization of the Wolffian duct system into the epididymis, vas deferens, and seminal vesicle.

It has recently been discovered that a metabolite of testosterone, dihydrotestosterone, induces development of the prostate and male external genitalia. Dr. Wilson will discuss how impairment in the action or formation of these male sex hormones, or in the protein receptor to which they bind, results in developmental anomalies involving both internal and external genital structures.

Dr. Wilson received his B.A. from the University of Texas at Austin, and his medical degree in 1955 from the University of Texas, Southwestern Medical School. He has over 160 professional publications to his credit and is the editor of "Benign Prostatic Hyperplasia."

## Biotech

**Continued from Page 1**

The institute's initial focus is expected to be in molecular genetics, cellular biology and cell production.

The New York State Center for Biotechnology will provide a program of information and technology transfer specifically designed to meet the needs of New York industry and academic institutions. New York corporations will have full access to the center.

The center will foster biotechnology research and application in the agriculture, food, chemical and pharmaceutical industries in the state.

The institute and the center will sponsor a program of research and development in those areas that are basic to biotechnology innovation and that are essential to the development of its economic potential.

7    **Cornell Chronicle**

# Brief Reports

## Summer Announcement Is Now Available

The 1983 edition of the Summer Session announcement, "Cornell Summer," is now available. The Summer Session staff requests that those who are responsible for Chronicle distribution also make copies of the announcement available to all faculty, staff and students in their building.

They also suggest that departmental offices keep copies for future reference. Additional copies are available from the Information Center in Day Hall or the Summer Session Office in B12 Ives Hall.

The announcement cover was created and drawn by Zevi Blum '57, associate professor of art. Blum's etching illustrates the theme for "Cornell Summer"—"1984. How Close Are We?"

## Women's Studies Program Seeking Nominations

The Women's Studies Program is seeking nominations and self-nominations of Cornell students and staff and residents of the Ithaca area to serve on its Executive Board, effective July 1.

Students, staff and community members who wish to nominate themselves or others should contact the Women's Studies Program, 332 Uris Hall, 256-6480, for details. Nominations will be open until April 14

New board members are selected by the existing board.

Earlier this year seven Cornell faculty were selected to serve on the board. They are Donald Barr, human service studies; Karen Brazell, Asian studies; Raymond Cypess, veterinary diagnostic laboratory; Lorna Fitzgerald, psychology; Vandra Huber, I&LR; Isabel Hull, history; and Diana Meyers, government.

Women's Studies, a permanent program in the College of Arts and Sciences, aims to encourage the development of teaching and scholarship about women and sex roles for both women and men. Policy is set by the executive board, composed of members of the Cornell and Ithaca communities, who have an interest in women's studies.

## Book Fund Will Honor Woman, Radio Pioneer

A book fund has been established at the university in memory of Margaret Ross Cuthbert, Class of 1908, a pioneer in radio broadcasting and Supervisor of Public Affairs for the National Broadcasting Co. at the time of her retirement in 1952.

The fund, which will be used for the purchase of books in the humanities, is part of the Cornell Library Associates' Endowment Fund. The monies, which amount to $27,500, are the bequest of Alice Blinn, Cornell Class of 1917 and life-long friend of Miss Cuthbert.

Miss Blinn was an editor of the "Ladies Home Journal" from 1934 until her retirement in 1952. Miss Blinn, who died in 1982, was elected an alumni trustee of the university in 1944, becoming the second woman to serve on the Board of Trustees. She was a library associate for more than 30 years.

It was through Miss Blinn that Miss Cuthbert received her first job in radio in 1925 with station WEAF in New York City. This station became the flag station for NBC in 1926, and Miss Cuthbert became the producer of many programs and director of Women's and Children's Programs.

## 'On Being Romantic' Is Lecture Subject

Carl Woodring, professor of English at Columbia University, will deliver a lecture, "On Being a Romantic," at 4:30 p.m. today, in Kaufmann Auditorium of Goldwin Smith Hall.

Woodring will hold a seminar at 10 a.m. Friday in 201 A.D. White House. Discussion material for the seminar may be picked up there at the Society for the Humanities.

Woodring, known for his publications on the English literature of the Romantic period, is the author of "Politics in English Romantic Poetry." The society's theme this year is "The Humanities and Politics."

## Short Story Contest Entries Now Open

The $400 first prize in the Arthur Lynn Andrews Short Story Competition will be awarded this year to the best short story or group of short stories by a Cornell graduate or undergraduate.

Entry deadline is noon, April 15. Previous winners are not eligible to compete, although runners-up of previous years may enter. Entry length is not restricted, and the prize may be divided among entries.

Submissions, signed with an assumed name, should be taken to Jean Morehouse, Office of the Dean of the Faculty, 315 Day Hall. Each entry should be accompanied by an envelope with the author's real name sealed inside and the assumed name written on the outside.

Questions may be addressed to Morehouse at 6-4843 or to Jonathan Culler, Department of English, 342 Rockefeller Hall, 6-4553.

## Assemblies Approve Fines Collection Policy

Changes in the collection process for on-campus parking fines for faculty and staff, which was discussed in last week's Chronicle, was endorsed by the Employee Assembly by a vote of 5-4-1, and unanimously passed by the University Assembly in separate meetings last week.

The proposal will go before the Board of Trustees at that meeting later this month and, if endorsed by the board, will then go to the New York State Legislature for a Charter Change.

---

# Summary Annual Reports of Benefit Plans

The Employee Retirement Income Security Act of 1974 (ERISA) requires that an annual report for each employee benefit plan covered by ERISA be filed with the Internal Revenue Service. In addition, ERISA also requires that summaries of these reports be distributed to plan participants. The following summaries present all information required and conform with the style and content requirements of the U.S. Department of Labor.

EXHIBIT C,
Page 106

8    Thursday, March 17, 1983

# Brief Reports

## Stop Smoking Workshop Will Be Offered In April

University Health Services, in conjunction with the Tompkins County Cancer Society, will sponsor a free workshop for members of the Cornell community who want to stop smoking.

"FreshStart" is a four-session workshop designed to help participants stop smoking by providing them with essential information and helpful strategies needed to direct efforts at stopping, according to Janis Talbot, health educator. The sessions are 1½ hours long and will be held from 7.30-9.30 p.m. April 4, 7, 11 and 14.

"FreshStart uses a straightforward, no-nonsense approach," Talbot said. "The program emphasizes not only how to stop, but how to stay off smoking. Individual situations are given more attention than is group process. The Cancer Society feels that it is significant that a person who takes two weeks to stop smoking is just as likely to stay off cigarettes as a person who takes months to stop."

Enrollment deadline is March 28. To register call the Health Education Office at Gannett Health Center at 256-4782. Classes are limited to 20 people.

## Kennedy Is Selected As 'Mason of Year'

Laing B. Kennedy, director of regional offices in the Division of Public Affairs, has been named "Mason of the Year" by Hobasco Lodge 716, F. & A.M.

He will receive the 24th annual award of the lodge at a public dinner and ceremony at the Masonic Temple (Seneca and Cayuga Streets in downtown Ithaca) at 6.30 p.m. Thursday, March 24.

A 1963 graduate of Cornell, Kennedy is being recognized by the Masons for his community service. United Way (1972 campaign chairman and president of the Board of Directors, 1982); active in First Presbyterian Church, 4-H leader; Ithaca Rotary Club, a former All-American hockey player active for years in coaching various hockey teams in the Ithaca area.

Dinner reservations may be made by calling Russell Martin at 256-2079 or 273-0188.

## Assyriologist to Talk About 'New' Language

An Italian Assyriologist who recently deciphered a "new" language — from the 25th century B.C. — will speak at 4.30 p.m. Thursday, March 17, in 230D Rockefeller Hall.

Giovanni Pettinato of the University of Rome will lecture on "The Archives of Ebla," the ancient north Syrian city whose civilization and language were virtually unknown until 1964.

The Italian expedition excavating the



COPY OF EBLA DOCUMENT (ca. 2500 B.C.)

mound of Tell Mardikh in Syria began to discover inscriptions on clay tablets in 1974. The next year an entire library of more

than 15,000 texts and fragments was uncovered.

Pettinato, the epigraphist for the expedition deciphered the language written in cuneiform script and has continued to publish hundreds of texts.

Many of the tablets are bilingual, written in Eblaite and Sumerian, and include a 3,000 word-bilingual dictionary, the longest ever found in antiquity, according to David I. Owen, associate professor of Near Eastern Studies at Cornell.

The archive includes economic, literary, religious and mathematical documents as well as international treaties, all of which date to the 25th century B.C., Owen said.

Pettinato's talk is sponsored by the Department of Near Eastern Studies, in cooperation with Classics, History of Art, Mathematics, Modern Languages and Linguistics and the programs of Jewish Studies and Archaeology.

## City and Regional Planning Offers Summer Program

The Department of City and Regional Planning in conjunction with the Division of Summer Session, Extramural Courses and Related Programs will offer the third annual Progressive Planning Summer Program June 6 through Aug. 5, with a combination of academic courses and shorter institutes.

Three- and six-week courses will include National Planning and Industrial Policy; Rural Planning Issues; Neighborhood Housing Strategies: Alternatives in Third World Planning; Introduction to Planning and Quantitative Techniques for Planners.

The Institutes (of two and five days in length respectively) are National Reindustrialization: A New Agenda for Local Economic Planning, and Management Training for Community Enterprises and Non-Profit, Local Government Agencies.

Tuition for the courses is $700. Institute charges range from $150 to $375. Limited financial aid may be available in some instances.

For further information, contact Pierre Clavel or Lynn Coffey, 201 W. Sibley Hall, 256-6212.

## 'The Two-State Solution;' Second Lecture Planned

The second lecture in the two-part series, "Mutual Recognition and Peace—The Two-State Solution," will take place at 4:30 p.m. Monday, March 21, in Kaufmann Auditorium of Goldwin Smith Hall.

The speaker will be Meir Pa'il, professor of military history at Tel Aviv University and a former member of the Knesset, who will be addressing the topic from an Israeli perspective.

Pa'il was a member of the Palmach prior to Israeli independence, after which he joined the Israeli Defense Forces. He served as Commander in Chief of the Armed Forces Military Academy, and as Chief of the Department of Tactics and Operational Doctrine of the Armed Forces Supreme General Staff.

Pa'il is active in the Israeli Council for Israeli-Palestinian Peace and in Sheli, the Israel Peace Party.

The series is sponsored by: Committee to Support Israeli Peace Groups, Palestine Human Rights Committee, Progressive Zionist Alliance, Government Department, Cornell United Religious Work, International Student Programming Board and Peace Studies.

## Judicial Adviser Search Is Begun

A five-member search committee has been appointed to seek a new judicial adviser.

Dale Okonow, who has held the two-year appointment as judicial adviser since 1981, will graduate from the Cornell Law School in May.

The main function of judicial adviser is to provide advice and counsel to anyone charged by the judicial administrator at Cornell with offenses against the university community. Some legal training is required for the position.

It is a part-time paid position involving approximately 10 hours of work per week.

Joseph B. Bugliari, professor of agriculture and business law, heads the search committee.

Other committee members are Dale Grossman, lecturer in agriculture economics and communication arts; Gordon Kirkwood, the Frederic J. Whiton Pro-

## Director of CURW Will Be Speaker

Robert L. Johnson, director of Cornell United Religious Work, will speak at the 11 a.m. Sunday, March 20, Sage Chapel Service. His sermon topic will be "God As Father."

Johnson came to Cornell in May 1982 as director of CURW. He continues to serve as president of the National Institute for Campus Ministries, a position he has held since 1980.

A graduate of the University of North Carolina at Chapel Hill, Johnson was ordained in 1954 in the United Methodist Church. He received his master of divinity degree from Union Theological Seminary in 1955 and Master of Theology from Harvard Divinity School in 1968. He served for 18 years as director of the Wesley Foundation at Chapel Hill and is the author of "Counter Culture and the Vision of God."

Music for the service will be provided by the Sage Chapel Choir under the direction of Donald R.M. Paterson, university organist and Sage Chapel choirmaster. Glenn Burdett serves as graduate assistant and accompanist.

fessor of Classics; Kathy McCarty, research aide in University Development; and Gregory Vojnovic, Hotel '86.

Application deadline is April 7. Those interested in applying should contact Bugliari at 203 Warren Hall, telephone 256-2194.

## Archaeology Travel Scholarships Available

Applications for Hirsch travel scholarships for summer field training for archaeology students are being accepted through April 5.

Details and application forms are available from members of the archaeology faculty or Beverly Phillips at 265 McGraw Hall between 8 a.m. and 1 p.m. Monday through Thursday.

Some 10 students, participating in properly supervised archaeological field study and research projects in the United States and abroad, will receive up to $700 toward travel expenses. Undergraduate archaeology students will be preferred candidates, but others with a proven interest in archaeology may apply

---

## The Week in Sports

# Men's Lacrosse Opens Saturday

The Cornell men's lacrosse team opens up its 1983 season Saturday with a big game at home against Adelphi University starting at 2 p.m. on Schoellkopf Field.

The Red team is anxious to begin the season and pick up where it left off in 1982 when it had an 11-2 overall record, captured its ninth straight Ivy League title and made it all the way to the semifinals of the NCAA tournament. It was the best season for the Red since 1978. Sixteen lettermen are back and there are veterans returning at nearly every position.

The Big Red should have one of its most explosive attacks in recent years, as seniors Bruce Bruno and Matt Crowley return up front. Both were first team All-Ivy a year ago, while Bruno was named third team All-American and the Ivy League Player of the Year and Crowley received honorable mention All-American honors. Bruno finished the season with 22 goals and 38 assists; Crowley with 35-17-52. Another key attackman is Kevin Cook, a transfer from Nassau Community College where he was the 1982 junior college player of the year.

Midfield is an area where the Red figures to have a great deal of depth. Among the returnees are seniors Paul Mercer and

Tarik Ergin, junior Andy Phillips and sophomores Ken Entenmann, Jamie Smith and Tim Gordon. Mercer was second team All-Ivy a year ago with 16 goals and five assists, while Ergin converted on 153 of 253 faceoffs and led the team in ground balls with 106. Phillips had nine goals and four assists.

The defense will have an entirely different look this spring, as gone from last year's defensive unit are All-Americans Tim Daly and Sam Rappel and fellow starter Mike Haushalter. Senior Bill Nordhausen and junior Mike Higgins both played a great deal at midfield defense in 1982, while senior Vinnie Iliriti will also receive playing time after being a good tender during his first three years at Cornell. Senior Bob Miller, Junior Kevin Loucks and freshman Steve Paletta are also being counted on. Among those who will be on the defensive midfield unit are seniors Josh Cully and Steve Fitzpatrick, and sophomores Rob Gilmartin and Steve Dadourian.

The Big Red looks solid in goal with junior Peter Ruchkin and senior J.D. Phillips. Ruchkin emerged as the starter early last year and recorded the highest save percentage by a Big Red goaltender (.765) since 1973.

Adelphi, Saturday's opponent, should be one of the top teams in the nation this season. Last year, the Panthers had a 10-4 record and qualified for the NCAA tournament where they lost to Virginia (10-6) in the quarterfinals. Adelphi topped the Big Red last spring in the season opener for the Red on Long Island, 15-7, so Cornell will be out for revenge.

In other Cornell sports action this weekend, two Big Red winter teams are scheduled for competition. The women's fencing team will be at the NCAA championships at Penn State Thursday through Saturday. The squad's last competition was at the Northeastern championships at Brandeis two weeks ago, and Cornell took first place, avenging last year's second place finish. Ellen Belknap led the team with a 15-7 record, while Christine Hamori and Sue Moss fenced well in turning in 13-6 and 13-7 scores, respectively. All three performers have a shot at placing high in individual competition this weekend.

The women's polo team will oppose an alumni squad Sunday, beginning at 8:15 p.m. at the Oxley Arena. The Red currently has an 8-4 record and its last match was an 11-10 victory over the Upstate Polo Club on Feb. 26.

# EXHIBIT D

1 | NELSON E. ROTH, SBN 67350
      ner3@cornell.edu
2 | CORNELL UNIVERSITY
      300 CCC Building
3 | Garden Avenue
      Ithaca, New York 14853-2601
4 | Telephone:   (607)255-5124
      Facsimile:   (607)255-2794
5 |
      BERT H. DEIXLER, SBN 70614
6 |     bdeixler@proskauer.com
      CHARLES S. SIMS, New York Attorney Registration No. 1535640
7 |     admitted *pro hac vice*
           csims@proskauer.com
8 | CLIFFORD S. DAVIDSON, SBN 246119
           cdavidson@proskauer.com
9 | PROSKAUER ROSE LLP
      2049 Century Park East, 32nd Floor
10 | Los Angeles, CA  90067-3206
      Telephone:   (310) 557-2900
11 | Facsimile:   (310) 557-2193

12 | Attorneys for Defendant,
      CORNELL UNIVERSITY

13 |

14 | UNITED STATES DISTRICT COURT

15 | SOUTHERN DISTRICT OF CALIFORNIA

16 | KEVIN VANGINDEREN,                       ) Case No. 07-CV-2045-BTM-JMA
17 |                    Plaintiff,             ) Hon. Barry T. Moskowitz
18 |          v.                              ) DEFENDANT'S MEMORANDUM
19 | CORNELL UNIVERSITY,                      ) OF POINTS AND AUTHORITIES
                                              ) IN SUPPORT OF SPECIAL
                                              ) MOTION TO STRIKE
20 |                    Defendant.            ) PLAINTIFF'S COMPLAINT
                                              ) PURSUANT TO SECTION 425.16
21 |                                          ) OF THE CALIFORNIA CODE OF
22 |                                          ) CIVIL PROCEDURE
                                              )
23 |                                          ) [Per chambers, no oral argument
                                              ) unless requested by the Court]
24 |                                          )
                                              ) [Request for Judicial Notice filed
25 |                                          ) concurrently]
                                              )
26 |                                          ) Hearing Date: December 21, 2007
                                              ) Time:            11:00 a.m.
27 |                                          ) Location:        Courtroom 15
                                              )
28 |                                          ) Action Filed: October 1, 2007

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ....................................................................................... 1

STATEMENT OF FACTS ........................................................................... 2

    **A.**   Plaintiff's Criminal Activity and the *Cornell Chronicle*'s
        reporting of it. ........................................................................... 2

    **B.**   Plaintiff Contacts Cornell regarding the Article's Accessibility
        on the Internet ........................................................................... 4

    **C.**   Plaintiff Files Suit ..................................................................... 4

DISCUSSION .............................................................................................. 5

I.   The Complaint Is A SLAPP Lawsuit, Therefore Plaintiff Must
    Demonstrate a Reasonable Probability of Succeeding in His Claims .............. 5

II.  Plaintiff Cannot Demonstrate a Reasonable Probability of Succeeding
    in His Claims ............................................................................................. 8

    **A.**   Because There Was No Republication Plaintiff's Claims Are
        Time-Barred, Having Accrued in 1983 ................................... 10

    **B.**   Plaintiff's Libel Claim Is Legally Insufficient because the
        *Chronicle* Report Was A Fair and True Report about Criminal
        Activity and therefore Is Privileged ....................................... 15

    **C.**   Plaintiff's Claim for Public Disclosure of Private Facts Is
        Legally Insufficient because Plaintiff's Crimes Were A Matter of
        Legitimate Public Concern........................................................ 17

III.  CONCLUSION .......................................................................................... 19

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1

## TABLE OF AUTHORITIES

2
                                                                              Page

3

## FEDERAL CASES

4

5   *Arikat v. JP Morgan Chase & Co.*,
        430 F. Supp. 2d 1013 (N.D. Cal. 2006) ..................................................12
6
    *Bosley Med. Inst., Inc. v. Kremer*,
7       402 F.3d 672 (9th Cir. 2005) ..................................................................7

8   *Brown v. Baden (In re Yagman)*,
        796 F.2d 1165 (9th Cir. 1986) .............................................................9, 16
9
    *California Pro-Life Council, Inc. v. Getman*,
10      328 F.3d 1088 (9th Cir. 2003) ...............................................................5

11  *Canatella v. Van De Kamp*,
        486 F.3d 1128 (9th Cir. 2007) ...........................................................11, 13
12
    *Cox Broad. Corp. v. Cohn*,
13      420 U.S. 469 (1975) .............................................................................18

14  *Crane v. Arizona Republic*,
        972 F.2d 1511 (9th Cir. 1992) ...........................................................15, 16
15
    *Duboff v. Playboy Enters. Int'l, Inc.*,
16      No. 06-358-HA, 2007 U.S. Dist. LEXIS 50717 (D. Or. June 26, 2007) ...............8

17  *Four Navy Seals v. Associated Press*,
        413 F. Supp. 2d 1136 (S.D. Cal. 2005) ...............................................5, 8
18
    *Metabolife Int'l v. Wornick*,
19      264 F.3d 832 (9th Cir. 2001) ...........................................................9, 10

20  *New York Times Co. v. Sullivan*,
        376 U.S. 254 (1964) .............................................................................15
21
    *Nicosia v. De Rooy*,
22      72 F. Supp. 2d 1093 (N.D. Cal. 1999) ..................................................16

23  *Oja v. United States Army Corps of Eng'rs*,
        440 F.3d 1122 (9th Cir. 2006) .............................................................11
24
    *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
25      No. 02 CV 2258 JM (AJB), 2007 U.S. Dist. LEXIS 16356 (S.D. Cal.
        March 7, 2007) .............................................................................11
26
    *The Florida Star v. B.J.F.*,
27      491 U.S. 524 (1989) .............................................................................18

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

# TABLE OF AUTHORITIES (cont'd.)

Page

*Time, Inc. v. Hill,*
    385 U.S. 374 (1967)................................................................................18

*United States v. Lockheed Missiles & Space Co., Inc.,*
    190 F.3d 963 (9th Cir. 1999).....................................................................5

*Van Buskirk v. N.Y. Times Co.,*
    325 F.3d 87 (2d Cir. 2003).......................................................................11

*Vess v. Ciba-Geigly Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003)...................................................................7

*Zamani v. Carnes,*
    491 F.3d 990 (9th Cir. 2007)................................................................2, 6

## STATE CASES

*ARP Pharmacy Servs., Inc. v. Gallagher Bassett Servs., Inc.,*
    135 Cal. App. 4th 841 (2006)...................................................................9

*Chavez v. Mendoza,*
    94 Cal. App. 4th 1083 (2001)...................................................................7

*City of Cotati v. Cashman,*
    29 Cal. 4th 69 (Cal. 2002).......................................................................7

*Colt v. Freedom Commc'ns, Inc.,*
    109 Cal. App. 4th 1551 (2003).............................................................8, 15

*E.B. v. Liberation Publ'ns, Inc.,*
    7 A.D.3d 566 (2004)...............................................................................14

*Equilon Enters., LLC v. Consumer Cause, Inc.,*
    29 Cal. 4th 53 (2002).............................................................................6

*Firth v. State,*
    98 N.Y.2d 365 (2002) ..............................................................11, 13, 14

*Fox Searchlight Pictures v. Paladino,*
    89 Cal. App. 4th 294 (2001)..................................................................5, 7

*Franklin v. Dynamic Details, Inc.,*
    116 Cal. App. 4th 375 (2004)..................................................................16

*Gates v. Discovery Commc'ns, Inc.,*
    34 Cal. 4th 679 (2004)........................................................................17, 18

iii

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1

**TABLE OF AUTHORITIES (cont'd.)**

2

<u>Page</u>

3   *Governor Gray Davis Com. v. Am. Taxpayers Alliance,*
4      102 Cal. App. 4th 449 (2002) ...................................................................... 7

5   *Gregoire v. G.P. Putnam's Sons,*
   298 N.Y. 119 (1948) ................................................................. 11, 13, 14

6   *Kajima Eng'g & Construction, Inc. v. City of Los Angeles,*
7      95 Cal. App. 4th 921 (2002) ...................................................................... 7

8   *Lafayette Morehouse, Inc. v. Chronicle Publ'g Co.,*
   37 Cal. App. 4th 855 (1995) ...................................................................... 5

9   *Macias v. Hartwell,*
10     55 Cal. App. 4th 669 (1997) ................................................................5, 10

11  *McGarry v. Univ. of San Diego,*
   154 Cal. App. 4th 97 (2007) ..................................................................... 10

12  *Melvin v. Reid,*
13     112 Cal. App. 285 (1931) .........................................................................17

14  *Messenger ex rel. Messenger v. Gruner + Jahr Printing and Pub.,*
   94 N.Y.2d 436 (2000) ...........................................................................9, 16

15  *Okun v. Super. Ct.,*
16     29 Cal. 3d 442 (1981) .............................................................................12

17  *Reader's Digest Ass'n v. Superior Court,*
   37 Cal. 3d 244 (1984) .............................................................................16

18  *Seelig v. Infinity Broad. Corp.,*
19     97 Cal. App. 4th 798 (2002) ...................................................................... 7

20  *Shively v. Bozanich,*
   31 Cal. 4th 1230 (2003) ...................................................................11, 12, 14

21  *Shulman v. Group W Prods.,*
22     18 Cal. 4th 200 (1998) .......................................................................16, 18

23  *Taus v. Loftus,*
   40 Cal. 4th 683 (2007) ...................................................... 6, 8, 9, 10, 16, 17

24  *The Traditional Cat Ass'n, Inc. v. Gilbreath,*
25     118 Cal. App. 4th 392 (2004) ...........................................................10, 11, 12, 14

26  *Wilcox v. Superior Court,*
   27 Cal. App. 4th 809 (1994) .................................................................5, 6

27

28

iv

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES (cont'd.)

Page

## STATUTES

Cal. Code Civ. Pro. § 340(c) ....................................................................................9, 10

Cal. Code Civ. Pro. § 425.16 .......................................................................................2, 5

Cal. Code Civ. Pro. § 425.16(a) ..................................................................................... 5

Cal. Code Civ. Pro. § 425.16(b) ..................................................................................... 6

Cal. Code Civ. Pro. § 425.16(b)(1) ................................................................................. 6

Cal. Code Civ. Pro. § 425.16(c) ..................................................................................... 9

Cal. Code Civ. Pro. § 425.16(e) ..................................................................................... 6

Cal. Code Civ. Pro. § 47(d) ..........................................................................................16

NY CLS CPLR § 215(3) ............................................................................................9, 11

v

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1    Defendant Cornell University ("Cornell") hereby submits its memorandum of

2 points and authorities in support of Cornell's special motion to strike the Complaint

3 of plaintiff Kevin Vanginderen ("Plaintiff") in its entirety, with prejudice and

4 without leave to amend.

5                              **INTRODUCTION**

6    This action presents a direct First Amendment challenge to the manner in

7 which universities in particular, and libraries in general, can maintain their historic

8 function as preservers of expressed ideas and information. Recently, universities,

9 libraries and other institutions have endeavored to increase public knowledge by

10 digitizing their physical archives and making them available electronically. Doing

11 so cannot be a republication that restarts applicable statutes of limitations based on

12 the content of those works.

13    Were this Court to find that digitization constitutes republication for

14 defamation or false light purposes, universities everywhere would be confronted

15 with the need to research and verify every assertion of fact in all works housed at

16 those institutions. These burdens are wholly inconsistent with the free expression

17 intended by the First Amendment and equally inconsistent with the historic role of

18 our universities as the retainers and imparters of ideas. Further, permitting this

19 claim to proceed is wholly inconsistent with the progression of the law concerning

20 defamation and free speech.

21    This case in particular underscores the risks to universities and libraries

22 because the claims of defamation and privacy invasion, with the $1,000,000 price

23 tag attached to them, are obviously premised on the hope that the underlying facts

24 will be unavailable because of the passage of the 24 years since the arrest and

25 conviction of the plaintiff occurred. As the concurrently filed declarations and court

26 records demonstrate, however, in this case the hope of immunity from proof of

27 plaintiff's crimes because of lost memory is futile. The public records of the public

28

                                      1
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1   legal proceedings demonstrate beyond cavil that the Plaintiff, an active member of

2   the California State Bar, and of this Court, is a convicted thief, indeed convicted

3   upon his own plea of guilty in satisfaction of a pending burglary charge.

4        The evidence reveals that Plaintiff was charged on March 8, 1983 with third

5   degree burglary, arising from his theft of books from an office in Fernow Hall on

6   Cornell's campus on March 5, 1983. According to the Accusatory Instrument, this

7   charge was based on Plaintiff's sworn confession. He was arrested, and on March

8   17, 1983, the *Cornell Chronicle*, in its weekly police blotter column, accurately

9   reported Plaintiff's arrest in a brief one-paragraph summary. This is the alleged

10  libel and public disclosure upon which Plaintiff sues.

11       Because Plaintiff cannot possibly prevail in this action, it is imperative that

12  this Court apply the protections of California Code of Civil Procedure Section

13  425.16, the anti-SLAPP statute, and dismiss the action. The Ninth Circuit has

14  repeatedly recognized the power and propriety of District Courts in California

15  applying the statute where warranted. *See, e.g., Zamani v. Carnes*, 491 F.3d 990,

16  994 (9th Cir. 2007). This Court therefore is empowered to bring this action's direct

17  intrusion into the exercise of free speech to an end, and it should do so in a

18  published opinion that will put all on notice of the risk of bringing such spurious

19  challenges to the conscientious operation of universities and libraries in ensuring

20  access to, and expression of, ideas.

## STATEMENT OF FACTS

21

22  **A.**    **Plaintiff's Criminal Activity and the *Cornell Chronicle*'s reporting**
23        **of it.**

24       On March 8, 1983, plaintiff Kevin G. Vanginderen ("Plaintiff") was charged

25  in Ithaca City Court with third degree burglary, a Class D felony. The Accusatory

26  Instrument alleged:

27

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1
2
3
4
5

on or about the 5th day of March, 1983 . . . [Plaintiff] did knowingly enter or remain unlawfully in a building, to wit: defendant entered at approx. 2:00AM room 312C Fernow Hall, Tower Road, Cornell University, City of Ithaca, N.Y., to commit the crime of larceny therein by stealing books, with said office space belonging to Richard J. Baker, with all actio[n]s by defendant without authorization, are contrary to the provisions of the Statute in case made an provided.

6    (*See* concurrently filed Defendant's Request for Judicial Notice [Def. Req. for Jud.

7    Not.], Ex. A, p. 5).

8        Plaintiff confessed to the charge under oath, as documented in the Accusatory

9    Instrument dated March 8, 1983.  (*Id.*)[1]

10       On March 17, 1983, the *Cornell Chronicle*, Cornell University's weekly

11   campus newspaper, reported the following:

12
13
14
15

Department of Safety Officials have charged Kevin G. Vanginderen of 603 Winston Court Apartments with third degree burglaries [sic] in connection with 10 incidents of petit larceny and five burglaries on campus over a period of a year. Safety reported recovering some $474 worth of stolen goods from him.

16   (Def. Req. for Jud. Not., Ex. B, p. 15). This report appeared in the normal "Blotter

17   Barton" column, which reported on police activity and public safety issues in and

18   around Cornell University (the Cornell Police maintain their offices in Barton Hall).

19       A second charge was later brought against Plaintiff for petit larceny, a Class

20   A misdemeanor. The Accusatory Instrument dated August 17, 1983, indicates that

21   "on or about the 5th day of March, 1983 . . . [Plaintiff] did commit the crime of petit

22   larceny by stealing books located at room 312C, Fernow Hall, Tower Road, Cornell

23

24   [1] Further details of Plaintiff's criminal activities will be available for the Court at the

25   hearing on this special motion. An order to show cause why the court should not

26   unseal the records of Plaintiff's arrest is pending in the relevant Tompkins County

27   Court in the State of New York. The return date for the Order to Show Cause is

28   November 16, 2007. (*See* Def. Req. for Jud. Not., Ex. D, p. 21).

3

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

1  University, located within the City of Ithaca, New York." (Def. Req. for Jud. Not.,

2  Ex. A, p. 7). On August 22, 1983, Plaintiff pled guilty to petit larceny in full

3  satisfaction of the charges pending against him. (Def. Req. for Jud. Not., Ex. A, pp.

4  6, 8).

5      The *Cornell Chronicle* has been publicly available since it was published on

6  March 17, 1983, in libraries, and for some period in an online archive maintained by

7  the Cornell University Library.

8  **B.    Plaintiff Contacts Cornell regarding the Article's Accessibility on**

9         **the Internet**

10     On September 3, 2007, the Cornell University Library received an e-mail

11  from Plaintiff in which Plaintiff demanded that the library remove that portion of the

12  digitized *Cornell Chronicle* article, dated March 17, 1983, that describes the original

13  charge against him for criminal activity on the Cornell campus. (Def. Req. for Jud.

14  Not., Ex. C, p. 19). Cornell declined Plaintiff's demand.

15  **C.    Plaintiff Files Suit**

16     On October 1, 2007, Plaintiff filed the present action (the "Complaint") in

17  San Diego Superior Court based on two causes of action: libel and public disclosure

18  of private information. The Complaint alleges, among other things, that Cornell

19  republished the *Chronicle* report "sometime in the year 2007 . . . by placing it in the

20  public domain on the defendant's library website for the first time, which was over

21  twenty four years after its first more limited publication." (Compl. ¶¶ 1, 4).

22  Plaintiff alleges that the report was false, (*id.*), and that he did not discover it until

23  he "conducted an annual '[G]oogle search' of his name on the [I]nternet." (Compl.

24  ¶¶ 2, 5). Google® searches reveal the indexed text of the article and a link to the

25  digitized copy stored in the Cornell University Library archive. Plaintiff clicked

26  such a link in order to enter the library's archive and view the article.

27     Plaintiff seeks $1,000,000. (Compl. ¶¶ 3, 6).

28

8085/21177-001
Current/10224157v7

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

1

## DISCUSSION

2

**I.    The Complaint Is A SLAPP Lawsuit, Therefore Plaintiff Must**
3      **Demonstrate a Reasonable Probability of Succeeding in His Claims**

4          The issue of the *Cornell Chronicle* Plaintiff seeks to suppress addressed a

5    matter of public interest: Plaintiff's criminal activities on the campus of Cornell

6    University.  Plaintiff's Complaint thus indisputably arises from Cornell's exercise of

7    free speech in connection with a matter of public interest.  California Code of Civil

8    Procedure Section 425.16, the "anti-SLAPP statute," therefore applies.[2]

9          The anti-SLAPP statute was enacted in 1993 in order to address "a disturbing

10   increase in lawsuits brought primarily to chill the valid exercise of the constitutional

11   rights of freedom of speech and petition for the redress of grievances."  The statute

12   applies to all "litigation without merit filed to dissuade or punish the exercise of

13   First Amendment rights of defendants."  *California Pro-Life Council, Inc. v.*

14   *Getman*, 328 F.3d 1088, 1089 (9th Cir. 2003) (quoting *Lafayette Morehouse, Inc. v.*

15   *Chronicle Publ'g Co.*, 37 Cal. App. 4th 855, 858 (1995)).  The anti-SLAPP statute is

16   to be broadly interpreted so as to protect Constitutional rights and to act as a

17   screening mechanism by "eliminate[ing] meritless litigation at an early stage in the

18   proceedings." *Macias v. Hartwell*, 55 Cal. App. 4th 669, 672 (1997); *see also* Cal.

19   Code Civ. Pro. § 425.16(a) ("[T]his section shall be construed broadly.").

20   Defamation suits such as the one in the present case are a primary target of the anti-

21   SLAPP statute. *Fox Searchlight Pictures v. Paladino*, 89 Cal. App. 4th 294, 305

22   _____

23   [2] It is well settled that the anti-SLAPP statute applies to state claims brought in

24   federal court.  *United States v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963,

25   973 (9th Cir. 1999) (noting that disallowing anti-SLAPP motions in federal court

26   would encourage forum shopping, contrary to the purposes of the Erie Doctrine);

27   *Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1148 (S.D. Cal. 2005)

28   (citing *Lockheed* and applying anti-SLAPP statute).

5

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

EXHIBIT D,
Page 118

1   (2001); *accord Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 816 (1994),

2   *disapproved on other grounds by Equilon Enters., LLC v. Consumer Cause, Inc.*, 29

3   Cal. 4th 53 (2002).

4     The anti-SLAPP statute creates a procedure whereby a defendant may move

5   to strike a complaint, or any cause of action, that arises "from any act of that

6   [defendant] in furtherance of the [defendant]'s right of petition or free speech under

7   the United States Constitution in connection with a public issue." Cal. Code Civ.

8   Pro § 425.16(b)(1). Such a complaint or cause of action "shall be subject to a

9   special motion to strike, unless the court determines that the plaintiff has established

10  that there is a probability that the plaintiff will prevail on the claim." *Id.*

11    Courts evaluate an anti-SLAPP motion in two steps:

12      First, a defendant must make an initial prima facie

13      showing that the plaintiff's suit arises from an act in
    furtherance of the defendant's rights of petition or free

14      speech. Second, once the defendant has made a prima
    facie showing, the burden shifts to the plaintiff to

15      demonstrate a probability of prevailing on the challenged
    claims.

16  *Zamani v. Carnes*, 491 F.3d 990, 994 (9th Cir. 2007) (internal quotations and

17  citations omitted; *see Taus v. Loftus*, 40 Cal. 4th 683, 712 (2007). A SLAPP lawsuit

18  defendant satisfies the first prong of Section 425.16(b) upon demonstrating that the

19  causes of action sought to be stricken are based upon "any act of [defendant] in

20  furtherance of [defendant's] right of petition or free speech under the United States

21  or California Constitution in connection with a public issue." *Wilcox*, 27 Cal. App.

22  4th at 820 (*quoting* Cal. Code Civ. Pro. § 425.16(b)). Pursuant to Section 425.16(e),

23  an "act in furtherance of a person's right of petition or free speech under the United

24  States or California Constitution in connection with a public issue" includes, in

25  relevant part:

26      [. . .](3) any written or oral statement or writing made in a

27      place open to the public or a public forum in connection
    with an issue of public interest; (4) or any other conduct in

28      furtherance of the exercise of the constitutional right of

8085/21177-001
Current/10224157v7

6

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

The broadly-defined threshold showing is "intended to be given broad application in light of its purposes." *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 808 (2002) (citations omitted).

In order to succeed in its special motion to strike, Cornell need not demonstrate that Plaintiff intended to chill Cornell's exercise of its free speech activities, *Bosley Med. Inst., Inc. v. Kremer*, 402 F.3d 672, 682 (9th Cir. 2005); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 808 (2002), or that its speech was actually chilled, *Vess v. Ciba-Geigly Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003). Cornell also need not show that its activities were protected under the First Amendment as a matter of law. *Fox Searchlight*, 89 Cal. App. 4th at 305. Rather, "a court must generally presume the validity of the claimed constitutional right in the first step of the anti-SLAPP analysis . . . . Otherwise, the second step would become superfluous in almost every case, resulting in an improper shifting of the burdens." *Governor Gray Davis Com. v. Am. Taxpayers Alliance*, 102 Cal. App. 4th 449, 458 (2002) (quoting *Chavez v. Mendoza*, 94 Cal. App. 4th 1083, 1089-90 (2001)).

Merely referencing the allegations of the Complaint itself satisfies Cornell's required showing. *See City of Cotati v. Cashman*, 29 Cal. 4th 69, 78 (Cal. 2002) ("In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech."); *Kajima Eng'g & Construction, Inc. v. City of Los Angeles*, 95 Cal. App. 4th 921, 929 (2002) (holding that, in deciding an anti-SLAPP motion, a court must examine solely the activity that has been alleged in the pleading as the basis for the challenged cause of action).

The First and Second Causes of Action derive from Cornell's publishing in 1983 a report of Plaintiff's criminal activities in the *Cornell Chronicle* and

7

1  maintaining the availability of that 1983 report both in hard and electronic form.

2  Such publication undoubtedly is an act in furtherance of Cornell's right of free

3  speech on a public issue and is within the ambit of the anti-SLAPP statute. *Four*

4  *Navy Seals*, 413 F. Supp. 2d. at 1149 (holding, in anti-SLAPP case, that publication

5  of article concerning potential criminal activity by military personnel was a matter

6  of public interest); *Duboff v. Playboy Enters. Int'l, Inc.*, No. 06-358-HA, 2007 U.S.

7  Dist. LEXIS 50717, at * 16 (D. Or. June 26, 2007) ("The writing and publishing of a

8  magazine article is conduct in furtherance of the exercise of free speech rights under

9  the [identical Oregon] anti-SLAPP statute."); *Loftus*, 40 Cal. 4th at 712-13 (holding

10  that publishing findings in professional journal regarding child mistreatment

11  qualified for anti-SLAPP protection); *Colt v. Freedom Commc'ns, Inc.*, 109 Cal.

12  App. 4th 1551, 1557 (noting that, in context of newspaper report concerning SEC

13  complaint and legal proceedings, "Plaintiffs do not dispute that the publishing of

14  newspaper articles [falls under the anti-SLAPP statute], nor could they in light of the

15  First Amendment rights involved.").

16      For the foregoing reasons, Cornell has met its initial burden; the Complaint is

17  a SLAPP suit. The burden shifts to Plaintiff to demonstrate that he has a reasonable

18  probability of succeeding in his claims.

19

20  **II.**    **Plaintiff Cannot Demonstrate a Reasonable Probability of Succeeding in His Claims**

21      The Court should dismiss this SLAPP lawsuit because Plaintiff cannot make

22  the required showing that he has a reasonable probability of success. Plaintiff's

23  defamation and public disclosure claims are legally insufficient because publication

24  and disclosure occurred when the relevant issue of the newspaper was published on

25  March 17, 1983, and the acts of the Cornell University Library in continuing to

26  maintain public accessibility of that article, by maintaining paper and digital

27

28

8

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1  archives, is not a republication that avoids application of the single publication rule.

2  The claims are time-barred.

3       The defamation claim is fatally defective for the additional reason that even if

4  there were a publication by digitization of the *Chronicle* within the limitations

5  period, Cornell's report was fair and true. The private facts claim is deficient not

6  only because it is time-barred, but also because as a matter of state and First

7  Amendment law the continued public availability of newspapers reporting the news

8  is not actionable. Moreover, to the extent New York law applies to this action

9  Plaintiff cannot state a claim for public disclosure because New York does not

10  recognize such a tort. *See Messenger ex rel. Messenger v. Gruner + Jahr Printing*

11  *and Pub.*, 94 N.Y.2d 436, 441 (2000).[3]  The Court is required to strike Plaintiff's

12  claims and award Cornell reasonable attorneys fees and costs. *ARP Pharmacy*

13  *Servs., Inc. v. Gallagher Bassett Servs., Inc.*, 135 Cal. App. 4th 841, 854 (2006);

14  Cal. Code Civ. Pro. § 425.16(c).

15       Once a court determines that a Complaint arises from an act in furtherance of

16  protected expression, "the plaintiff must show a 'reasonable probability' of

17  prevailing in its claims for those claims to survive dismissal." *Metabolife Int'l v.*

18  _____

19  [3] For purposes of this special motion to strike, the Court need not engage in a

20  conflict of laws analysis because California and New York law are substantially the

21  same in relevant respects regarding the libel claim. *Brown v. Baden (In re Yagman)*,

22  796 F.2d 1165, 1170 (9th Cir. 1986) ("It is axiomatic that, unless there is a

23  difference between the laws of the states, a choice need not be made.") For

24  example, both states apply a one-year statute of limitations to libel. Cal. Code Civ.

25  Pro. § 340(c); NY CLS CPLR § 215(3). The Court therefore can assess the

26  sufficiency of Plaintiff's libel claim with reference to the laws of either state.

27  Furthermore, Plaintiff's claim is legally insufficient in California, for the reasons set

28  forth below, and simply is not recognized in New York.

9

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

1  *Wornick*, 264 F.3d 832, 840 (9th Cir. 2001); *see Loftus,* 40 Cal. 4th at 713 ("[I]n

2  order to avoid dismissal of each claim under section 425.16, plaintiff bore the

3  burden of demonstrating a probability that she would prevail on the particular

4  claim.")  Plaintiff "must demonstrate that the complaint is legally sufficient and

5  supported by a prima facie showing of facts to sustain a favorable judgment if the

6  evidence submitted by the plaintiff is credited." *Metabolife Int'l*, 264 F.3d at 840

7  (citation omitted); *Loftus,* 40 Cal. 4th at 714 (noting that claims must be stricken "if

8  the plaintiff is unable to demonstrate both that the claim is legally sufficient and that

9  there is sufficient evidence to establish a prima facie case with respect to the

10  claim.").  In order to be considered for this purpose, Plaintiff's evidence must be

11  "competent and admissible." *Macias v. Hartwell*, 55 Cal. App. 4th 669, 675 (1997).

12  He "cannot simply rely on the allegations in the complaint, but must provide the

13  court with sufficient *evidence* to permit the court to determine whether there is a

14  probability that the plaintiff will prevail on the claim." *The Traditional Cat Ass'n,*

15  *Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 398 (2004) (granting anti-SLAPP motion)

16  (internal quotations and citations omitted) (emphasis in original).  The court "must

17  also examine whether there are any constitutional or nonconstitutional defenses to

18  the pleaded claims and, if so, whether there is evidence to negate any such

19  defenses." *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 109 (2007).

20  ### A.  Because There Was No Republication Plaintiff's Claims Are Time-Barred, Having Accrued in 1983

21

22      The *Cornell Chronicle* report at issue was published in 1983, twenty-four

23  years before Plaintiff filed this litigation.  The act of making the archive available to

24  individuals who have electronic access to the Cornell University Library server

25  where it is maintained is not a republication that precludes application of

26  California's or New York's single publication rule.  Thus, any claim arose 24 years

27  ago and expired one year later.  The migration of the archive to the Internet does not

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1 | avoid application of the single publication rule any more than would moving the

2 | newspaper from one Cornell library to another.

3 |   In California, causes of action for defamation and public disclosure are

4 | extinguished after one year. Cal. Code Civ. Pro. § 340(c). Defamation claims in

5 | New York also expire after one year, NY CLS CPLR § 215(3), and New York does

6 | not recognize the disclosure tort. The statute of limitations begins to run upon

7 | publication, and only one tort cause of action can be based upon that publication.

8 | *Id.;F irth v. State*, 98 N.Y.2d 365, 371 (2002); *Gregoire v. G.P. Putnam's Sons*, 298

9 | N.Y. 119 (1948). This is the single publication rule. *See Oja v. United States Army*

10 | *Corps of Eng'rs*, 440 F.3d 1122, 1130 (9th Cir. 2006); *Van Buskirk v. N.Y. Times*

11 | *Co.*, 325 F.3d 87, 89 (2d Cir. 2003). This limitation applies "notwithstanding how

12 | many copies of the publication are distributed or how many people hear or see the

13 | broadcast. Any subsequent republication or rebroadcast gives rise to a new single

14 | cause of action." *The Traditional Cat Ass'n, Inc.*, 118 Cal. App. 4th at 395; *see Van*

15 | *Buskirk*, 325 F.3d at 39.

16 |   In *Shively v. Bozanich*, 31 Cal. 4th 1230 (2003), the leading California case

17 | concerning the single publication rule, the California Supreme Court noted that the

18 | primary purpose of the single publication rule was to prevent a chilling effect upon

19 | the reporting of issues of public concern. *Id.* at 1244. Such concern was based on

20 | the possibility at common law that a plaintiff

21 |        could bring an action seeking redress for libel against a
        publisher based upon an allegedly defamatory remark
22 |        contained in a newspaper issued 17 years prior to the
        plaintiff's discovery of the defamation, on the theory that
23 |        the sale to the plaintiff of the long-forgotten copy of the
        newspaper constituted a new publication, starting anew the
24 |        running of the period of limitations.

25 | *Id.* at 1244. Motivated by the same concerns, Courts in this Circuit repeatedly have

26 | held that the single publication rule applies to the Internet. *See, e.g., Canatella v.*

27 | *Van De Kamp*, 486 F.3d 1128, 1133 (9th Cir. 2007); *Oja v. United States Army*

28 |

---

11

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1 *Corps of Eng'rs*, 440 F.3d at 1128; *Sundance Image Tech., Inc. v. Cone Editions*

2 *Press, Ltd.*, No. 02 CV 2258 JM (AJB), 2007 U.S. Dist. LEXIS 16356, at *17 (S.D.

3 Cal. March 7, 2007).

4      There is no actionable libel in this case because Cornell has not published the

5 *Cornell Chronicle* article since March 17, 1983. To state a claim for libel, "plaintiff

6 must establish the intentional publication of a statement of fact that is false,

7 unprivileged, and has a natural tendency to injure or which causes special damage."

8 *Arikat v. JP Morgan Chase & Co.*, 430 F. Supp. 2d 1013, 1020 (N.D. Cal. 2006).

9 "Publication" means "communication to a third person who understands the

10 defamatory meaning of the statement and its application to the person to whom

11 reference is made." *Id.* (quoting *Okun v. Super. Ct.*, 29 Cal. 3d 442, 458 (1981));

12 *see Shivley v. Bozanich*, 31 Cal. 4th 1230, 1242 (2003) (same). Libel thus requires

13 an intentional communication to a third person. Continued publication of the

14 original edition of a newspaper or book is not a republication, but rather is the first

15 publication and is squarely subject to the single publication rule. *See generally*

16 *Traditional Cat Ass'n*, 118 Cal. App. 4th at 401-04.

17      Cornell did not repeat facts from the original publication in a new edition of

18 the *Cornell Chronicle* after the initial publication in 1983, but merely maintained its

19 archive of the original publication, in an accessible electronic format. Making its

20 collection more accessible by digitization of its paper archives, thereby permitting

21 the public easier access to what already was available at various libraries (and in any

22 other locations where prior issues were available), does not avoid application of the

23 single publication rule. Had Plaintiff physically visited the library and discovered

24 the article he could not claim that there was a republication in 2007 merely because

25 he saw the *Chronicle* sitting on the shelf. The fact that a precise photographic image

26 of the original *Chronicle* article is now available online, in addition to on the shelf,

27 changes nothing, and does not amount to a republication.

28

12

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1    As relevant cases make clear, intentional communication, in the libel context,

2   requires more than simply making a work available for an interested party to

3   retrieve.  Courts considering arguments to the contrary have firmly rejected them

4   and reasserted the single publication rule's protection of free speech.  In *Canatella*

5   *v. Van De Kamp*, the Ninth Circuit rejected plaintiff's claim that Defendants

6   published libelous State Bar disciplinary information when it was displayed on

7   Defendants' website in response to users' Internet search queries.  The court also

8   rejected Plaintiff's argument that Defendant published the disciplinary information

9   when it moved that information from one part of the site to another:

10          [T]he California Bar's decision to [move] the allegedly
            offensive disciplinary summary to Canatella's search page
11          did not trigger a new cause of action since a verbatim copy
            of that summary had appeared on the exact same website
12          [for three years].  Thus, contrary to Cantanella's claims,
            the California Bar's posting of his disciplinary record in a
13          different section of the same website did not give rise to a
            new cause of action . . . .
14

15   *Canatella*, 486 F.3d at 1135.

16          The *Canatella* holding precludes the present Plaintiff's claim.  Just like the

17   disciplinary report in *Canatella*, the Internet archive version of the *Chronicle* is a

18   precise copy – in fact, the equivalent of a photograph – of the original.  Consistent

19   with *Canatella*, simply "moving" an image of the physically archived copy from the

20   paper shelf to the electronic shelf does not republish it sufficiently to remove the

21   time-bar imposed by the single publication rule.

22          The New York Court of Appeals similarly has held that making information

23   retrievable on the Internet does not intrinsically constitute republication of that

24   information.  In *Firth v. State*, the court rejected plaintiff's argument that "because

25   publications on the Internet are available only to those who seek them . . . , each hit

26   or viewing of the report should be considered a new publication that retriggers the

27

28

13

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1  statute of limitations." *Firth*, 98 N.Y.2d at 369.  In rejecting this argument, the

2  court drew upon its decision in *Gregoire v. G.P. Putnam's Sons*:

3       In *Gregoire*, we held that a publisher's sale from stock of
4  a copy of a book containing libelous language did not
   constitute a new publication.  We explained that if the
5  multiple publication rule were applied to such a sale, the
   [s]tatute of [l]imitation[s] would never expire so long as a
6  copy of such book remained in stock and is made by the
   publisher the subject of a sale or inspection by the public.
7  Such a rule would thwart the purpose of the Legislature to
   bar completely and forever all actions which, as to the
8  time of their commencement, overpass the limitation there
   prescribed upon litigation.

9  *Id.* (quoting *Gregoire*, 298 N.Y. at 125-126).  A New York appellate court more

10  recently applied *Gregoire* to order the dismissal of a libel claim brought more than

11  one year after a book was posted on the Internet and placed on sale to the general

12  public. *E.B. v. Liberation Publ'ns, Inc.*, 7 A.D.3d 566, 567 (App. Div., 2d Dep't

13  2004) (holding that when plaintiff discovered book on the Internet was

14  irrelevant in analysis of when publication occurred).

15       The reasoning of both *Firth* and *Gregoire* applies to the current action, and

16  California courts have explicitly adopted the reasoning of those decisions in the

17  context of the Internet. *See, e.g., Shively*, 31 Cal. 4th at 1244; *The Traditional Cat*

18  *Ass'n*, 118 Cal. App. 4th at 404.  The Cornell University Library has made available

19  a copy of a 24-year-old issue of a Cornell newspaper to those who have access to the

20  Library over the Internet.  Querying Cornell's website for a copy of that back issue

21  is no different than walking up to a reference librarian and requesting it.  Likewise,

22  receiving a copy of the issue in .pdf format on one's computer is no different than

23  locating the *Chronicle* on microfiche or locating a print copy on the shelf.

24       If the creation of a digital archive were sufficient to restart the limitations

25  period, no library or institution making archives available could safely do so without

26  risking massive expense and liability.  Universities would be chilled from archiving

27  the work of their students, professors and staff for fear that each new technological

28

14

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1  platform on which past archives were made available would set the statute of

2  limitations to run anew.  All of the policies and justifications for the single

3  publication rule apply here and preclude treating digital availability on a new

4  platform to count as a republication that restarts the statute of limitations.

5       Cornell has done nothing more than provide access to a virtual section of its

6  library.  Because placing a copy of the March 17, 2003 edition of the *Chronicle* in

7  that virtual section is not a publication or a public disclosure, the Court should find

8  Plaintiff's claims legally insufficient and should strike them pursuant to the anti-

9  SLAPP statute.

10      **B.**    **<u>Plaintiff's Libel Claim Is Legally Insufficient because the *Chronicle*</u>**
11  **<u>Report Was A Fair and True Report about Criminal Activity and</u>**
     **<u>therefore Is Privileged</u>**

12       Try as he might, Plaintiff cannot escape the fact that he was charged with

13  felony burglary.  As indicated in the records of the Ithaca City Court, filed

14  concurrently as Exhibit A to the Request for Judicial Notice, Plaintiff was formally

15  charged on March 8, 1983 with burglary in the third degree, a Class D felony.  As

16  demonstrated in Exhibit B, the *Chronicle* reported:

17       Department of Safety Officials have charged Kevin G.
18       Vanginderen of 603 Winston Court Apartments with third
     degree burglary in connection with 10 incidents of petit
19       larceny and five burglaries [sic] on campus over a period
     of a year.  Safety reported recovering some $474 worth of
20       stolen goods from him.

21       Though the *Chronicle*'s account of Plaintiff's crimes was indeed entirely

22  accurate, it need not have been in order to be considered fair and true.  "Under

23  California law, a newspaper report is fair and true if it captures the substance, the

24  gist, the sting of the libelous charge.  The news article need not track verbatim the

25  underlying [criminal] proceeding."  *Crane v. Arizona Republic*, 972 F.2d 1511, 1519

26  (9th Cir. 1992).  A report need not be entirely accurate in order to be privileged.

27  "Erroneous statement is inevitable in free debate, and . . . must be protected if the

28

15

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

1    freedoms of expression are to have the breathing space that they need . . . to

2    survive." *New York Times Co. v. Sullivan*, 376 U.S. 254, 271-272 (1964); *Colt v.*

3    *Freedom Commc'ns, Inc.*, 109 Cal. App. 4th 1551, 1558 (2003) ("[T]he 'fair and

4    true report' requirement does not limit the privilege to statements that contain no

5    errors."). "A certain degree of flexibility/literary license is afforded reporters under

6    the privilege." *Crane*, 972 F.2d at 1519 (quoting *Reader's Digest Ass'n v. Superior*

7    *Court*, 37 Cal. 3d 244, 261 (1984).

8        In addition to being accurate, the *Chronicle* report was also privileged.  It is

9    well settled that "[a]ccusations of criminal activity, like other statements, are not

10   actionable if the underlying facts are disclosed." *Nicosia v. De Rooy*, 72 F. Supp. 2d

11   1093, 1103 (N.D. Cal. 1999) (citing *In re Yagman*, 796 F.2d 1165, 1174 (9th Cir.

12   1986)); *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 388 (2004)

13   (quoting *Nicosia*).  Further, the *Chronicle's* publication was privileged as a fair and

14   true report based on a charge or complaint to a public official.  Cal. Code Civ. Pro.

15   § 47(d) ("A privileged publication or broadcast is one made . . . By a fair and true

16   report in, or a communication to, a public journal . . . of a verified charge or

17   complaint made by any person to a public official, upon which complaint a warrant

18   has been issued.")[4]

19       Plaintiff's libel claim therefore is legally insufficient.  The claim should be

20   stricken in accordance with the anti-SLAPP statute.

21   _____

22   [4] In New York, "[a] civil action cannot be maintained against any person, firm, or

23   corporation, for the publication of a fair and true report of any judicial proceeding,

24   legislative proceeding or other official proceeding . . . ."  N.Y. Civil Rights L. § 74

25   (McKinney 2007).  A news report reflecting a judicial proceeding is not actionable

26   regardless of the ultimate disposition of the matter.  *Phillips v. Murchison*, 252 F.

27   Supp. 513, 522 (S.D.N.Y. 1966), *aff'd in part, rev'd in part*, 383 F.2d 370 (2d Cir.

28   1967).

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

**C.   Plaintiff's Claim for Public Disclosure of Private Facts Is Legally Insufficient because Plaintiff's Crimes Were A Matter of Legitimate Public Concern**

To succeed on a claim of public disclosure of private facts, under California law, Plaintiff must demonstrate "(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern." *Loftus*, 40 Cal. 4th at 717 (quoting *Shulman v. Group W Prods.*, 18 Cal. 4th 200, 214 (1998)).[5]  Consistent with the fourth required element of the claim, newsworthiness is a complete defense, *id.*, and is determined "with regard to [otherwise private] individuals by assessing the logical relationship or nexus, or the lack thereof, between the events or activities that brought the person into the public eye and the particular facts disclosed." *Id.* at 718.  As the California Court of Appeal explained in the first California case considering the invasion of privacy tort, the right of privacy "does not exist in the dissemination of news and news events." *Melvin v. Reid*, 112 Cal. App. 285, 290 (1931).

Here, plaintiff's claim is barred by the California Supreme Court's recent holding in *Gates v. Discovery Communication*, as well as relevant Supreme Court precedents:

> We conclude that an invasion of privacy claim based on allegations of harm caused by a media defendant's publication of facts obtained from public official records of a criminal proceeding is barred by the First Amendment to the United States Constitution. (*Cox, supra*, 420 U.S. at p. 495; *Oklahoma Publ'g, supra*, 430 U.S. at p. 311; see also *Daily Mail, supra*, 443 U.S. at p. 103; *The Florida Star, supra*, 491 U.S. at p. 533; *Bartnicki, supra*, 532 U.S. at pp. 527–528.)

*Gates v. Discovery Commc'ns, Inc.*, 34 Cal. 4th 679, 696 (2004).

---

[5] As discussed above, New York law does not recognize this cause of action. *See Gruner + Jahr Printing and Pub.*, 94 N.Y.2d 436 at 441.  Sections 50 and 51 of New York's Civil Right's Law, which provide a limited statutory right of privacy, are inapplicable.

17

1    The Accusatory Instrument dated March 8, 1983 concerning plaintiff's arrest

2    was a public record in Ithaca City Court.  Plaintiff's infractions brought him into the

3    public eye and the facts disclosed in the *Chronicle* relate directly – and exclusively –

4    to those events.  The allegations against Plaintiff were a matter of public record and

5    the *Chronicle* was entitled to report on them.

6    The First Amendment's guarantee of freedom of the press protects the right to

7    report news even when it involves the affairs of otherwise private persons:

8    
9    
10
11
12
13

> The guarantees for speech and press are not the preserve of
> political expression or comment on public affairs, essential
> as those are to healthy government. One need only pick up
> any newspaper or magazine to comprehend the vast range
> of published matter which exposes persons to public view,
> both private citizens and public officials. Exposure of the
> self to others in varying degrees is a concomitant of life in
> a civilized community. The risk of this exposure is an
> essential incident of life in a society which places a
> primary value on freedom of speech and of press.

14    *Time, Inc. v. Hill*, 385 U.S. 374, 388 (1967), *quoted in Shulman*, 18 Cal. 4th at 208.

15    The publication of information derived from public records, including information

16    concerning the criminal activities of otherwise private citizens, enjoys First

17    Amendment protection.  In *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975), the

18    Supreme Court held that the press could not be prohibited from publishing the name

19    of a rape victim when that name had been provided in a public record.  As the Court

20    explained:

21
22
23
24
25

> The commission of crime, prosecutions resulting from it,
> and judicial proceedings arising from the prosecutions,
> however, are without question events of legitimate
> concern to the public and consequently fall within the
> responsibility of the press to report the operations of
> government . . . . [T]he prevailing law of invasion of
> privacy generally recognizes that the interests in privacy
> fade when the information involved already appears on the
> public record.

26
27    *Id.* at 492, 494; *see also The Florida Star v. B.J.F.*, 491 U.S. 524, 535-536 (1989).

28

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

EXHIBIT D,
Page 131

1    The holdings in *Gates*, *The Florida Star* and *Cox Broad. Corp.* directly

2  preclude Plaintiff's claim for public disclosure of private information. His claim for

3  public disclosure of private information therefore is legally insufficient.

4

5  **III.**   **<u>CONCLUSION</u>**

6    For the foregoing reasons, Cornell respectfully requests this Court to dismiss

7  Plaintiff's Complaint in its entirety, and that Cornell be awarded attorneys' fees and

8  costs.

9

10

11  DATED: November 2, 2007         BERT H. DEIXLER
                              CHARLES S. SIMS

12                               CLIFFORD S. DAVIDSON
                               PROSKAUER ROSE LLP

13                               NELSON E. ROTH

14                               CORNELL UNIVERSITY

15

16                         s/Bert H. Deixler
                                    Bert H. Deixler

17                         Attorneys for Defendant,

18                         CORNELL UNIVERSITY

19

20

21

22

23

24

25

26

27

28

19

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
SPECIAL MOTION TO STRIKE PLAINTIFF'S COMPLAINT

8085/21177-001
Current/10224157v7

**EXHIBIT E**

1  NELSON E. ROTH, SBN 67350
       ner3@cornell.edu
2  CORNELL UNIVERSITY
   300 CCC Building
3  Garden Avenue
   Ithaca, New York 14853-2601
4  Telephone:    (607)255-5124
   Facsimile:    (607)255-2794
5
   BERT H. DEIXLER, SBN 70614
6      bdeixler@proskauer.com
   CHARLES S. SIMS, New York Attorney Registration No. 1535640
7      admitted *pro hac vice*
       csims@proskauer.com
8  CLIFFORD S. DAVIDSON, SBN 246119
       cdavidson@proskauer.com
9  PROSKAUER ROSE LLP
   2049 Century Park East, 32nd Floor
10 Los Angeles, CA  90067-3206
   Telephone:    (310) 557-2900
11 Facsimile:    (310) 557-2193

12 Attorneys for Defendant,
   CORNELL UNIVERSITY
13

14              UNITED STATES DISTRICT COURT

15            SOUTHERN DISTRICT OF CALIFORNIA

16
   KEVIN VANGINDEREN,                  )  Case No. 07-CV-2045-BTM (JMA)
17                                      )
                  Plaintiff,            )
18                                      )  **CORNELL'S REPLY IN FURTHER**
         v.                             )  **SUPPORT OF SPECIAL MOTION TO**
19                                      )  **STRIKE PLAINTIFF'S COMPLAINT**
   CORNELL UNIVERSITY,                  )  **PURSUANT TO SECTION 425.16 OF**
20                                      )  **THE CALIFORNIA CODE OF CIVIL**
                  Defendant.            )  **PROCEDURE**
21                                      )
                                        )  [Evidentiary Objections and Declarations of
22                                      )  Clifford S. Davidson and Simeon F. Moss
                                        )  filed concurrently]
23                                      )
                                        )  [Per chambers, no oral argument unless
24                                      )  requested by the Court]
                                        )
25                                      )  Hearing Date:  December 21, 2007
                                        )  Time:           11:00 a.m.
26                                      )  Location:       Courtroom 15
                                        )
27 _____ )  Action Filed: October 1, 2007

28

_____
DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

## I.  **INTRODUCTION**

Plaintiff Kevin Vanginderen ("Plaintiff") perfectly articulates the importance of this case:

> A correction of the injustice faced by the Plaintiff would require little technical effort on behalf of the Defendant. The Defendant would not presumably include within its 'digitized' library archives known fraudulent publications such as, *The Autobiography of Howard Hughes* or *The Hitler Diaries*, yet it contends here that an undue burden would be placed upon it if [sic] were to edit one of its own questionable publications.

Opp. at 11 – 12. Plaintiff could not be more misguided: all works, questionable or not, would be included in a digitized library. A library is a repository of information for the ages available to scholars, commentators and the public. This includes the entire historical record, along with all its inaccuracies, follies and works that have been proven to be fraudulent. Plaintiff seems to hypothesize a library without ancient documentation of Columbus' search for a route to "India" or the fraudulent novel *A Million Little Pieces*; where the overturned *Dred Scott* decision would be stricken from the historical record; or where a *Cornell Chronicle* article, unchallenged during the statute of limitations period, would be discarded in the face of a $1,000,000 lawsuit. The Court must protect the role of libraries by preventing Plaintiff from proceeding with his claims.

As discussed below, Plaintiff utterly fails to demonstrate a probability of success in his claims – as the anti-SLAPP statute requires. *See* Cal. Code Civ. Pro. § 425.16(b)(1) – (3). The evidence conclusively establishes that Plaintiff's claims are without merit. Nevertheless, Plaintiff asserts – without competent evidence or apposite and published authorities – that the *Chronicle* is not a newspaper; that he should be excused from the one-year statute of limitations applicable to his claims because he did not discover the *Chronicle* report about his crimes until 24 years after it was published; and that the report was untrue. When drafting his Complaint and the Opposition to this Motion, Plaintiff's strategy appears to have been to rely on the fact that the police and prosecution records were sealed. Indeed, he opposed Cornell's motion to unseal those very records. *See* Declaration of Clifford S. Davidson ("Davidson Declaration") ¶ 2 & Ex. A, filed concurrently.

Unfortunately for Plaintiff, those records are now public (and are part of the Court's record) and demonstrate the frailty of Plaintiff's position. Plaintiff was charged with Burglary in the 3rd

DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

8085/21177-001
Current/10430794v

1  Degree in connection with 10 incidents of petit larceny and five burglaries. Even if he was not

2  charged with each of these crimes, the newly-unsealed records reveal that he was charged *in*

3  *connection* with these crimes and that he confessed to having stolen on numerous occasions. The

4  records demonstrate conclusively that the *Chronicle* report was not only fair and true, but also

5  entirely accurate:

6      Regardless, any cause of action Plaintiff might have had in connection with the *Chronicle*

7  article expired 24 years ago. Plaintiff's arguments to the contrary are meritless.

8                            **II.   DISCUSSION**

9  **A.   Plaintiff's Complaint Is without Question A SLAPP Lawsuit**

10      Plaintiff's claim that Cornell cannot avail itself of California Code of Civil Procedure §

11  425.16 (hereinafter, "anti-SLAPP statute") is patently incorrect. Plaintiff advances two main

12  theories as to why the anti-SLAPP statute does not apply: (1) Plaintiff's complaint is not retaliatory

13  or in response to Cornell's petitioning activity; and (2) the *Chronicle* article does not address a

14  public issue. Opp. at 5:1 – 6:4. The law is to the contrary.

15      **1.   The Anti-SLAPP Statute Applies Broadly to Any Conduct In Furtherance of**
        **the Exercise of the Right of Free Speech**
16

17      Plaintiff relies on a website – ironically enough – for the proposition that the anti-SLAPP

18  statue protects only petition-related activity. Opp. at 5. In contrast to the website, actual legal

19  authorities demonstrate that the anti-SLAPP statute by its terms extends to the First Amendment

20  activities at issue in this case.

21      The anti-SLAPP statute protects "any act in furtherance of a person's right of petition **or**

22  **free speech** under the United States or California Constitution in connection with a public issue.

23  Cal. Code Civ. Pro, § 425.16(b)(1) (emphasis added). The meaning of "act in furtherance of a

24  person's right of petition or free speech under the United States or California Constitution in

25  connection with a public issue" includes:

26          (3) any written or oral statement or writing made in a place open to
            the public or a public forum in connection with an issue of public
27          interest; (4) or any other conduct in furtherance of the exercise of the
            constitutional right of petition or the constitutional right of free
28

                                          2                              07cv2045
      DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

1   speech in connection with a public issue or an issue of public
    interest.

2   The provisions of the anti-SLAPP statute are construed broadly, Cal. Code Civ. Pro.

3   § 425.16(a), and encompass newspaper reports, reports on crime, and other publications. *See*

4   Defendant's Memorandum of Points and Authorities in Support of Special Motion to Strike

5   ("Memorandum") at 7 and 8 (collecting cases). Defamation claims, even those not associated with

6   petition activities, fall squarely within the ambit of the anti-SLAPP statute. Memorandum at 5 and

7   6 (collecting cases). Even the depublished case Plaintiff cites in his opposition, *Hebrew Academy*

8   *of San Francisco v. Goldman*, 129 Cal. App. 4th 391 (2005), *review granted by Hebrew Academy*

9   *of San Francisco v. Goldman*, 118 P.3d 1017, 1017 (2007), applies the anti-SLAPP statute to

10  speech unrelated to petition activities.

11  The anti-SLAPP statute thus clearly applies to defamation claims based on newspaper (and

12  other) publications, not simply petition-related activities.

13  **2.      Plaintiff's Criminal Activities Were (and Are) Public Issues Or Issues Of Public**

14  **Interest**

15  Plaintiff also protests that Cornell cannot avail itself of anti-SLAPP protection because

16  Plaintiff's criminal activities are not a matter of public concern. Opp. at 5. Courts in this Circuit

17  agree that reporting on crimes is the sort of conduct the anti-SLAPP statute protects. *See, e.g.,*

18  *Four Navy Seals*, 413 F. Supp. 2d. 1136, 1149 (S.D. Cal. 2005) (holding, in anti-SLAPP case, that

19  publication of article concerning potential criminal activity by military personnel was a matter of

20  public interest); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 808 (2002) (noting that

21  "issue of public interest" requirement "is to be construed broadly so as to encourage participation

22  by all segments of our society in vigorous public debate related to issues of public interest"

23  [citations omitted]); *see also* Memorandum at 7 and 8.

24  Plaintiff's opposition is misguided. His criminal activities were of public interest and the

25  *Chronicle* was afforded First Amendment privilege to report them. *See* Memorandum at 15 – 19.

26  Furthermore, those activities continue to be of public interest now that he practices law.

27

28

DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

**B.**    **Plaintiff Has Not Demonstrated that His Complaint Is Legally Sufficient**

    **1.**    **Plaintiff's Primary Case Is Unpublished and Therefore Inapposite**

        One of the few cases Plaintiff cites in opposition to Cornell's motion is *Hebrew Academy*. This case has been depublished and rendered un-citable by the California Supreme Court's grant of review. *See Hebrew Academy of San Francisco v. Goldman*, 118 P.3d 1017, 1017 (2007); Cal. Ct. R. 8.1105(e)(1) ("Unless otherwise ordered … an opinion is no longer considered published if the Supreme Court grants review or the rendering court grants rehearing."); Cal. Ct. R. 8.1115(a) (unpublished opinions "must not be cited or relief on by a court or a party in any other action.") Indeed, another Court in this district refused to permit citation to *Hebrew Academy* for this very reason. *Sundance Image Technology v. Cone Editions Press Ltd.*, No. 02-CV-2258-JM (AJB), 2007 U.S. Dist. LEXIS 16356, at *19 fn. 4 (S.D. Cal. March 7, 2007). The Court therefore should not permit Plaintiff to rely on this case for any proposition.

    **2.**    **The Single Publication Rule Applies to The *Chronicle***

        The *Chronicle* unquestionably is protected by the single publication rule. Plaintiff argues that the single publication rule does not apply because the *Chronicle* is not "mass media," Opp. at 8:1 – 8:7, a term Plaintiff does not bother to define. The one case Plaintiff cites in support of this proposition, *Hebrew Academy*, is depublished pending review (see section II(A)(1), *supra*), is distinguishable and in fact supports Cornell's position. The *Hebrew Academy* court, itself, noted that the California Supreme Court's earlier decision in *Shively v. Bozanich*, 31 Cal. 4th 1230 (2003), "ma[de] clear that application of the single publication rule has invariably been confined to newspapers and books." *Hebrew Academy*, 129 Cal. App. 4th at 398 (citing *Shively*, 31 Cal. 4th at 1245). The *Shively* Court interpreted the provisions of California Civil Code § 3425.3, which codifies the single publication rule and specifically refers to newspapers.[1]

---

[1] Per Cal. Civ. Code § 3425.3: "No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine . . . ."

DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

8085/21177-001
Current/10430794v

1    The *Chronicle* is a newspaper within the meaning of the single publication rule and cases

2  interpreting it.  The definition of "newspaper" contained in Civil Code § 3425.3 should be

3  interpreted in its "ordinary, everyday meaning."  *Halbert's Lumber, Inc. v. Lucky Stores, Inc.*, 6

4  Cal. App. 4th 1233, 1238 (1992).  The ordinary meaning of "newspaper" is "[a] publication for

5  general circulation, usu[ally] in sheet form, appearing at regular intervals, usu[ally] daily or

6  weekly, and containing matters of general public interest, such as current events."  Black's Law

7  Dictionary 1065 (7th Ed. 1999).  As described in the concurrently-filed Declaration of Simeon F.

8  Moss ("Moss Declaration"), in 1983, the *Cornell Chronicle* was published weekly with a

9  circulation of over 10,000 and was "widely distributed across campus, including at the various

10  dining halls, the campus store, and key administrative and administrative buildings.  The *Cornell*

11  *Chronicle* was available at any of these locations from the day of publication until the next week's

12  newspapers were distributed."  Moss Decl. ¶ 6.  It covered – and continues to cover – a wide

13  variety of subjects and current events.  Moss Decl. ¶ 8.  One of those current events is criminal

14  activity on campus.  In 1983, 25 of the 35 issues of the *Chronicle* contained crime blotters

15  documenting crime on campus as reported by the Cornell Department of Public Safety.  Moss

16  Decl. ¶ 7.

17    The single publication rule would apply to the *Chronicle* even if it were not a "newspaper."

18  The *Hebrew Academy* court's refusal to apply the single publication rule was based on the

19  offending publication's extremely limited distribution of 10 copies, 129 Cal. App. 4th at 399, and

20  on the court's determination that respondents therefore were not in need of the single publication

21  rule's protections:

22
23              We conclude that the single publication rule does not apply to the
               Goldman oral history . . . .  Respondents have not shown they are in
               need of protection from a multiplicity of suits, of from a continuous
24              tolling of the statute of limitations, or from the application of diverse
               laws to a single event, which are the problems the rule was designed
25              to solve.

26  *Hebrew Academy*, 129 Cal. App. 4th at 400.  With a circulation of over 10,000, the *Cornell*

27  *Chronicle* clearly is in need of the single publication rule, though the same would be true if its

28  circulation were much lower.  *Hebrew Academy* therefore is distinguishable on this ground.

8085/21177-001
Current/10430794v    DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

1    Further, the New York Court of Appeal recently applied the single publication rule to bar an

2    invasion of privacy claim, under New York civil rights law, arising from a single photograph

3    displayed in an art gallery. *Nussenzweig v. diCorcia*, No. 155, slip op., 2007 N.Y. LEXIS 3244, at

4    *2 (N.Y. Nov. 15, 2007).

5        **3.    The Discovery Rule Does Not Apply to The *Chronicle***

6        Plaintiff claims that the discovery rule has tolled the one-year statute of limitations, which

7    allegedly did not begin to run until he discovered the *Chronicle* through his Google® search in

8    September 2007.  Plaintiff relies on the alleged "very limited publication" of the *Chronicle* in

9    support of this claim, Opp. at 8, and alleges, without the support of competent evidence, that he

10   was "simply incapable of discovering" the report about him "in an obscure publication he had not

11   even known the existence of," Opp. at 9.  The *Chronicle* had a circulation of at least 10,000 in

12   1983.  Moss Decl. ¶ 6.  Plaintiff cannot seriously argue that he was "simply incapable of

13   discovering" the March 17, 1983 publication.  Indeed, his criminal defense attorney noted in 1983

14   that Plaintiff "has reacted tremendously to the shame and indignity **of a publicized arrest and**

15   **prosecution**."  Supp. Req. Jud. Not., Ex. F, p. 74 (emphasis added).

16       Plaintiff's statement that he was not aware of the *Chronicle*'s existence and never saw a

17   single copy is as irrelevant as it is unlikely.  Even if the *Chronicle*'s distribution were significantly

18   less than 10,000, the discovery rule still would not apply.  Plaintiff cites *Shively* for the proposition

19   that the discovery rule applies where it is difficult for plaintiff to understand or learn of the injury

20   or the injury is hidden.  Opp. at 9.  However, whether by oversight or design, Plaintiff fails to

21   disclose that the *Shively* court affirmed courts' "uniform[] *reject[ion of]* the application of the

22   discovery rule to libels published in books, magazines, and newspapers."  *Shively*, 31 Cal. 4th at

23   1250 (emphasis in original).  The *Shively* court further held that "[a]lthough application of the

24   discovery rule may be justified **when the defamation was communicated in an inherently**

25   **secretive manner** . . . , the justification does not apply when the defamation occurred by means of

26   a book, magazine or newspaper that was distributed to the public."  *Hebrew Academy*, 129 Cal.

27   App. 4th at 401 (quoting *Shively*, 31 Cal. 4th at 1250 – 1251).

28

DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

EXHIBIT E,
Page 139

1    The discovery rule is a rarely-invoked equitable exception to the finality of the single

2    publication rule. *Hebrew Academy*, 129 Cal. App. 4th at 401 ("The discovery rule constitutes an

3    **equitable exception** to general legal rules concerning the accrual of a cause of action, such as the

4    single publication rule." [emphasis added]). It does not apply to alleged "libels published in books,

5    magazines and newspapers." *Id.* at 402 (quoting *Shively*, 31 Cal. 4th at 1250) (internal quotations

6    omitted). That is because "[i]t is only in situations to which the single publication rule clearly does

7    *not* apply that the discovery rule *may* apply." *Id.* (emphasis in original); *see Nussenzweig v.*

8    *diCorcia*, 2007 N.Y. LEXIS 3244 at *2 (dismissing statutory privacy claim, applying single

9    publication rule and declining to apply discovery rule to photograph displayed in gallery).

10    Plaintiff's other discovery rule cases are wholly unrelated to the libel context and are

11    distinguishable based on the hidden nature of the medical, toxic and other torts involved. *Fox v.*

12    *Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803 (2005) (medical malpractice); *Hopkins v. Dow*

13    *Corning Corp.*, 33 F.3d 1116. 1120 (9th Cir. 1994) (strict products liability); *Jolly v. Eli Lilly &*

14    *Co.*, 44 Cal. 3d 1103, 1109 (1988) (defective drugs); *Dawson v. Eli Lilly & Co.*, 543 F.Supp. 1330,

15    1338 (D.D.C. 1982) (same). Such cases are inapposite.

16    **4.    Plaintiff's Cited Copyright Cases Are Inapposite**

17    Plaintiff asserts that application of the single publication rule in this case "flies in the face

18    of recent rulings regarding illegal uploading and downloading of copyrighted sound recordings."

19    Opp. at 9 and 10. This is totally irrelevant. The purpose of copyright law is to ensure that the

20    owners of works are compensated for their efforts. In order to achieve this purpose, Congress has

21    prohibited the unauthorized copying and use of works of authorship. In one of Plaintiff's cases, the

22    Southern District of New York held that, **under the Copyright Act of 1976** (17 U.S.C. § 101, *et*

23    *seq.*) defendant could not avoid liability based on an argument that it was simply the "functional

24    equivalent" of a library of users' compact disks. *UMG Recordings, Inc. v. MP3.com*, 92 F. Supp.

25    2d 349, 350 (S.D.N.Y. 2000). The other copyright holding Plaintiff cites stands only for the

26    proposition that "Napster users who upload file names to the search index for others to copy violate

27    plaintiffs' distribution rights. Napster users who download files containing copyrighted music

28    violate plaintiffs' reproduction rights." *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th

DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

1    Cir. 2001). Plaintiff's Copyright cases address "use" and "infringement," rather than

2    "publication," and therefore should be disregarded.

3       The purpose of the single publication rule is to prevent a chilling effect on the reporting of

4    matters of public interest, *Shively,* 31 Cal. 4th at 1244, a goal unrelated to laws protecting owners

5    of works. Plaintiff's inapt comparison of these distinct areas of law thus should be disregarded.

6    **C.**     <u>**Plaintiff Has Not Demonstrated that His Complaint Is Factually Sufficient**</u>

7       Plaintiff fails to make the required prima facie showing that his complaint is factually

8    sufficient. *See Metabolife Int'l,* 264 F.3d 832, 840 (9th Cir. 2001). He must make such a showing

9    by introducing "competent and admissible" evidence. *Macias v. Hartwell,* 55 Cal. App. 4th 669,

10    675 (1997). Plaintiff utterly fails to do so and the exhibits attached to his Affidavit are incompetent

11    and inadmissible.

12       Plaintiff claims that the March 17, 1983 *Chronicle* report about his crimes was false

13    because it stated that he was arrested and charged in connection with 10 charges of petit larceny

14    and five burglaries. *See* Req. for Judicial Notice, Ex. B, p. 15. Plaintiff's argument is premised on

15    the view that the Accusatory Instrument needed to have charged him with 15 separate incidents in

16    order for the *Chronicle* report to have been accurate. Opp. at 12. In fact, as demonstrated in the

17    exhibits attached to Cornell's Supplemental Request for Judicial Notice and supporting

18    declarations, the *Chronicle* report was entirely accurate. The Supplementary Investigative Report

19    from Plaintiff's police file states that Plaintiff's confession established him as the perpetrator of

20    four petit larcenies and one burglary. Supp. Req. for Jud. Not., Ex. F, pp. 19 & 23 (report), 30

21    (confession). That same report identifies Plaintiff as "in some way involved with" four additional

22    burglaries and six additional petit larcenies. Supp. Req. for Jud. Not., Ex. F, pp. 14, 15 & 23.

23    Simple arithmetic therefore demonstrates that the *Cornell Chronicle* accurately reported the results

24    of the police investigation.

25       Though the *Chronicle* report was entirely accurate, it need not have been, and it need not

26    have tracked the verbatim language of the Accusatory Instrument. Rather, the *Chronicle* article

27    need only have been fair and true. "Under California law, a newspaper report is fair and true if it

28    captures the substance, the gist, the sting of the libelous charge. The news need not track verbatim

DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

8085/21177-001
Current/10430794v

1  the underlying [criminal] proceeding." *Crane v. Arizona Republic*, 972 F.2d 1511, 1519 (9th Cir.

2  1992). In *Colt v. Freedom Communications*, 109 Cal. App. 4th 1551, 1559-1560 (2003), the court

3  affirmed the trial court's grant of an anti-SLAPP motion and noted: "Were we to accept plaintiffs'

4  arguments, we would require that newspapers be limited to word-for-word quotation from legal

5  documents. Of course, the law imposes no such requirement." The *Colt* court concluded its

6  opinion with a blunt analogy:

7          The situation [in this case] is analogous to that of an accused criminal
           who enters a plea of nolo contendere. His action for defamation
8          against a reporter of the details of the crime with which he was
           charged would fail. And this would be true even if the reporter noted
9          that he had been charged with attacking his victim with a tire iron
           when in reality it had been a ball-peen hammer.
10

11  *Id.* at 1561. Therefore, even if the *Chronicle*'s characterization of the charges against Plaintiff

12  were incorrect, Plaintiff's claim is inadequate because the *Chronicle* report was fair and true.

13  **D.    Plaintiff's Disingenuous Attempt to Salve His False Light Claim Should Be Rejected**

14          Plaintiff attempts to re-characterize his false light claim as a federal civil rights claim in

15  order to take advantage of federal tolling principles allegedly applicable in civil rights actions. *See*

16  Opp. at 7 (citing *Maldonado v. Harris*, 370 F.3d 945, 955 (9th Cir. 2004)). Plaintiff then invokes

17  the discovery rule and argues that his false light claim is not time-barred. *See* Opp. at 7 (citing *Two*

18  *Rivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). Plaintiff's argument is spurious and his cases

19  are distinguishable. Both cases, as well as the cases they cite regarding the statute of limitations

20  issue, concern claims under 42 U.S.C. § 1983. Plaintiff has not articulated a claim under this or

21  any other federal statute or constitutional provision.

22          Further, Plaintiff's attempt to make an end run around the single publication rule by relying

23  on a privacy claim rather than defamation also must fail. The single publication rule squarely

24  applies to invasion of privacy claims as well as libel. Cal. Civ. Code § 3425.3. "Where the

25  complaint is based on an offensive statement that is defamatory, plaintiffs have not been allowed to

26  circumvent [§3425.3] by proceeding on a theory other than defamation." *Long v. The Walt Disney*

27  *Co.*, 116 Cal. App. 4th 868, 873 (2004) (quoting *Fellows v. National Enquirer, Inc.*, 42 Cal.3d 234,

28  240 (1986)). For these reasons, Plaintiff's false light claim is insufficient and should be stricken.

8085/21177-001
Current/10430794v

9                                                              07cv2045
DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

EXHIBIT E,
Page 142

1  **E.    Cornell Has Conducted Itself Appropriately in This Litigation and Plaintiff's
2          Unfounded Accusations to the Contrary Should Be Disregarded**

3          Plaintiff accuses Cornell of underhanded litigation tactics. He claims that "[Cornell] has

4  surreptitiously obtained a copy of an Accusatory Instrument in this matter while aware it is part of

5  a sealed record . . . . The Defendant did so without a court order to release this sealed record and

6  then improperly filed it as part of the current record." Opp. at 12:11 – 12:13. As discussed in the

7  Declaration of Nelson E. Roth in Support of Supplemental Request for Judicial Notice ("Roth

8  Declaration"), the Accusatory Instruments attached to the Request for Judicial Notice – filed with

9  Cornell's Memorandum – were not sealed and Cornell obtained the record simply by directly

10 asking the Ithaca City Court for a copy. Roth Decl. ¶ 4. Moreover, Plaintiff did not oppose the

11 application to unseal the City Court's record's. Davidson Decl. ¶ 3, Ex. A, p. 11.

12         Further, Cornell has not "recently disseminated press releases regarding this case." Opp. at

13 3. In fact, Plaintiff has not disseminated, yet, any press releases regarding Plaintiff's case against

14 it. Moss Decl. ¶ 9. Even if this were a relevant issue – which it is not – Plaintiff does not cite

15 evidentiary support for his claim because there is none.

16                          **III.    CONCLUSION**

17         Because the anti-SLAPP statute applies, Plaintiff must demonstrate the legal and factual

18 sufficiency of his claims. Because he has failed to do so, the Court should Grant Cornell's Special

19 Motion to Strike and tax Cornell's costs and attorneys' fees to Plaintiff.

20

21 DATED: December 14, 2007                    NELSON E. ROTH
                                              CORNELL UNIVERSITY
22
                                              BERT H. DEIXLER
23                                            CHARLES S. SIMS
                                              CLIFFORD S. DAVIDSON
24                                            PROSKAUER ROSE LLP

25

26                                            /s  Bert H. Deixler
                                              ―――――――――――――――
                                                    Bert H. Deixler
27
                                              Attorneys for Defendant,
28                                            CORNELL UNIVERSITY

                                          10                           07cv2045
DEFENDANT'S REPLY IN FURTHER SUPPORT OF SPECIAL MOTION TO STRIKE

# EXHIBIT F

1  NELSON E. ROTH, SBN 67350
       ner3@cornell.edu
2  CORNELL UNIVERSITY
   300 CCC Building
3  Garden Avenue
   Ithaca, New York 14853-2601
4  Telephone:    (607)255-5124
   Facsimile:    (607)255-2794
5
   BERT H. DEIXLER, SBN 70614
6      bdeixler@proskauer.com
   CHARLES S. SIMS, New York Attorney Registration No. 1535640
7      admitted pro hac vice
       csims@proskauer.com
8  CLIFFORD S. DAVIDSON, SBN 246119
       cdavidson@proskauer.com
9  PROSKAUER ROSE LLP
   2049 Century Park East, 32nd Floor
10 Los Angeles, CA  90067-3206
   Telephone:    (310) 557-2900
11 Facsimile:    (310) 557-2193

12

13                  UNITED STATES DISTRICT COURT

14               SOUTHERN DISTRICT OF CALIFORNIA

15 KEVIN VANDGINDEREN,              )  Case No. 07-CV-2045-BTM-JMA
                                    )
16              Plaintiff,          )  Hon. Barry T. Moskowitz
                                    )
17        v.                        )  DECLARATION OF VALERIE
                                    )  CROSS DORN IN SUPPORT OF
18 CORNELL UNIVERSITY,              )  DEFENDANT'S REQUEST FOR
                                    )  JUDICIAL NOTICE IN SUPPORT
19              Defendant.          )  OF SPECIAL MOTION TO STRIKE
                                    )  PLAINTIFF'S COMPLAINT
20 ─────────────────────────────      PURSUANT TO SECTION 425.16
                                       OF THE CALIFORNIA CODE OF
21                                     CIVIL PROCEDURE

22                                    [Per chambers, no oral argument
                                      unless requested by the Court]
23
                                     [Special Motion to Strike and
24                                    Request for Judicial Notice filed
                                     concurrently]
25
                                     Hearing Date:  December 21, 2007
26                                   Time:          11:00 a.m.
                                     Place:         Courtroom 15
27
                                     Action Filed: October 1, 2007
28

────────────────────────────────────────────────────────────
   DECLARATION OF VALERIE CROSS DORN IN SUPPORT OF REQUEST FOR JUDICIAL
                              NOTICE

## DECLARATION OF VALERIE CROSS DORN

I, Valerie Cross Dorn, declare as follows:

    1.    I am an attorney admitted to practice before the courts of the State of New York, among others, and I serve as Associate University Counsel at Cornell University in Ithaca, New York. I have personal knowledge of the facts set forth herein through my position with Cornell University.

    2.    I submit this Declaration in support of the Defendant's Request for Judicial Notice in Support of Special Motion to Strike ("Request for Judicial Notice"). If called as a witness, I could and would testify competently to the following.

    3.    I am informed and believe that on September 3, 2007, the Cornell University Library received an e-mail from plaintiff Kevin Vanginderen ("Plaintiff") in which Plaintiff requested that the library remove the portion of the digitized *Cornell Chronicle* article, dated March 17, 1983, that describes charges against him for criminal activity on the Cornell campus. A true and correct copy of Plaintiff's September 3, 2007 e-mail received by the Library is attached as Exhibit C to the Request for Judicial Notice.

    4.    Upon the service of Plaintiff's Summons and Complaint on Cornell on October 3, 2007, my office filed an application in Ithaca City Court for an Order to Show Cause seeking the unsealing of plaintiff's records pursuant to New York Criminal Procedure Law section 160.50.

    5.    On October 15, 2007, I received a telephone call from the City Court Clerk's Office informing me that the records were not sealed and were available for pickup. I obtained those records on October 16, 2007. The records are attached as Exhibit A to the Request for Judicial Notice.

    6.    Also on October 15, the City Court Clerk informed me that the County Court of Tompkins County possesses sealed records relating to the criminal charges against Plaintiff. Because Plaintiff has refused to stipulate to unsealing any of his

1

1  criminal records, this office made an application to the County Court of Tompkins

2  County that resulted in an Order to Show Cause why the records should not be

3  unsealed, returnable on November 16, 2007.  A true and correct copy of the Order to

4  Show Cause issued by the County Court of Tompkins County with the moving

5  papers submitted in support thereof is attached to the Request for Judicial Notice as

6  Exhibit D.

7       7.    The additional criminal records will be provided to this Court if and

8  when they become available.

9       I declare under penalty of perjury under the laws of the State of California,

10  and the United States of America that the foregoing is true and correct

11  and that this declaration was executed this 31st day of October, 2007, at Ithaca,

12  New York.

13

14

15                                    Valerie Cross Dorn

16

17

18

19

20

21

22

23

24

25

26

27

28

2

DECLARATION OF VALERIE CROSS DORN

8085/21177-001
Current/10235491v1

**EXHIBIT G**

1  NELSON E. ROTH, SBN 67350
       ner3@cornell.edu
2  CORNELL UNIVERSITY
   300 CCC Building
3  Garden Avenue
   Ithaca, New York 14853-2601
4  Telephone:    (607)255-5124
   Facsimile:    (607)255-2794
5
   BERT H. DEIXLER, SBN 70614
6      bdeixler@proskauer.com
   CHARLES S. SIMS, New York Attorney Registration No. 1535640
7      admitted *pro hac vice*
       csims@proskauer.com
8  CLIFFORD S. DAVIDSON, SBN 246119
       cdavidson@proskauer.com
9  PROSKAUER ROSE LLP
   2049 Century Park East, 32nd Floor
10 Los Angeles, CA  90067-3206
   Telephone:    (310) 557-2900
11 Facsimile:    (310) 557-2193

12

13              UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15  KEVIN VANGINDEREN,                )  Case No. 07-CV-2045-BTM-JMA
                                      )
16           Plaintiff,               )  Hon. Barry T. Moskowitz
                                      )
17        v.                          )  DECLARATION OF NELSON E.
                                      )  ROTH IN SUPPORT OF
18  CORNELL UNIVERSITY,               )  CORNELL'S SUPPLEMENTAL
                                      )  REQUEST FOR JUDICIAL
19           Defendant.               )  NOTICE IN SUPPORT OF
                                      )  SPECIAL MOTION TO STRIKE
20                                       PLAINTIFF'S COMPLAINT
                                         PURSUANT TO SECTION 425.16
21                                       OF THE CALIFORNIA CODE OF
                                         CIVIL PROCEDURE
22
                                         [Per chambers, no oral argument
23                                       unless requested by the Court]

24                                       Hearing Date:  December 21, 2007
                                         Time:          11:00 a.m.
25                                       Place:         Courtroom 15

26                                       Action Filed: October 1, 2007

27

28
_____
     DECLARATION OF NELSON E. ROTH IN SUPPORT OF SUPPLEMENTAL
               REQUEST FOR JUDICIAL NOTICE

## DECLARATION OF NELSON E. ROTH

I, Nelson E. Roth, declare as follows:

1.     I am an attorney admitted to practice in California and the United States District Court for the Southern District of California, as well as before the courts of the State of New York, among others, and I serve as Deputy University Counsel at Cornell University.  I am also thoroughly familiar with New York criminal law and procedure, having taught criminal law at the Cornell Law School for approximately 10 years and having served as a New York State Special Prosecutor and Deputy Attorney General from 1993 to 1997.  Except as otherwise noted, I have personal knowledge of the facts set forth herein.

2.     I submit this Declaration in reply to Plaintiff's opposition papers and in further support of the Defendant's Request for Judicial Notice in Support of Special Motion to Strike ("Request for Judicial Notice").  If called as a witness, I could and would testify competently to the following.

3.     With respect to criminal charges brought against Plaintiff in the City Court of the City of Ithaca, New York, in 1983, Plaintiff states at paragraph 6 of his November 20, 2007 affidavit that "the entire record was sealed" in 1985.  This is erroneous.  While my September 19, 2007 e-mail to Plaintiff, attached as Exhibit 5 to Plaintiff's opposition papers, did indicate my belief that Plaintiff's criminal records were sealed, I subsequently learned from the Ithaca City Court that records of the proceedings before the Ithaca City Court relating to Plaintiff were, in fact, never sealed.  My prior belief that the records were sealed was based on the fact that the records of the Cornell University Police were marked sealed.  Only after Plaintiff refused to consent to unseal his criminal records and Cornell was required to submit an application to Ithaca City Court seeking to unseal the records did I learn that there were proceedings involving Plaintiff in two courts, that the proceedings in Ithaca City Court were not sealed, and that the proceedings before a Tompkins County Grand Jury and the Tompkins County Court, including the

1

DECLARATION OF NELSON E. ROTH IN SUPPORT OF SUPPLEMENTAL
REQUEST FOR JUDICIAL NOTICE

1  investigative file of the Cornell University Police and the prosecution file of the

2  Tompkins County District Attorney, were sealed pursuant to a Seal Order entered by

3  the Tompkins County Court on March 5, 1985.

4      4.    Cornell University obtained the records of the Ithaca City Court

5  (previously filed as Exhibit A to the Request for Judicial Notice) directly from the

6  Ithaca City Court on October 16, 2007 after that court determined that its records

7  were not sealed.

8      5.    Contemporaneously with the filing of this Declaration, Cornell

9  University is filing a Supplemental Request for Judicial Notice with pertinent

10  documents unsealed pursuant to a November 16, 2007 order of the Tompkins

11  County Court granting Cornell's application to unseal records.  A true and correct

12  copy of that unsealing order is attached to the Supplemental Request for Judicial

13  Notice as Exhibit E .

14      6.    True and correct copies of pertinent records unsealed on November 16,

15  2007 are attached collectively to the Request for Judicial Notice as Exhibit F.

16      7.    The now-unsealed records, and those previously filed by Cornell in this

17  matter, reflect the following chronology of events:

18
19      March 5, 1983 – While investigating reported thefts in Fernow Hall on
        the Cornell University campus, Cornell Police obtained the student
20      identification number of a student who sold some of the stolen books to
        a local bookstore, matched that student identification number to a
21      Cornell student named Kevin Vanginderen, and verified identification
        with a book store clerk using a photo array.  Supp. Req. Jud. Not., Ex.
22      F, pp. 5-24.
23
24      March 8, 1983 – Plaintiff confessed under oath to multiple burglaries
        and larcenies that spanned a period of approximately one year prior to
25      Plaintiff's arrest.  Multiple items of stolen property were recovered
        from Plaintiff's residence.  Plaintiff was charged the same date in
26      Ithaca City Court with Burglary 3rd Degree, a felony.  Supp. Req. Jud.
        Not., Ex. F, pp. 25-26 & 29-36.
27
28

2

DECLARATION OF NELSON E. ROTH IN SUPPORT OF SUPPLEMENTAL
REQUEST FOR JUDICIAL NOTICE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

June 7, 1983 – Tompkins County Grand Jury indicted Plaintiff for two counts of Burglary in the 2nd Degree.  Supp. Req. Jud. Not., Ex. F, p. 69.

August 1, 1983 – Tompkins County Court dismissed indictment "as defective" and gave The People permission to refile.  Apparently the indictment mistakenly charged Burglary in the 2nd Degree instead of the proper charge of Burglary in the 3rd Degree.  *See* Supp. Req. Jud. Not., Ex. F, pp. 90 & 92-93.

August 16, 1983 – Plaintiff's attorney confirmed a negotiated plea whereby the District Attorney agreed not to refile felony charge and to accept a plea to petit larceny in full satisfaction of any charges relative to the thefts at Cornell University.  The People consented to a sentence of a one-year conditional discharge.  As part of the disposition, Plaintiff returned all stolen property still in his possession. Req. Jud. Not., Ex. A, p.6.

August 17, 1983 –  An Accusatory Instrument was signed charging Plaintiff with Petit Larceny, a Class A Misdemeanor.  Req. Jud. Not., Ex. A, p. 7.

August 22, 1983 – The record of disposition in the Ithaca City Court reflects that Plaintiff pled guilty to the charge in satisfaction of the charge of Burglary 3rd Degree.  Req. Jud. Not., Ex. A, p. 8.

March 5, 1985 – Tompkins County Court issued an order sealing records of the Cornell Police, the District Attorney, the New York State Division of Criminal Justice Services, the Tompkins County Sheriff, and the FBI <u>relating to the June 7, 1983 indictment charging Burglary in the 2nd Degree</u> (Tompkins County Indictment No. 83-46).  The order did not seal the records of the Ithaca City Court regarding the proceedings that occurred in that court (including the original charge of Burglary in the 3rd Degree) and the cover letter from the Office of Supreme and County Court Clerks that accompanied the seal order explicitly crossed out the reference to the Ithaca City Court from the list of addressees.  Supp. Req. Jud. Not., Ex. F, pp. 94-95.

October 16, 2007 – Ithaca City Court released copies of the records of the proceedings before that court to Cornell University.  Those records

3

DECLARATION OF NELSON E. ROTH IN SUPPORT OF SUPPLEMENTAL
REQUEST FOR JUDICIAL NOTICE

1      were never sealed.  Req. Jud. Not., Ex. A; Decl. of Valerie Cross Dorn
2      ¶ 5.

3      November 16, 2007 – The Tompkins County Court ordered the
4      unsealing of the records of the Cornell University Police and the
       Tompkins County District Attorney pertaining to the proceedings held
5      in that court.  Supp. Req. Jud. Not., Ex. E, pp. 3-4.

6
7      8.      Thus the records show that, because the felony charges brought in

Tompkins County Court were dismissed, the records from that court were sealed.
8
       However, the seal order did not purport to seal the records of the proceedings held in
9
       the Ithaca City Court, either those before Plaintiff's indictment on felony charges, or
10
       those relating to his subsequent negotiated guilty plea to a Class A Misdemeanor.
11
       They further show that Plaintiff stands convicted in the State of New York of the
12
       crime of petit larceny based upon the plea of guilty he entered to satisfy the charge
13
       of Burglary in the 3rd Degree.  The records reflecting the original charge of Burglary
14
       in the 3rd Degree and his conviction of petit larceny are public records and, on
15
       information and belief, have never been sealed.
16
            I declare under penalty of perjury under the laws of the State of New York,
17
       California, and the United States of America that the foregoing is true and correct
18
       and that this declaration was executed this 12th day of December, 2007, at Ithaca,
19
       New York.
20
21
22                                                        _____
23                                                        Nelson E. Roth
24
25
26
27
28
                                          4
       DECLARATION OF NELSON E. ROTH IN SUPPORT OF SUPPLEMENTAL
                   REQUEST FOR JUDICIAL NOTICE